## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF NORTH CAROLINA
## GREENVILLE DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | **Case No. 19-1697-5-JNC** |
| **CAH ACQUISITION COMPANY 12, LLC, d/b/a** | ) | |
| **FAIRFAX COMMUNITY HOSPITAL,** | ) | **Chapter 11** |
| | ) | |
| Debtor. | ) | |
| | ) | |

## MOTION TO EMPLOY GRANT THORNTON LLP
## AS FINANCIAL CONSULTANT FOR THE TRUSTEE

Thomas W. Waldrep, Jr., trustee in the above-captioned case (the "Trustee"), hereby moves for the entry of an Order pursuant to Section 327(a) of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") and Rule 2014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") authorizing the employment of the firm of Grant Thornton LLP ("Grant Thornton") to provide financial advisory services and related information management services to the Trustee, effective as of March 17, 2019.  In support of this Motion, the Trustee refers to and relies upon the *Affidavit of Scott B. Davis in Support of Motion to Employ Grant Thornton LLP as Financial Consultant for the Trustee* (the "Davis Affidavit"), attached hereto as **Exhibit A**, and respectfully states as follows:

### JURISDICTION AND VENUE

1.      This United States Bankruptcy Court for the Eastern District of North Carolina (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, and this matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

2.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory predicates for the relief requested herein are Section 327(a) of the Bankruptcy Code and Bankruptcy Rule 2014.

1

## FACTUAL BACKGROUND

4.    An involuntary Chapter 7 petition was filed against CAH Acquisition Company #1, LLC ("CAH 1") on February 19, 2019.  Thomas W. Waldrep, Jr. was appointed as Trustee on February 22, 2019.

5.    On March 15, 2019, the Court entered an Order converting CAH 1's involuntary Chapter 7 case to a Chapter 11 case and appointing Thomas W. Waldrep, Jr. as Trustee of the Chapter 11 estate.

6.    On March 17, 2019, CAH Acquisition Company #2, LLC ("CAH 2") filed a petition for relief under Chapter 11 of the United States Bankruptcy Code. Thomas W. Waldrep, Jr. was appointed as Chapter 11 Trustee on March 18, 2019.

7.    On March 14, 2019, CAH Acquisition Company #3, LLC ("CAH 3") filed a petition for relief under Chapter 11 of the United States Bankruptcy Code. Thomas W. Waldrep, Jr. was appointed as Chapter 11 Trustee on March 15, 2019.

8.    On March 17, 2019, CAH Acquisition Company #4, Inc. ("CAH 4") filed a petition for relief under Chapter 11 of the United States Bankruptcy Code. Thomas W. Waldrep, Jr. was appointed as Chapter 11 Trustee on March 18, 2019.

9.    On March 21, 2019, CAH Acquisition Company 6, LLC ("CAH 6") filed a petition for relief under Chapter 11 of the United States Bankruptcy Code.  Thomas W. Waldrep, Jr. was appointed as Chapter 11 Trustee on March 29, 2019.

10.    On March 21, 2019, CAH Acquisition Company 7, LLC ("CAH 7") filed a petition for relief under Chapter 11 of the United States Bankruptcy Code.  Thomas W. Waldrep, Jr. was appointed as Chapter 11 Trustee on March 29, 2019.

11.    On March 17, 2019, CAH Acquisition Company 12, LLC ("CAH 12" or "Debtor")

filed a petition for relief under Chapter 11 of the United States Bankruptcy Code. Thomas W. Waldrep, Jr. was appointed as Chapter 11 Trustee on March 18, 2019.

12. On March 29, 2019, the Court entered an Order dismissing CAH 12's Chapter 11 case. CAH 12 subsequently filed a petition for relief under Chapter 11 of the United States Bankruptcy Code in the Northern District of Oklahoma on April 1, 2019.

13. On April 15, 2019, the Court entered an Order transferring CAH 12's Chapter 11 case from the Northern District of Oklahoma to the Eastern District of North Carolina. On April 15, 2019, the Court also entered an Order appointing Thomas W. Waldrep, Jr. as Chapter 11 Trustee.

14. On March 17, 2019, CAH Acquisition Company 16, LLC ("CAH 16") filed a petition for relief under Chapter 11 of the United States Bankruptcy Code. Thomas W. Waldrep, Jr. was appointed as Chapter 11 Trustee on March 18, 2019.

**RELIEF REQUESTED**

15. Pursuant to Section 327(a) of the Bankruptcy Code and Bankruptcy Rule 2014, the Trustee requests the Court enter an Order: (i) authorizing the employment and retention of Grant Thornton as financial consultant for the Trustee in the instant case pursuant to the terms and conditions of that certain engagement letter dated April 11, 2019 by and between the Trustee and Grant Thornton (the "Engagement Letter"), attached hereto as **Exhibit B**; (ii) approving the terms of Grant Thornton's employment, including the proposed fee structure set forth in the Engagement Letter; (iii) authorizing the Trustee on behalf of the Debtors to enter into a Business Associate Agreement for Health Care Providers (a "BAA") with Grant Thornton, the form of which is attached to the Engagement Letter; and (iv) granting such other and further relief as the Court deems appropriate. The Trustee requests that Grant Thornton's employment be deemed effective as of

3

March 17, 2019.

### A.   Selection of Grant Thornton

16.     The Trustee seeks to retain Grant Thornton as financial consultant because of its extensive expertise in the financial and reporting aspects of a Chapter 11 proceeding, specifically one dealing with a healthcare debtor.

17.     Grant Thornton is a national accounting and consulting firm that has significant experience in corporate restructurings, operations improvement, litigation analytics, valuations, and bankruptcy case management services.  Grant Thornton has extensive experience working with and for distressed companies in complex financial and operational restructurings, both out-of-court and in Chapter 11 proceedings throughout the United States.  Scott B. Davis, the lead Grant Thornton partner in this engagement, has provided a full range of restructuring services throughout the United States to underperforming healthcare debtors in financially-troubled situations.  Mr. Davis has extensive experience in interim management and debtor advisory work; bankruptcy preparation and management; litigation support; post-merger integration and debt restructuring and refinancing.

18.     For the foregoing reasons, the Trustee believes that Grant Thornton is both well qualified and able to assist the Trustee in this Chapter 11 proceeding in an efficient and timely manner.

### B.   Scope of Services to Be Rendered

19.     Grant Thornton's services are necessary and essential to enable the Trustee to faithfully fulfill his duties as Trustee.  Mr. Davis is the principal professional responsible for the engagement and is supported by other experienced Grant Thornton professionals.  Additional Grant Thornton staff are available and will be deployed as necessary to serve the Trustee during this Chapter 11 case pursuant to the terms of the Engagement Letter.

20.     Working under the direction of the Trustee and collaboratively with the Trustee's counsel and other professionals, Grant Thornton will provide the following services:

a)     Analyze the Debtor's financial position, business plans, and financial projections prepared by management including, but not limited to, commenting on assumptions and comparing those assumptions to historical Debtor and industry trends;

b)     Consult with the Trustee on the assessment of a bankruptcy exit strategy;

c)     Consult with the Trustee in connection with the development of financial projections;

d)     Assist the Trustee with its communications with patients, suppliers, statutory committees, and other parties-in-interest;

e)     Analyze the Debtor's rolling 13-week cash receipts and disbursements forecast and assess liquidity and DIP financing needs;

f)     Consult with the Trustee regarding their valuation of the Debtor on a going-concern and liquidation basis;

g)     Consult with the Trustee, in coordination with legal counsel, in the preparation of a disclosure statement, plan of reorganization and the underlying business plans from which those documents are developed;

h)     Assist the Trustee, in coordination with legal counsel, in evaluating competing disclosure statements, plans and other strategic proposals made by the Committee of Unsecured Creditors or other interested parties in this Chapter 11 case;

i)     Assist the Trustee in responding to information requests submitted by statutory committees and their legal and/or financial counsel;

j)     Assist the Trustee with its vendor management program;

k)     Consult with the Trustee regarding the preparation of required financial statements, schedules of financial affairs, monthly operating reports, and any other financial disclosures required by the Court;

l)     Provide expert advice and testimony regarding financial matters related to, including, among other things, the feasibility of any proposed plan of reorganization, and the valuation of any securities issued in connection with any such plan;

m)     Analyze the Debtor's Information Technology ("IT") infrastructure, storage media, and third-party systems;

5

n)      Consult with the Trustee on the assessment of Debtor's IT systems;

o)      Consult with the Trustee in connection with the development of data-preservation and data-collection efforts described in the Statement of Work dated April 11, 2019;

p)      Provide digital forensic and related services (including, but not limited to, forensic preservation and collection of electronic data), to be performed at the direction of the Trustee;

q)      Assist the Trustee with its communications with third-party IT providers and other parties-in-interest;

r)      Assist the Trustee in responding to information requests submitted by statutory committees and their legal and/or financial counsel; and

s)      Provide additional services as requested from time to time by the Trustee and agreed to by Grant Thornton.

## C.      **Professional Fees and Expenses**

21.     Pursuant to the terms and conditions of the Engagement Letter, Grant Thornton has agreed to accept payment for services provided to the Trustee, in this case at about 73% of its standard rates.  A copy of the Engagement Letter is attached hereto as **Exhibit B**.

22.     The fee schedule setting forth Grant Thornton's standard rates and the applicable discounted rates is included in the Engagement Letter and may be summarized as follows:

| Classification | Standard Hourly Rates | Discounted Hourly Rates |
| --- | --- | --- |
| Partner / Principal | $870 | $620 |
| Managing Director | $800 | $620 |
| Director | $710 | $500 |
| Senior Manager | $710 | $500 |
| Manager | $590 | $450 |
| Senior Associate | $450 | $310 |
| Associate | $320 | $250 |

23.     In addition, Grant Thornton's fees for certain forensic technology services, which fees are set forth in more detail in Attachment B to the Statement of Work dated April 11, 2019, may be summarized as follows:

**Database Fees**

6

| Standard Database Set-Up | $2,250 per database |
|---|---|
| Standard Database Hosting | $750 per month |
| Encrypted Database Set-up & Hosting | $4,500 per month per database |
| Database Archiving | $250 per month per database |

**Data Visualization Fees**

| Visualization Server Site Set-up | $2,500 per site |
|---|---|
| Visualization User Licensure | $500 per user, per month |

**Evidence Collection Fees**

| Forensic Imaging | $800 – $1,250 per Device/Drive (up to 2 TB) |
|---|---|
| Server Share Logical Image | $1,000 – $1,200 per Server Share |
| Backup Tape File Listing | $150 – $200 per Backup Tape |
| Backup Tape Data Extraction | $250 – $300 per Backup Tape |

**Data Processing**

| Processing Set-Up | $500 per Logical Unit |
|---|---|
| Processing & Review Promotion | $75 – $150 per GB |
| Optical Character Recognition | $35 per GB |
| Load File Creation | $150 per GB |
| Machine Translation | $0.12 – $0.15 per file |
| Load File Ingestion | $125 per GB |

**Data Analytics, Hosting, and Review**

| Document Imaging | No unit-based charge |
|---|---|
| Conceptual Analytics / Assisted Review | $200 per GB |
| User Licensing | $100 per user per month |
| Offline Hosting | $5 per GB per month |
| Data Hosting | $10 – $35 per GB per month |

24.     Grant Thornton also will seek reimbursement of all necessary out-of-pocket business expenses incurred in connection with this matter and a six percent administrative charge to cover administrative overhead.

25.     Grant Thornton intends to apply to the Court for the payment of compensation for services rendered and reimbursement of actual and necessary out-of-pocket expenses in accordance with applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules of this Court.

26.     As described more fully in the Davis Affidavit in support of this Motion, the terms

of compensation reflected in the attached Engagement Letter are consistent with, and typical of, engagements entered by Grant Thornton and other financial consultants when rendering financial consulting services for clients similar to the Trustee, both inside and outside of bankruptcy. The terms of the Engagement Letter were negotiated between the Trustee and Grant Thornton and reflect the work to be performed by Grant Thornton in this Chapter 11 case and the firm's expertise.

27.     Grant Thornton has agreed to accept as compensation such sums as may be allowed by the Court on the basis of the professional time spent, the rates charged for such services, the necessity of such services to the administration of the estate, the reasonableness of the time within which the services were performed in relation to the results achieved, and the complexity, importance, and nature of the problems, issues, or tasks addressed in the case. Grant Thornton has prepared the Davis Affidavit, which discloses the information relevant to this Motion pursuant to Bankruptcy Rules 2014 and 2016. The Davis Affidavit is attached hereto as **Exhibit A**.

### D.     <u>Disinterestedness of Professionals</u>

28.     To the best of the Trustee's knowledge, information, and belief, based on and except as set forth in the Davis Affidavit, Grant Thornton does not hold or represent any interest adverse to the Trustee or the Debtor, its creditors, or other parties-in-interest in connection with the Trustee, the Debtor, and this Chapter 11 case, and is a "disinterested person" as that term is defined by Bankruptcy Code Section 101(14), as modified by Bankruptcy Code Section 1107(b). More specifically, as set forth in the Davis Affidavit, Grant Thornton, its members, and its employees:

a)     are not creditors, equity security holders, or insiders of the Trustee or the Debtor;

b)     are not and were not, within 2 years before the date of the filing of the Debtor's Chapter 11 petitions, directors, officers, or employees of the Trustee or the Debtor; and

c) do not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the Debtor, or for any other reason.

29. Based on and as set forth in the Davis Affidavit, Grant Thornton informed the Trustee that Grant Thornton has assessed, and will continue to assess, any and all client relationships to ensure that Grant Thornton does not represent any interests adverse to the Trustee or the Debtor, its creditors, or other parties-in-interest and that no disqualifying circumstances exist, and further, that Grant Thornton shall disclose on an ongoing basis any relationship that may reflect upon Grant Thornton's disinterestedness. The Trustee understands that to the extent Grant Thornton discovers any additional facts bearing upon matters described herein or its engagement by the Trustee during the period of its employment, Grant Thornton promptly will disclose such facts and supplement the information contained in this Motion and the Davis Affidavit.

30. Grant Thornton has not been retained to assist any entity or person other than the Trustee on matters relating to, or in connection with, the Trustee and this Chapter 11 case. If this Court approves the proposed retention and employment of Grant Thornton by the Trustee, Grant Thornton will not accept any engagement or perform any service for any entity or person other than the Trustee related to this Chapter 11 case. Grant Thornton will, however, continue to provide professional services to, and engage in commercial or professional relationships with, entities or persons that may be creditors of the Debtor or parties-in-interest in this Chapter 11 case; *provided, however*, that such services do not relate to, or have any connection with, the Debtor and this Chapter 11 case.

31. The Trustee has been advised that Grant Thornton will not share any compensation to be paid on behalf of the Trustee in connection with services to be performed with any other person or entity, other than other professionals of Grant Thornton, to the extent required by

Bankruptcy Code Section 504.

## CONCLUSION

WHEREFORE, the Trustee requests that this Court enter an Order (i) authorizing the employment and retention of Grant Thornton as financial consultant for the Trustee in this case pursuant to the terms and conditions of the Engagement Letter, effective as of March 17, 2019; (ii) approving the terms of Grant Thornton's employment, including the proposed fee structure set forth in the Engagement Letter; (iii) authorizing the Trustee on behalf of the Debtors to enter into a Business Associate Agreement for Health Care Providers (a "BAA") with Grant Thornton, the form of which is attached to the Engagement Letter; and (iv) granting such other and further relief as the Court deems appropriate.

Respectfully submitted, this the 24th day of April, 2019.

**WALDREP LLP**

/s/ *Thomas W. Waldrep, Jr.*
Thomas W. Waldrep, Jr. (N.C. State Bar No. 11135)
James C. Lanik (N.C. State Bar No. 30454)
Jennifer B. Lyday (N.C. State Bar No. 39871)
Francisco T. Morales (N.C. State Bar No. 43079)
John R. Van Swearingen (N.C. State Bar No. 53646)
101 S. Stratford Road, Suite 210
Winston-Salem, NC 27104
Telephone: 336-717-1440
Telefax: 336-717-1340
Email: notice@waldrepllp.com

# EXHIBIT A

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NORTH CAROLINA**
**GREENVILLE DIVISION**

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | **Case No. 19-1697-5-JNC** |
| **CAH ACQUISITION COMPANY 12, LLC, d/b/a** | ) | |
| **FAIRFAX COMMUNITY HOSPITAL,** | ) | **Chapter 11** |
| | ) | |
| Debtor. | ) | |
| | ) | |

### AFFIDAVIT OF SCOTT B. DAVIS IN SUPPORT OF MOTION TO EMPLOY GRANT THORNTON LLP AS FINANCIAL CONSULTANT FOR THE TRUSTEE

I, Scott B. Davis, do solemnly depose and declare as follows:

1.     I am a Partner at Grant Thornton LLP ("Grant Thornton"), with offices located at 201 S. College St., Charlotte, NC 28244. I specialize in corporate restructuring and financial advisory services to financially troubled organizations, specifically in the healthcare and not-for-profit sectors.  Grant Thornton is the United States member firm of Grant Thornton International. Grant Thornton is a firm of independent public accountants as defined under the Code of Professional Conduct of the American Institute of Certified Public Accountants and Consultants.

2.     I am fully familiar with the facts hereinafter and submit this affidavit (the "Affidavit") in connection with the *Motion to Employ Grant Thornton LLP as Financial Consultant for the Trustee* (the "Motion") pursuant to Section 327(a) of the Bankruptcy Code and Rules 2014 and 2016 of the Federal Rules of Bankruptcy Procedure.

3.     To the extent that any information disclosed herein requires amendment or modification upon Grant Thornton's receipt of additional information or as additional information becomes available, a supplemental affidavit will be submitted to the Court.

### Professional Fees and Expenses

4.     Pursuant to the terms and conditions of that certain engagement letter dated April

1

11, 2019 by and between the Trustee and Grant Thornton (the "Engagement Letter"), Grant Thornton has agreed to accept payment for services provided to the Trustee, in this case at about 73% of its standard rates.  A copy of the Engagement Letter is attached to the Motion as **Exhibit B**.

5.      The fee schedule setting forth Grant Thornton's standard rates and the applicable discounted rates is included in the Engagement Letter and may be summarized as follows:

| Classification | Standard Hourly Rates | Discounted Hourly Rates |
|---|---|---|
| Partner / Principal | $870 | $620 |
| Managing Director | $800 | $620 |
| Director | $710 | $500 |
| Senior Manager | $710 | $500 |
| Manager | $590 | $450 |
| Senior Associate | $450 | $310 |
| Associate | $320 | $250 |

6.      In addition, Grant Thornton's fees for certain forensic technology services, which fees are set forth in more detail in Attachment B to the Statement of Work dated April 11, 2019, may be summarized as follows:

| **Database Fees** | |
|---|---|
| Standard Database Set-Up | $2,250 per database |
| Standard Database Hosting | $750 per month |
| Encrypted Database Set-up & Hosting | $4,500 per month per database |
| Database Archiving | $250 per month per database |

| **Data Visualization Fees** | |
|---|---|
| Visualization Server Site Set-up | $2,500 per site |
| Visualization User Licensure | $500 per user, per month |

| **Evidence Collection Fees** | |
|---|---|
| Forensic Imaging | $800 – $1,250 per Device/Drive (up to 2 TB) |
| Server Share Logical Image | $1,000 – $1,200 per Server Share |
| Backup Tape File Listing | $150 – $200 per Backup Tape |
| Backup Tape Data Extraction | $250 – $300 per Backup Tape |

| **Data Processing** | |
|---|---|
| Processing Set-Up | $500 per Logical Unit |

| | |
|---|---|
| Processing & Review Promotion | $75 – $150 per GB |
| Optical Character Recognition | $35 per GB |
| Load File Creation | $150 per GB |
| Machine Translation | $0.12 – $0.15 per file |
| Load File Ingestion | $125 per GB |

**Data Analytics, Hosting, and Review**

| | |
|---|---|
| Document Imaging | No unit-based charge |
| Conceptual Analytics / Assisted Review | $200 per GB |
| User Licensing | $100 per user per month |
| Offline Hosting | $5 per GB per month |
| Data Hosting | $10 – $35 per GB per month |

7.      The Trustee also has agreed to reimburse Grant Thornton for all actual and necessary out-of-pocket business expenses incurred in connection with this matter.

8.      These rates are set at a level designed to fairly compensate Grant Thornton for the work of its financial advisors.  After conducting certain diligence in connection with reasonable compensation that Grant Thornton could request for the provision of its services in this Chapter 11 case, upon information and belief, the terms of the Engagement Letter are similar to the terms, both financial and otherwise, agreed to by Grant Thornton and other financial consultancy firms, both inside and outside of bankruptcy.  Moreover, the terms of the Engagement Letter were negotiated between the Trustee and Grant Thornton and reflect the work to be performed by Grant Thornton in this Chapter 11 case and the firm's financial consultancy expertise.

9.      Grant Thornton intends to apply to the Court for payment of compensation for services rendered and reimbursement of actual and necessary out-of-pocket business expenses and an administrative charge of six percent, in accordance with applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules and orders of this Court.  Grant Thornton has agreed to accept as compensation such sums as may be allowed by the Court on the basis of the professional time spent, the rates charged for such services, the necessity of such services to the administration of the estate, the reasonableness of the time within which the services were

3

performed in relation to the results achieved, and the complexity, importance, and nature of the problems, issues, or tasks addressed in the case.

10.     No compensation has been received by Grant Thornton from the Trustee or any other person on said account.

11.     Grant Thornton has agreed not to share (a) any compensation that it may receive with another party or person, other than members of the firm itself or (b) any compensation that another person or party has received.

### Grant Thornton's Conflict Check System

12.     A search of the client databases and other relevant databases of Grant Thornton was performed to identify any connections or relationships with the entities with which the Trustee or the Debtor has material relationships as identified by the Trustee.  Such analysis consisted of a review of contacts with the Trustee, the Debtor, and entities holding claims or interests in the Debtor that were made reasonably known to Grant Thornton by the Trustee.  A list of the parties reviewed is reflected in Schedule 1 to this Affidavit.  Grant Thornton's review included conducting a query of such parties in databases containing the names of individuals and entities that are current or former clients of Grant Thornton or who have other relationships with Grant Thornton. Additionally, Grant Thornton included potential judges and bankruptcy administrators in the search process.  A summary of the relationships that Grant Thornton identified during this process is set forth in Schedule 2 hereto.

13.     Grant Thornton has provided or could reasonably be expected to continue to provide services unrelated to this Chapter 11 case for the various entities shown on Schedule 2. Grant Thornton's assistance to these parties has been related to providing various financial, litigation support, business consulting, or tax services.  To the best of my knowledge, no services

4

have been provided to these parties in interest that involve their rights in this Chapter 11 case, nor does Grant Thornton's involvement in this case compromise its ability to continue such consulting services.

14.     In addition, as part of its diverse practice, Grant Thornton appears in numerous cases and court proceedings and participates in transactions that involve many different professionals, including attorneys, accountants, investment banks, and financial consultants who may represent claimants and parties in interest in this Chapter 11 case.  Further, Grant Thornton has performed in the past, and may perform in the future, advisory and consulting services for various attorneys and law firms and has been represented by various attorneys and law firms, some of whom may be involved in these proceedings.  Based on our current knowledge of the professionals involved, and to the best of my knowledge, none of these relationships creates an interest materially adverse to the Trustee or the Debtor in matters upon which Grant Thornton is to be employed, and none are in connection with the Trustee, the Debtor, or this case.

### Disinterestedness of Grant Thornton

15.     To the best of my knowledge, and based on the results of the conflicts search described above, Grant Thornton is a "disinterested person" within the meaning of Section 101(14) of the Bankruptcy Code (as supplemented by Section 1107(b) of the Bankruptcy Code), in that, except as otherwise set forth herein, Grant Thornton and its professionals:

a)     are not creditors, equity security holders, or insiders of the Trustee or the Debtor;

b)     are not and were not, within 2 years before the date of the filing of the Debtor's Chapter 11 petition, directors, officers, or employees of the Trustee or the Debtor; and

c)     do not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the Debtor, or for any other reason.

16.     In addition, to the best of my knowledge and based upon the results of the conflicts search described above, other than as described herein, neither I, Grant Thornton, nor any member or associate thereof, holds or represents an interest adverse to the Trustee, the Debtor, or the Debtor's estate.

17.     If any new material, relevant facts or relationships are discovered or arise, Grant Thornton promptly will file a supplemental affidavit pursuant to Bankruptcy Rule 2014(a).

18.     Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed this 24th day of April, 2019.

> */s/ Scott B. Davis*
> Scott B. Davis
> Partner
> Grant Thornton, LLP
> 201 S. College Street, Suite 2500
> Charlotte, NC 28244
> T +1 704 632 3540
> F +1 704 334 7701
> scott.davis@us.gt.com

## Schedule 1

| |
|---|
| 3M |
| Affiliated Medical Services |
| Airgas Mid South, Inc. |
| Alere North America, Inc. |
| American Esoteric Laboratory (AEL) |
| American Red Cross Blood Services |
| Ameripride |
| Amerisource Bergen Drug Corp |
| Anesthesia Dynamics |
| Anthem Blue Cross Life and Health Insurance Company |
| Anthem Health Plans of Kentucky, Inc. doing business as Anthem Blue Cross and Blue Shield |
| Anthem Health Plans of Maine, Inc. doing business as Anthem Blue Cross and Blue Shield |
| Anthem Health Plans of New Hampshire, Inc. doing business as Anthem Blue Cross and Blue Shield |
| Anthem Health Plans of Virginia, Inc. doing business as Anthem Blue Cross and Blue Shield |
| Anthem Health Plans, Inc. doing business as Anthem Blue Cross and Blue Shield |
| Anthem Insurance Companies, Inc. doing business as Anthem Blue Cross and Blue Shield |
| Arjo, INC. |
| Arnett Carbis Toothman, LLP |
| Assistant United Stated Trustee Jordan Sickman |
| AT&T |
| Attorney General, State of Missouri |
| Baker Donelson Bearman Caldwell & Berkowitz, PC |
| Bank of Hays |
| BC Technical |
| BCBSM Inc. doing business as BlueCross BlueShield of Minnesota |
| Beckman Coutler, Inc. |
| Bio rad Laboratories inc. |
| Bioventus |
| Blue Cross and Blue Shield of Georgia, Inc. |
| Blue Cross Blue Shield Healthcare Plan of Georgia, Inc. |
| Blue Cross Blue Shield of Michigan Mutual Insurance Company |
| Blue Cross Blue Shield of Wisconsin doing business as Anthem Blue Cross and Blue Shield |
| Blue Cross of California, Inc. doing business as Anthem Blue Cross |
| Boyce & Bynum Pathology Lab |
| Brett King |
| Brown County Treasurer |
| CAH Acquisition Company #1, LLC a Delaware Limited Liability Company doing business as Washington County Hospital |
| CAH Acquisition Company #10, LLC |

CAH Acquisition Company #11, LLC a Delaware Limited Liability Company doing business as Lauderdale Community Hospital

CAH Acquisition Company #12, LLC a Delaware Limited Liability Company doing business as Fairfax Community Hospital

CAH Acquisition Company #2, LLC a Delaware Limited Liability Company doing business as Oswego Community Hospital

CAH Acquisition Company #3, LLC a Delaware Limited Liability Company doing business as Horton Community Hospital

CAH Acquisition Company #4, Inc. an Oklahoma Corporation doing business as Drumright Regional Hospital

CAH Acquisition Company #5, LLC a Delaware Limited Liability Company doing business as Hillsboro Community Hospital

CAH Acquisition Company #6, LLC a Delaware Limited Liability Company doing business as I-70 Community Hospital

CAH Acquisition Company #7, LLC a Delaware Limited Liability Company doing business as Prague Community Hospital

CAH Acquisition Company #9, LLC

CAH Acquisition Company 16, LLC a Delaware Limited Liability Company doing business as Haskell County Community Hospital

Cardinal Health - Pharm

Cardinal Health 411, Inc.

Cardinal Health Nuclear Pharm

Carefusion Solutions, LLC

Castle Medical, LLC

Cayenne Medical, Inc.

Cerner Corporation

Charles E. Cartwright

Cigna Health and Life Insurance Company

Cigna Healthcare

Cindi A Sims - Saline County Collec

City Hillsboro, Kansas

City of Drumright

City of Prague

Community Blood Center

Community Insurance Company doing business as Anthem Blue Cross and Blue Shield

Compcare Health Services Insurance Corporation doing business as Anthem Blue Cross and Blue Shield

Comtrix Solutions

CPP Wound Care #25 LLC

CPP Wound Care, LLC

CPSI

Creek County Treasurer

| |
|---|
| Creekridge Capital |
| Daniel Bercu |
| David M. Warren |
| DELTA Healthcare Providers |
| Diagnostic Laboratory of OK |
| Doerner, Saunders, Daniel & Anderson, L.L.P. |
| Dominion North Carolina Power |
| Drumright Regional Hospital |
| Drumright Rural Health Clinic |
| Emergency Coverage Corp |
| Empire HealthChoice Assurance, Inc. doing business as Empire Blue Cross and Blue Shield |
| Empower H.I.S LLC<br>A Florida limited liability company |
| Empower Healthcare, LLC<br>a Florida Limited Liability Company |
| Empower HMS LLC a Delaware Limited Liability Company |
| Erx, LLC |
| Fairfax Community Hospital |
| Farnam Street Financial Inc. |
| First Capital Corporation |
| First Liberty |
| First Physicians Lending Solutions - Fairfax, LLC |
| Fisher Healthcare |
| Fox Rothschild |
| Fusion Meidcal Staffing |
| Gas & Supply |
| Gemino Healthcare Finance |
| Gene Evans |
| GlassRatner |
| GlazoSmithKline Pharmaceutical |
| Haskell County Community Hospital |
| Health Acquisition Company LLC<br>A West Virginia limited liability company |
| Healthy Alliance Life Insurance Company |
| Heartland Pathology Consultant |
| Hendren, Redwine & Malone, PLLC |
| HERC |
| High Point Capital |
| Hillsboro Community Hospital |
| HIPPA-Guard |
| HMC/CAH Consolidated, Inc. A Delaware corporation |

| |
|---|
| HMO Healthkeepers, Inc. doing business as Anthem Blue Cross and Blue Shield |
| HMO Missouri, Inc. |
| Horton City Clerk |
| Horton Community Hospital |
| Hospital Equipment Rental Co. |
| I.T.S. USA |
| I-70 COMMUNITY HOSPITAL |
| iHealthcare |
| iHealthcare II |
| iHealthcare, Inc. |
| J&J Health Care |
| James Shaffer |
| Jorge A. Perez |
| Judge Dana L. Rasure |
| Judge Joseph N. Callaway |
| Judge Robert E. Nugent |
| KCI USA |
| Keith Plummer |
| Key Rehabilitation |
| Klenda Austerman LLC |
| Lab Corp of America Holding |
| Labcorp |
| Labette County Treasurer |
| Landmark National Bank |
| Lauderdale Community Hospital |
| Lauderdale County Assessor |
| Lauderdale County HOPE Foundation |
| LGMG, LLC |
| Lifeblood/Mido UTH Blood |
| M&T Bank |
| Marion County Treasurer |
| Marjorie K. Lynch |
| McCartys |
| McKesson |
| McKesson Corporation |
| McKesson Corporation - RX |
| McKesson Medical-Surgical Inc. |
| McNair Oil Co. |
| Medline Industries, Inc. |
| Merrick, Baker & Strauss, P.C. |
| Midland |

| Miller EMS, LLC |
| Missouri Department of Revenue |
| Missouri Network Alliance, LLC |
| Mobile Cardiac Care, LLC |
| Modular Space Corporation |
| N.C. Department of Justice |
| Nelson Mullins Riley & Scarborough, LLP |
| Netgen Healthcare |
| Nortek Medical Staffing, Inc. |
| North Carolina Department of Health and Human Services, Division of Health Benefits |
| Nthrive Inc. |
| OG&E |
| Oklahoma Blood Institute |
| Oklahome Tax Commission |
| Ortho-Clinical Diagnositcs, Inc. |
| OSU Foundation |
| Oswego Community Hospital |
| Patriot Placement Staffing LLC |
| Paul L. Nusbaum |
| Paulette J. Delk |
| Pedro Galvez |
| Phusion Marketing Group |
| Phyllis Shaffer |
| Prague Community Hospital |
| Premier Spec Network LLC |
| Primeforce Medical Corp |
| Psychiatric Medical Care |
| Public Building Commission of Hillsboro, Kansas |
| Quality Systems, Inc. |
| Quest Diagnostics |
| R. Lee Webber, Morton & Germany, PLLC |
| Ramp Plymouth, PA |
| Raymond Howard |
| Reboot Inc. |
| Reboot, Inc./HIPPA Guard |
| Regence BlueCross BlueShield of Oregon |
| Regence BlueCross BlueShield of Utah |
| Regence BlueShield |
| Regence BlueShield of Idaho |
| RightCHOICE Managed Care, Inc. |
| Ripley City Recorder |

| |
|---|
| Robert Venable, M.D. |
| Rocky Mountain Hospital and Medical Service, Inc. doing business as Anthem Blue Cross and Blue Shield |
| Roger and Mary Swearengin |
| Rural Community Hospitals of Americ Attn: Steen F. White |
| Rural Community Hospitals of America LLC (D.B.A. RCHA) |
| Rural Emergency Medical Prov. |
| Rural Health Partners, LLC |
| Security Bank of Kansas City |
| Shared Medical Services Inc |
| Shared Medical Services, LLC |
| Siemens Healthcare Diagnostics |
| Spencer Fane LLP |
| Spilman Thomas & Battle, PLLC |
| Standley Systems, LLC |
| Stars |
| Stephani W. Humrickhouse |
| Steven F. White |
| Stevens & Brand, LLP |
| Stinson Leonard Street LLP |
| Stone Bank |
| Stryker Instruments |
| Sysco Food Services |
| Sysko of Kansas City |
| Sysmex America, Inc. |
| The Medical Protective Company |
| Thomas W. Waldrep, Jr. |
| TN Dept of Labor - Bureau of Unemployment Insurance |
| Topeka Health Systems, LLC |
| Total Medical Prsnnl Staffing |
| Town of Plymouth |
| Trial Attorney Carrie Ann Rochrscheib |
| Trial Attorney Christopher T. Borniger |
| Triplett Woolf Garretson, LLC |
| Trucode, LLC |
| United Linen Uniform Services |
| US Bank |
| US Foodservice |
| Volente Healthcare LLC |
| Waldrep, LLP |
| Washington County Hospital |

| |
|---|
| Washington County, NC |
| Werfen USA Labs |
| Westar Energy |
| Western Healthcare, LLC |
| WPM Pathology Laboratory |

## Schedule 2

| Relationship Identified | Services Related to Debtor's Case |
|---|---|
| Anthem Insurance Companies, Inc. (d.b.a Anthem Blue Cross and Blue Shield) | No |
| US Bank | No |
| Medline Industries, Inc. | No |
| CPSI | No |
| Quest Diagnostics | No |
| Nelson Mullins Riley & Scarborough, LLP | No |
| Fox Rothschild | No |
| Spencer Fane LLP | No |
| Westar Energy | No |
| McCartys | No |
| Lab Corp of America Holding | No |
| Bio Rad Laboratories inc. | No |
| Nthrive Inc. | No |
| Ameripride | No |
| Stinson Leonard Street LLP | No |
| Quality Systems, Inc. | No |
| First Financial Corp | No |
| Baker Donelson Bearman Caldwell & Berkowitz, PC | No |
| 3M | No |
| AT&T | No |
| M&T Bank | No |
| Sysmex America, Inc. | No |

# EXHIBIT B

**Grant Thornton**

April 11, 2019

Thomas W. Waldrep Jr.
Trustee
CAH Acquisition Company 12, LLC d/b/a Fairfax Community Hospital
40 Hospital Rd.
Fairfax, OK 74637
C/O Waldrep Law LLP
101 S. Stratford Road, Suite 210
Winston Salem, NC 27104

**Grant Thornton LLP**
201 S College St
Charlotte, NC 28244

T 704.632.3500
F 704.334.7701
www.GrantThornton.com

Dear Mr. Waldrep:

Grant Thornton LLP ("Grant Thornton," "Firm," or "we") is pleased to provide professional services (the "Services") with respect to Case No 19-10641-R (the "Case"), and for the benefit of CAH Acquisition Company 12, LLC d/b/a Fairfax Community Hospital ("Company," "Debtor," or "you"). The purpose of this **Engagement Letter** (the "Letter"), **Attachment A** – Standard Grant Thornton LLP Engagement Terms, and any related Statement(s) of Work (collectively, the "**Agreement**"), is to confirm the scope and terms of our engagement based on our mutual understanding. This Agreement is structured to allow us to offer professional services under a single agreement through the execution of a related Statements of Work for each project.

The Agreement is effective on February 19, 2019 (the "Effective Date") and will remain in full force and effect in accordance with its terms until terminated by either party in accordance with the termination provision set forth in Attachment A. You have advised us that you will request bankruptcy court approval of the terms of this Agreement, *nunc pro tunc* to February 19, 2019.

The Attachment A, as modified to include language previously agreed upon between Grant Thornton and the Middle District of North Carolina in a similar engagement, is an important part of this Agreement and should be carefully read.

Given that applicable professional standards, laws, and regulations may change in the future, Grant Thornton reserves the right to amend this Agreement upon appropriate notice to you and with your consent.

**Bankruptcy Court Approval**

On April 1, 2019 (the "Filing Date"), the Debtor filed a voluntary petition for relief under chapter 11 title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Northern District of Oklahoma (the "Bankruptcy Court"). This Agreement, and Grant Thornton's obligations and responsibilities relating to this engagement, are expressly subject to and conditioned upon Bankruptcy Court approval of the Agreement in its entirety. In the event that the Bankruptcy Court does not approve this

1



Agreement in its entirety within 30 days of the date of this Agreement, Grant Thornton may, in its sole discretion, without prejudice to its other rights and remedies and without any liability arising therefrom, terminate this Agreement. Without limiting the generality of the foregoing, Grant Thornton may, in its sole discretion, extend the foregoing 30-day deadline for Bankruptcy Court approval. In the event the Bankruptcy Court approves the Agreement, but deletes or holds unenforceable certain provisions thereof, Grant Thornton in its sole discretion may accept the Agreement as modified, or may terminate the engagement as set forth above, all without prejudice to its other rights and remedies. In the event that Grant Thornton elects to terminate this engagement, then, promptly upon Grant Thornton's request, the Company hereby agrees to withdraw or amend any application filed with the Bankruptcy Court to approve Grant Thornton's retention in the Case.

## Delivering the Services

The Services we provide to you under this Agreement will typically be set forth in distinct Statement(s) of Work signed by Grant Thornton and your authorized representative, specifying matters including applicable professional standards, scope, deliverables, timing, fees and payment terms.

From time to time in the course of our relationship, we may perform Services that you request without a Statement of Work. This Agreement will cover all Services rendered whether or not the parties execute a Statement of Work. Such Services will be billed at our standard hourly rates or as otherwise mutually agreed.

The Company acknowledges and agrees that the Company's management is responsible for supplying materially complete and accurate information, representations, and books and records upon which we must rely. It is further expressly agreed and understood that Grant Thornton shall have no responsibility or liability for auditing or verifying the Company's financial statements and supporting documentation (the "Company's Financials"). In performing its services hereunder, all parties in interest understand and acknowledge that Grant Thornton will be assuming and relying upon the truth and accuracy of the Company's Financials. Without limiting the generality of the foregoing, we will not audit or otherwise verify the materials provided to us, nor will we provide any assurances concerning the reliability, accuracy or completeness of any materials provided by the Company, the Company's management or any other party, and our Services cannot be relied upon to disclose errors or fraud should they exist. We have no responsibility for updating our Services.

## Term

This Agreement shall remain in full force and effect in accordance with its terms and conditions and shall constitute legal, valid, binding, and enforceable obligations of both Grant Thornton and the Company until terminated by either party in accordance with the termination provision set forth in Attachment A. Because applicable professional standards, law, and regulations may change in the future Grant Thornton reserves the right to amend this Agreement upon appropriate notice and your consent.

## Other Matters

This Agreement may be executed in any number of counterparts, each of which shall be an original, but such counterparts shall together constitute one and the same agreement. This Agreement may be executed and delivered by either party by electronic transmission. For purposes of this Agreement, any signature page signed and transmitted electronically shall be treated as an original document, and the signature of any party thereon, for purposes hereof, shall be considered as an original signature and the document transmitted electronically shall be considered to have the same binding effect as an original signature on an original document.

**Grant Thornton LLP**
U.S. member firm of Grant Thornton International Ltd



The Services to be provided by Grant Thornton will not constitute (a) a fairness or solvency opinion or (b) a compilation, examination, review or audit of any of the entity's information, financial or otherwise, historical or prospective, as described in the pronouncements on professional standards issued by the American Institute of Certified Public Accountants and the Public Company Accounting Oversight Board. In addition, we will not make any predictions or provide any opinions or other assurances concerning the outcomes of future events, including, without limitation, those that pertain to the operating results of any entity, the achievability of any business plan, the success of any investment, the recovery of any asset, or the ability to pay any debt. Additionally, we do not provide any legal advice.

The Company recognizes and acknowledges that by performing the Services set forth in this Agreement, Grant Thornton is not acting in any management capacity and that the Company has not asked Grant Thornton to make, nor has Grant Thornton agreed to make, any business decisions on behalf of the Company. All decisions about the business of the Company remain the sole responsibility of the Company. By the Company signing this Agreement, the Company expressly acknowledges that Grant Thornton does not guarantee, warrant, or otherwise provide any assurances of any particular outcome of the Case or this engagement, including but not limited to any assurance that the Company will restructure successfully.

Please confirm your acceptance of this Agreement by signing below, signing the enclosed Statement(s) of Work, and returning the signed Agreement. We look forward to the opportunity to serve you.

Very truly yours,

**GRANT THORNTON LLP**

Scott B. Davis
Partner

Enclosures:
Statement(s) of Work

**Agreed and Accepted**

The foregoing letter, Attachment A, and the attached Statement(s) of Work, if applicable, fully describe our mutual understanding and are accepted by all parties.

CAH Acquisition Company 12, LLC d/b/a Fairfax Community Hospital

By: _____    Date: _____4/11/19_____
Thomas W. Waldrep Jr., Trustee

**Grant Thornton**

1

CAH Acquisition Company 12, LLC d/b/a Fairfax Community Hospital
Agreement dated **April 11, 2019**

## ATTACHMENT A - STANDARD GRANT THORNTON LLP ENGAGEMENT TERMS

It is understood and agreed that the terms and conditions in this Attachment A refer to the Grant Thornton letter to which it is attached. The addressee of the letter, by signing the letter, has agreed to all of the terms and conditions in this Attachment A. In the event that there is a conflict between this Attachment A and the letter, including any Statements of Work, attachments, or amendments to the Agreement, the terms of Attachment A shall control.  Any capitalized terms in this Attachment A that are not defined shall have the meanings in the letter.

1.    Management Participation and Responsibilities. You will designate at least one management level individual who possesses the suitable skill, knowledge, experience, judgment, and willingness to be responsible for overseeing the Services on your behalf.  You will be solely responsible for applying independent business judgment with respect to the Services, including without limitation, establishing and monitoring the performance of the Services to ensure the objectives have been met, evaluating the adequacy of the engagement and any recommendations made, exclusively rendering decisions that involve management functions related to the engagement, accepting full responsibility for decisions on implementation or other further course(s) of action, and establishing and maintaining internal controls. Moreover, you will in all events remain responsible for the care and control of your premises, for all internal books and recordkeeping, for establishing and maintaining effective internal control systems and for all management functions, responsibilities and decisions.

2.    Business Risk Allocations. The terms of this Section 2 shall apply regardless of the nature of any claim asserted (including but not limited to contract, statute, tort, strict liability, or any form of negligence, whether by you, Grant Thornton, or others) but such terms shall not apply to the extent finally determined to be contrary to any applicable law.

(a)    The Company, on behalf of itself and its affiliates, will hold Grant Thornton and its present, future and former partners, principals, directors, employees and agents harmless from any liability, damages (including without limitation, direct, incidental and consequential), fees, expenses and costs (including defense costs) associated with any third-party claim arising from or relating to Grant Thornton's performance of its obligations under this Agreement, including but not limited to, claims arising from or relating to (i) Company's misrepresentations or (ii) false or incomplete information provided by any of the Company's personnel or agents to Grant Thornton in the performance of its Services.

(b)    With respect to the Services, the Company, on behalf of itself and its affiliates, agrees that the liability of Grant Thornton and its present, future and former partners, principals, directors, employees and agents for any claim, including but not limited to, Grant Thornton's negligence, shall not exceed the fees it receives for the portion of the work giving rise to such liability. In addition, the Company agrees that Grant Thornton and its present, future and former partners, principals, directors, employees and agents shall not under any circumstances be liable for any special, consequential, incidental or exemplary damages or loss (nor any lost profits, taxes, interest, tax penalties, savings or business opportunity).

(c)    Also, because of the importance of the information that the Company provides to Grant Thornton with respect to Grant Thornton's ability to perform the Services, the Company hereby releases Grant Thornton and its present, future and former partners, principals, directors, employees and agents from any liability, damages, fees, expenses and costs (including defense costs) relating to the Services, that arise from or relate to any information (including representations by management) provided by the Company, or their respective personnel or agents, that is not complete, accurate or current.

(d)    The terms of this Section 2 shall apply whether or not Grant Thornton was advised of the possibility of the damage or loss asserted and regardless of the nature of any claim asserted, including, but not limited to, contract,

statute, tort, strict liability or any form of negligence, whether of Grant Thornton, the Company or others, excepting only the situation, and to the extent, where Grant Thornton has been adjudicated by a final order or judgment of a court of competent jurisdiction to have committed willful or reckless misconduct, or gross negligence in connection with this engagement. Such terms shall not apply to the extent contrary to any applicable law. Such terms shall continue to apply after any termination of this Agreement and during any dispute between the parties.

(e)      **IN NO EVENT SHALL THE GRANT THORNTON FIRM BE LIABLE FOR, AND YOU HEREBY WAIVE, ANY INDIRECT, SPECIAL, CONSEQUENTIAL, INCIDENTAL, OR EXEMPLARY DAMAGES OR LOSS, INCLUDING WITHOUT LIMITATION, ANY LOST PROFITS, TAXES, INTEREST, PENALTIES, LOSS OF SAVINGS, OR LOST BUSINESS OPPORTUNITY.**

In responding to any claim asserted, the Grant Thornton Firm shall avail itself of any defense available to it under applicable law, but in no event shall the aggregate liability of the Grant Thornton Firm for any claims, losses or damages related to this Agreement exceed an amount that is proportional to the relative fault of the Grant Thornton Firm that is finally determined to have caused your losses.

(f)      <u>Limitation on Period to File Claims</u>. It is expressly agreed that any claim by or on behalf of either party arising out of the Services, whether it be in contract, tort, or otherwise, shall be deemed waived if a claim is asserted more than two (2) years from the date that the Deliverable is issued.

3.      <u>Use of Documentation and Reliance</u>. Our professional standards require us to maintain sufficient documentation to support our work. This documentation may include copies of your information. However to the extent that we have copies of your information, we will protect and safeguard your information from unauthorized disclosure.

You agree to protect all data, materials, deliverables and reports, and opinions delivered to you (the "Deliverables") from unauthorized use and prevent disclosure of the Deliverables to unauthorized third parties who may rely on them. Moreover, you agree that we have not and shall not be deemed to assume any duties or obligations to any third party, including without limitation an affiliate, subsidiary, parent company or shareholders, partners, members, creditors or any third party beneficiaries. Taxing jurisdictions are not considered third parties with respect to tax filings contemplated in a Statement of Work.

Our Deliverables will be based on our interpretation of the federal and state laws, regulations, administrative and judicial pronouncements, and other relevant authorities, in effect when we provide our deliverables. All of these authorities are subject to change, and such change may be retroactive or prospective in effect. We assume no responsibility to either advise you of, or to update our conclusions, for changes in respect to federal and state laws, regulations, administrative and judicial pronouncements, and other relevant authorities. As a result, evaluation of our Deliverables shall be based solely on its substantial conformance with any standards or specifications expressly set forth in this Agreement and applicable law and any claim of nonconformance must be clearly and convincingly shown.

4.      <u>Third Party Proceedings</u>. Unless expressly provided for in a Statement of Work, our Services do not include giving testimony or appearing or participating in discovery proceedings, in administrative hearings, in court, or in other legal or regulatory inquiries or proceedings. Moreover, our costs, expenses and time spent in legal and regulatory matters or proceedings arising from this Agreement to which we are not a party and the Services are not at issue, such as subpoenas, testimony, bankruptcy filings or proceedings, consultation involving private litigation, arbitration, government or industry regulation inquiries, whether made at your request or the request of a third party or by subpoena or equivalent, will be billed to you separately at our then current rates.

5.      <u>Access to Resources and Information</u>. Unless specified in a Statement of Work as the responsibility of Grant Thornton to provide, you shall have obtained for us on a timely basis any internal and third party permissions, licenses or approvals that are required for us to perform the Services contemplated hereunder (including use of any necessary

**Grant Thornton**

CAH Acquisition Company 12, LLC d/b/a Fairfax Community Hospital
Agreement dated **April 11, 2019**

software or data). You shall also provide us, on a timely basis, with such information, approvals and assistance as may be necessary to our work or as we may reasonably request, and our personnel assigned to any work hereunder shall not be assumed or deemed to have knowledge of information provided to others, whether external to or within the Grant Thornton Firm.

6.        Term and Termination. This Agreement will commence on the Effective Date and it will not expire, unless earlier terminated as provided in this Attachment A. We shall each have the right to terminate this Agreement, in whole or in part, at any time without further obligation to the other  by giving not less than thirty (30) days written notice to the other party; provided that in-process Statements of Work shall be completed, except in the event of an uncured, material breach.  Further, Grant Thornton shall have the right to terminate this Agreement if it discovers practices by you that we deem dishonest, fraudulent, or illegal; or we determine that the American Institute of Certified Public Accountants, Public Company Accounting Oversight Board, Securities and Exchange Commission, or other applicable rules or professional standards result in the Grant Thornton Firm's inability to complete the work, the Grant Thornton Firm may terminate the applicable Statement of Work or this Agreement. In the event that either party terminates this Agreement or any or all Statements of Work as set forth in this section, you agree to pay us for the Services, including out-of-pocket expenses and costs, rendered up to the date of such termination.

7.        Use of Third Party Service Providers and Affiliates. Grant Thornton LLP is the U.S. member firm of Grant Thornton International Ltd ("GTIL"), a global organization of member firms in over 110 countries. Member firms are neither members of one international partnership nor otherwise legal partners with one another. There is no common ownership, control, governance, or agency relationship among member firms.  Grant Thornton may use third-party service providers, such as independent contractors, specialists, or vendors, to assist in providing our professional services. We may also use GTIL member firms, other affiliates of Grant Thornton, or other accounting firms. Such entities may be located within or outside the United States.

The member firms of GTIL are intended third-party beneficiaries of this Agreement and are entitled to all the benefits and protections contained therein. No other third-party beneficiaries are intended under this Agreement.

In the event Grant Thornton subcontracts some of the Services to a GTIL member firm, Grant Thornton takes sole responsibility for all work performed in relation to this Agreement and Client agrees that, with respect to work that is the subject of this Agreement, its sole recourse is against Grant Thornton.

Additionally, Grant Thornton may use third-parties to provide administrative and operational support to Grant Thornton business operations. All of these third party service providers are subject to confidentiality obligations to protect the confidentiality of client data. Such entities may be located within or outside the United States.

8.        Electronic Communications. During the course of our engagement, we may need to electronically transmit confidential information to each other and to third-party service providers or other entities engaged by either Grant Thornton or you. Electronic methods include telephones, cell phones, e-mail, and fax. These technologies provide a fast and convenient way to communicate. However, all forms of electronic communication have inherent security weaknesses, and the risk of compromised confidentiality cannot be eliminated. You agree to the use of electronic methods to transmit and receive information, including confidential information.

**9.**        Privacy. Grant Thornton is committed to protecting personal information. We will maintain such information in confidence in accordance with professional standards and governing laws. Therefore, any personal information provided to us by the Company will be kept confidential and not disclosed to any third party unless expressly permitted by the Company or required by law, regulation, legal process, or professional standards. The Company is responsible for obtaining, pursuant to law or regulation, consents from parties that provided the Company with their personal information, which will be obtained, used, and disclosed by Grant Thornton for its required purposes.

Notwithstanding anything to the contrary herein, Grant Thornton imposes no conditions of confidentiality on any information it provides to you to the extent that it concerns the tax structure or tax treatment of any transaction.

10.     Basis for Our Conclusions. Our conclusions are limited solely to the matters for which we were engaged. No conclusions should be inferred as to any matters not specifically covered in the Agreement. Further, the conclusions are based upon the facts and information presented by you and may be inapplicable if the actual facts differ from those presented in any respect.

You represent that we may rely on the following, to the extent applicable, without verification.

(a)     All original documents, signatures and copies of documents provided by you are authentic.

(b)     When only drafts of pertinent documents are available, the executed versions of the draft documents will not vary materially from the ones provided by you for examination.

(c)     There are no inconsistent or adverse facts that are not otherwise provided by you and not apparent from the face of the documents that we have relied upon.

(d)     All legal documents necessary to perform the services have been duly and validly authorized, approved and executed by the appropriate persons.

With respect to (a) – (d) above, you hereby agree not to sue the Grant Thornton Firm and release the Grant Thornton Firm from all claims, whether known or unknown, liability, damages, fees, expenses and costs (including defense costs) relating to the Services that arise or relate to any information provided by you, your personnel or agents, that is misleading, incomplete, or not current.

11.     Dispute Resolution.

(a)     Mediation. Any controversy or claim arising out of or relating to the services, related fees or this Agreement shall first be submitted to mediation. A mediator will be selected by agreement of the parties, or if the parties cannot agree, a mediator acceptable to all parties will be appointed by the American Arbitration Association ("AAA"). The mediation will proceed in accordance with the customary practice of mediation and shall be concluded within sixty (60) days from receipt of written notice unless the parties agree otherwise. Any facts disclosed related to the mediation shall be kept confidential and each side shall pay its own costs of the mediation but will share equally the mediator's expenses.

(b)     Arbitration. In the event mediation is not successful, then the parties agree that the dispute(s) or claim(s) shall be settled by binding arbitration. The provisions herein supersede any contrary arbitral rules that might otherwise apply. The arbitration proceeding shall take place in the city in which the Grant Thornton office providing the Services is located unless the parties mutually agree to a different location. If the Services that are at issue are provided from various Grant Thornton offices, the arbitration will take place in Chicago, Illinois. The proceeding shall be governed by the provisions of the Federal Arbitration Act ("FAA") and will proceed in accordance with the then current Conflict Prevention & Resolution ("CPR") or the similar rules of another arbitration association if one other than CPR is selected, except that pre-hearing discovery shall be limited as provided for herein or unless specifically authorized by the arbitrators.

        i.  To begin the arbitration process, a party shall provide written notice of the issues to be resolved by arbitration (the "Notice") within fifteen (15) days of the parties' agreement to terminate or waive mediation, and the other party shall respond within twenty one (21) days and shall add any other issues to be resolved within the arbitration. The arbitrators shall only resolve those issues identified in the Notice, and issues that are not identified in the Notice shall not be arbitrated nor brought to court.

        ii.  The arbitration shall be conducted by three (3) arbitrators. Each party shall select an arbitrator experienced in the relevant subject matters within twenty one (21) days of the Notice who shall serve as a neutral

arbitrator, and the two (2) designated arbitrators shall then select a third neutral arbitrator within twenty one (21) days of their selection by the parties. It is the parties' intention that the two (2) arbitrators selected by the parties be "neutrals" who will not be informed as to which party selected them. If the two (2) arbitrators cannot agree on selection of a third arbitrator within twenty one (21) days of their appointment, the agency whose rules govern the arbitration shall request a list of arbitrators and select a third arbitrator under the agency's rules within thirty (30) days. If both parties are in agreement, the dispute may be heard by one (1) arbitrator selected within sixty (60) days following receipt of the Notice.

iii. The parties shall not be entitled to discovery except as it directly relates to the underlying Services that are at issue between the parties and shall submit a joint proposed schedule to the arbitrator(s) within thirty (30) days of the arbitrator(s)' selection. Other than described herein, no other discovery is allowed except by the arbitrator(s) and only for good cause shown.

iv. Except for impeachment-only information, each party must disclose within thirty (30) days after the selection of the arbitrator(s): (1) the names, addresses, telephone numbers, and email addresses of persons who have knowledge and/or discoverable information relating to the issues submitted for resolution, its claims and defenses; and (2) a computation showing each element of claimed damages.

v. The parties shall be entitled to take three (3) depositions not to exceed seven (7) hours for each such deposition. In addition, each side shall be entitled to depose any expert witness who will testify in the arbitration proceeding for no more than seven (7) hours. Each testifying expert shall provide the same materials required under Federal Rule of Civil Procedure 26(a)(2)(B). The parties must confer in good faith to resolve all discovery disputes. If they cannot resolve these themselves, the parties must attempt to do so in conference with the arbitrator(s). If the dispute is not resolved in conference, the arbitrator(s) must promptly rule on the issues. Each side may file dispositive motions without obtaining leave from the arbitrator(s), but must first confer with the other side prior to filing any dispositive motions. All motions should be filed no later than sixty (60) days prior to the arbitration hearing, unless agreed otherwise by the parties or ordered by the arbitrator(s).

vi. The arbitrator(s) shall have no authority to award non-monetary equitable relief and will not have the right to award indirect, consequential, or punitive damages. The award of the arbitration shall be in writing and shall be accompanied by a well-reasoned opinion. The award issued by the arbitrator(s) may be confirmed in a judgment by any federal or state court of competent jurisdiction. Each party shall be responsible for its own costs associated with the arbitration, except that the costs of the arbitrator(s) shall be equally divided by each side involved in the arbitration. The arbitration proceeding and all information disclosed during the arbitration shall be maintained as confidential, except as may be required to confirm the award, for disclosure to professional or regulatory bodies, as required by law or a court of law, or in a related confidential mediation or arbitration.

12. <u>General</u>.

(a)      Neither party shall assign any rights, obligations or claims relating to this Agreement.

(b)      Neither party shall be liable for any delay or failure in performance due to circumstances beyond its reasonable control.

(c)      Except for GTIL member firms and Grant Thornton affiliates, no third-party beneficiaries are intended under this Agreement.

(d)      Neither party shall use the other's name, service marks, or trademarks without prior written consent.

(e)      This Agreement, including its formation and the parties' respective rights and duties and all disputes that might arise from or in connection with this Agreement or its subject matter, shall be governed by and construed in

accordance with the laws of Illinois, without giving effect to conflicts of laws rules. The parties consent to the personal jurisdiction of the courts of the state where the Grant Thornton office performing the Services is located and the United States District Court for the District of such state, and the parties waive objection to venue in any of these courts.

(f)     Each party is an independent contractor with respect to the other and shall not be construed as having a trustee, joint venture, agency or fiduciary relationship.

(g)     If any portion of this Agreement is held invalid, it is agreed that such invalidity shall not affect any of the remaining portions.  Furthermore, if the Services are subject to the independence rules of the U.S. Securities and Exchange Commission ("SEC") with respect to you, such that any provision in this Agreement would impair our independence under the SEC's rules, such provision shall, to that extent, be of no further force and effect and the Agreement shall consist of the remaining provisions.

(h)     This Agreement, including any other incorporated attachments, sets forth the entire understanding between and among the parties regarding the Services and supersedes all prior and contemporaneous agreements, arrangements and communications and may not be modified or amended, except by the mutual written agreement of both parties.

(i)     The clauses regarding liability limitations, third party proceedings, indemnification and resolution of differences shall survive any termination of this Agreement.

13.     <u>Personnel</u>.  During the term of this Agreement and for a period of one (1) year after the Services are completed, we both agree not to solicit, directly or indirectly, or hire, the other's personnel participating on an engagement without express written consent.  If this provision is violated, the violating party will pay the other party a fee equal to the hired person's annual salary in effect at the time of the violation to reimburse the estimated costs of hiring and training replacement personnel, unless the individual is hired in response to a general advertisement made available to the public.

14.     <u>Successors and Affiliates</u>. Recognizing that at times Grant Thornton's work may pertain not only to you but also to various subsidiaries, affiliates, advisors and contractors, partnerships, companies, trusts or foundations, you agree, as may be requested by Grant Thornton from time to time (including subsequent to completion of the Services), to obtain written acceptance of the terms of this Agreement. Furthermore, you represent and warrant that this Agreement shall be binding on each party hereto and on each of your respective subsidiaries, successors, assigns and legal representatives.

15.     <u>Reportable Transactions</u>.  Taxpayers are required to disclose their participation in certain types of transactions ("Reportable Transactions") on forms filed with their federal income tax returns and/or with the IRS Office of Tax Shelter Analysis, and with agencies of certain states that impose similar requirements.  Failure to adhere to Reportable Transaction disclosure and filing requirements may result in the imposition of significant penalties under applicable federal and/or state law. We may be a "Material Advisor" with regard to Services provided to you and we may be subject to our own federal and/or state reporting, registration and list maintenance obligations, which are separate and independent of any taxpayer disclosure obligation.  We may be required to maintain and disclose to applicable federal and/or state regulatory agencies certain information regarding your participation in a Reportable Transaction, including your name and federal identification number, and other information as required.

Except as specifically stated in this Agreement, Grant Thornton does not assume any obligation to express any opinion on, provide any advice related to, or identify from any information provided by you or obtained by us during the course of providing Services to you under this Agreement, whether any particular transaction is a Reportable Transaction or the potential consequences of non-compliance with disclosure and filing requirements pertaining to a Reportable Transaction.  Reliance on any opinion or advice we may provide regarding whether a transaction is or is



CAH Acquisition Company 12, LLC d/b/a Fairfax Community Hospital
Agreement dated **April 11, 2019**

not a Reportable Transaction and /or any disclosure and filing requirements may not avoid the imposition of any penalty imposed on you under federal or state law for the failure to comply with such disclosure and filing obligations.

16.    Privileges Relating to Taxpayer Communications.   Any advice given by Grant Thornton with respect to a matter that is within the scope of our authority to practice before the IRS may be privileged under federal and state laws. This privilege may be asserted in any non-criminal tax matter before the IRS and in any non-criminal tax proceeding in Federal court and may be asserted to the extent such communication would be considered privileged communication if it were between a taxpayer and an attorney. At your sole cost and expense, we will cooperate with your efforts to assert taxpayer privileges when we receive a demand or inquiry for your information to the extent required by law.

CAH Acquisition Company 12, LLC
d/b/a Fairfax Community Hospital
Engagement Letter dated April 11, 2019
Statement of Work dated April 11, 2019

This **Statement of Work** ("Statement of Work") dated April 11, 2019 becomes a part of and is subject to the terms and conditions of the **Engagement Letter** and related **Attachment A** – Standard Grant Thornton LLP Engagement Terms dated April 11, 2019 between CAH Acquisition Company 12, LLC d/b/a Fairfax Community Hospital ("Client", "Company" or "you") and Grant Thornton LLP ("Grant Thornton," "Firm," or "we"). Any capitalized terms that are not defined in this Statement of Work shall have the meanings set forth in the Engagement Letter and Attachment A – Standard Grant Thornton LLP Engagement Terms. The purpose of this Statement of Work is to describe the Scope of **Services** ("Services") the Company is requesting Grant Thornton to perform, and to set forth the agreed fee, timing, and other matters related to the Services.

## Objective of Our Assignment

Below is a list of the Services it is anticipated that Grant Thornton may provide to the Company. Our approach and work plan is based on the procedures, analysis and budget requested by you. Our Services will be performed in accordance with the *Statement on Standards for Consulting Services* issued by the American Institute of Certified Public Accountants.

## Scope of Our Work

Our Services will consist of reading financial statements and other records, making inquiries of the Company's management and analyzing the information obtained. Accordingly, the completion of our report will require cooperation of the Company's management. The Services section below will indicate the specific areas that you have requested us to address during this engagement.

Our Services do not constitute an audit or review of the financial statements or any part thereof, the objective of which is the expression of an opinion or limited assurance on the financial statements, or a part thereof, or verification of the accuracy of the Company's management responses to our inquiries.

Our Services should not be relied upon to disclose errors, irregularities, or illegal acts, including fraud or defalcations.

Further, because of the importance of the information that is provided to Grant Thornton with respect to our ability to perform the Services, you hereby release the Grant Thornton Firm from any liability, damages, fees, expenses and costs (including defense costs) relating to the Services, that arise from or relate to any information (including representations by management) provided by you, or any third party, that is not complete, accurate or current.

## Limited Distribution of Our Report(s)

Our findings may be communicated to you in one or more written reports. The reports will be supplemented with oral commentary, which will be an integral part of the presentation. The presentation of our findings to you will constitute satisfactory completion of our work. Our reports cannot be distributed to third parties without our prior written approval.

## Conflict of Interest Disclosure

From time to time, we may encounter certain instances that in our view give rise to a potential conflict of interest between the Services we are going to perform and services that we may already be performing for an

1

 **Grant Thornton**

CAH Acquisition Company 12, LLC
d/b/a Fairfax Community Hospital
Engagement Letter dated April 11, 2019
Statement of Work dated April 11, 2019

existing client. In such cases, we shall notify you of such a conflict and seek appropriate advance written consent from all parties prior to providing Services.

## The Services

The Services we will provide under this Statement of Work consist of bankruptcy advisory services relating to the involuntary bankruptcy filing by the Company.

Below is a list of the Services it is anticipated that Grant Thornton may provide to the Company:

(i)     Analyze the Company's financial position, business plans and financial projections prepared by management including, but not limited to, commenting on assumptions and comparing those assumptions to historical Company and industry trends;

(ii)    Consult with the Trustee on the assessment of a bankruptcy exit strategy;

(iii)   Consult with the Trustee in connection with the development of financial projections;

(iv)    Assist the Trustee with its communications with customers, suppliers, statutory committees, and other parties-in-interest;

(v)     Analyze the Company's rolling 13-week cash receipts and disbursements forecast and assess liquidity and DIP financing needs;

(vi)    Consult with the Trustee regarding their valuation of the Company on a going-concern and liquidation basis;

(vii)   Consult with the Trustee, in coordination with legal counsel, in the preparation of a disclosure statement, plan of reorganization and the underlying business plans from which those documents are developed;

(viii)  Assist the Trustee, in coordination with legal counsel, in evaluating competing disclosure statements, plans and other strategic proposals made by the Committee of Unsecured Creditors or other interested parties in the Case;

(ix)    Assist the Trustee in responding to information requests submitted by statutory committees and their legal and/or financial counsel;

(x)     Assist the Trustee with its vendor management program;

(xi)    Consult with the Trustee regarding the preparation of required financial statements, schedules of financial affairs, monthly operating reports, and any other financial disclosures required by the Bankruptcy Court;

(xii)   Provide expert advice and testimony regarding financial matters related to, including, among other things, the feasibility of any proposed plan of reorganization, and the valuation of any securities issued in connection with any such plan; and,

(xiii)  Provide additional services as requested from time to time by the Company and agreed to by Grant Thornton.

Grant Thornton and the Company recognize that certain services listed above may not be performed or that certain other services may be performed depending on facts and circumstances that may emerge during the course of this engagement. In the event that Grant Thornton determines, in its sole discretion, that additional

2



CAH Acquisition Company 12, LLC
d/b/a Fairfax Community Hospital
Engagement Letter dated April 11, 2019
Statement of Work dated April 11, 2019

Services requested are beyond the scope of this original engagement, the Company agrees to file a motion seeking to approve the expansion of Grant Thornton's retention to include these additional Services.

GT US Shared Services Center India Private Limited ("GTSSC") and/or the Grant Thornton Knowledge and Capability Center India Private Limited ("KCC"), affiliates of Grant Thornton located in Bangalore, India – may assist us in providing our professional services.

## Additional Services Available – Change Order

It is understood that during the performance of the procedures, additional items may arise that you determine require additional investigation. While such additional investigation is not contemplated by this Statement of Work, or our fee estimate, we will be pleased to perform any additional procedures you deem necessary and request in writing. Prior to performing any additional procedures, we will discuss the scope of the procedures with you and the related fees in a change order or in a writing describing the additional work. Any additional procedures performed are subject to all the terms and conditions of this Agreement.

## Fees and Expenses

Scott Davis will maintain overall responsibility for the engagement and will provide field support services and coordinate daily management of the engagement. Other professionals who may be identified during the course of the engagement may also provide additional services.

Fees are based on actual hours incurred and the following hourly billing rates for the resources utilized. The hourly rates charged by Grant Thornton for the Services provided by its personnel differ based upon, among other things, each professional's level of experience, and types of Services being provided. In the ordinary course of business, Grant Thornton periodically revises its hourly rates to reflect promotions and other changes in personnel responsibilities, increases in experience, and increases in the cost of doing business. The next rate change is expected to occur on or about August 1, 2019.

In exchange for the Services summarized previously, Grant Thornton will be entitled to compensation at discounted hourly rates for professional services. The professional fees shall be calculated by multiplying the actual hours expended providing the agreed-upon Services by the discounted hourly billing rates for the specific personnel involved. At present, Grant Thornton's standard hourly rates and applicable discounted hourly rates by classification are as follows:

| Professional | Standard Hourly Rates | Discounted Hourly Rates |
| --- | --- | --- |
| Partner / Principal | $870 | $620 |
| Managing Director | $800 | $620 |
| Director | $710 | $500 |
| Senior Manager | $710 | $500 |
| Manager | $590 | $450 |
| Senior Associate | $450 | $310 |
| Associate | $320 | $250 |

Changes in regular hourly rates will be noted on the invoices for the first period in which the revised rates become effective.

3



CAH Acquisition Company 12, LLC
d/b/a Fairfax Community Hospital
Engagement Letter dated April 11, 2019
Statement of Work dated April 11, 2019

We will provide regular communication (written or verbal) on the status of our fees during the life of the engagement. If it appears that the stated fee estimate will be exceeded, we will consult with you before continuing with the engagement.

In addition, Grant Thornton will be entitled to reimbursement of reasonable expenses incurred in connection with this engagement, including but not limited to travel, report production, delivery services, photocopying and other costs incurred in providing the Services. Our expenses will include an administrative charge of 6.0% of standard fees to cover items such as copies, postage, supplies, computer and technology usage, software licensing, research and library databases, and similar expense items.

Grant Thornton will also request compensation for any time and expenses (including, without limitation, reasonable legal fees and expenses of Grant Thornton's own counsel) that may be incurred in considering or responding to discovery requests or other requests for documents or information, or in participating as a witness or otherwise in any legal, regulatory, or other proceedings arising from or relating to Grant Thornton's performance of these Services.

From time to time, Grant Thornton may receive certain incentives in the form of bonuses and rewards from its corporate card and other vendors. Such incentives to the extent received will be retained by Grant Thornton to cover firm expenses.

Bills for our Services will be issued periodically. Our fees are not contingent upon the confirmation of a Plan of Reorganization. Invoices are due upon receipt.

The Company understands and acknowledges that Grant Thornton will apply for compensation for professional services to be rendered in connection with this Chapter 11 case and for reimbursement of expenses incurred, in accordance with applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules of the United States Bankruptcy Court for the Eastern District of North Carolina, the applicable United States Trustee Guidelines, and any applicable orders of this Court (the "Payment Rules, Guidelines and Orders"). Payment of fees and reimbursement of expenses will be subject to ultimate allowance and approval by the Bankruptcy Court, and any additional orders governing interim payment of professionals in the Case.

Grant Thornton does not have any agreement to share its revenues from the Services for which it is seeking to be retained hereunder with any other non-affiliated entity. Grant Thornton has not been paid any retainer against which to bill fees and expenses incurred in this case.

**Entire Agreement**

This Statement of Work represents the parties' entire understanding with respect to the Services in this document. This Statement of Work does not modify or amend the Agreement. In the event of a conflict between this Statement of Work, Attachment A – Standard Grant Thornton LLP Engagement Terms, and any other exhibit or attachment included in the Agreement, the terms of the Attachment A shall govern.

**Grant Thornton LLP**
U.S. member firm of Grant Thornton International Ltd

 **Grant Thornton**

CAH Acquisition Company 12, LLC
d/b/a Fairfax Community Hospital
Engagement Letter dated April 11, 2019
Statement of Work dated April 11, 2019

**Agreed and Accepted**
The undersigned hereby agree to the terms and conditions as set forth above.

**GRANT THORNTON LLP**

Date: 4/11/19

Scott B. Davis, Partner


CAH Acquisition Company 12, LLC d/b/a Fairfax Community Hospital

Date: 4/11/19

Thomas W. Waldrep Jr., Trustee

**Grant Thornton**

CAH Acquisition Company 12, LLC
d/b/a Fairfax Community Hospital
Engagement Letter dated April 11, 2019
Statement of Work dated April 11, 2019

This **Statement of Work** ("Statement of Work") dated April 11, 2019 (along with **Attachment B**, below) becomes a part of and is subject to the terms and conditions of the **Engagement Letter** and related **Attachment A** – Standard Grant Thornton LLP Engagement Terms dated April 11, 2019 between CAH Acquisition Company 12, LLC d/b/a Fairfax Community Hospital ("Client", "Company" or "you") and Grant Thornton LLP ("Grant Thornton," "Firm," or "we"). Any capitalized terms that are not defined in this Statement of Work shall have the meanings set forth in the Engagement Letter, Attachment A – Standard Grant Thornton LLP Engagement Terms, or Attachment B. The purpose of this Statement of Work is to describe the Scope of **Services** ("Services") the Company is requesting Grant Thornton to perform, and to set forth the agreed fee, timing, and other matters related to the Services.

## Objective of Our Assignment

Below is a list of the Services it is anticipated that Grant Thornton may provide to the Company. Our approach and work plan is based on the procedures, analysis and budget requested by you. Our Services will be performed in accordance with the *Statement on Standards for Consulting Services* issued by the American Institute of Certified Public Accountants.

## Scope of Our Work

Our Services will consist of performing certain digital forensic procedures, making inquiries of the Company's management and third-party service providers, and analyzing the information obtained. Accordingly, the completion of our report will require cooperation of the Company's management (as well as the cooperation of management's third-party service providers). The Services section below will indicate the specific areas that you have requested us to address during this engagement.

Our Services do not constitute an audit or review of the financial statements or any part thereof, the objective of which is the expression of an opinion or limited assurance on the financial statements, or a part thereof, or verification of the accuracy of the Company's management responses to our inquiries. Our Services should not be relied upon to disclose errors, irregularities, or illegal acts, including fraud or defalcations. Further, because of the importance of the information that is provided to Grant Thornton with respect to our ability to perform the Services, you hereby release the Grant Thornton Firm from any liability, damages, fees, expenses and costs (including defense costs) relating to the Services, that arise from or relate to any information (including representations by management) provided by you, or any third party, that is not complete, accurate or current.

Additionally, Client acknowledges that any electronic media to be collected may have pre-existing damage or other problems and that we (and our affiliates and agents) do not assume responsibility for such damage or further problems resulting therefrom. In addition, with respect to such Services, you have or will take responsibility that:

    i    To the best of your knowledge and belief after due inquiry, Client has the right to be in possession of, or is the owner of, all equipment/data/media furnished to or collected by us on your behalf;

    ii    Such equipment/data/media is furnished to Grant Thornton LLP for a lawful purpose; and

    iii    Collection, possession, processing, and transfer of such equipment/data/media comply with all applicable laws and, regulations.

1



CAH Acquisition Company 12, LLC
d/b/a Fairfax Community Hospital
Engagement Letter dated April 11, 2019
Statement of Work dated April 11, 2019

**Limited Distribution of Our Report(s)**

Our findings may be communicated to you in one or more written reports. The reports will be supplemented with oral commentary, which will be an integral part of the presentation. The presentation of our findings to you will constitute satisfactory completion of our work. Our reports cannot be distributed to third parties without our prior written approval.

**Conflict of Interest Disclosure**

From time to time, we may encounter certain instances that in our view give rise to a potential conflict of interest between the Services we are going to perform and services that we may already be performing for an existing client. In such cases, we shall notify you of such a conflict and seek appropriate advance written consent from all parties prior to providing Services.

**The Services**

The Services we will provide under this Statement of Work consist of bankruptcy advisory services relating to the involuntary bankruptcy filing against the Company. Below is a list of the Services it is anticipated that Grant Thornton may provide to the Company:

(i)      Analyze the Company's Information Technology ("IT") infrastructure, storage media, and third-party systems;

(ii)     Consult with the Trustee on the assessment of Company's IT systems;

(iii)    Consult with the Trustee in connection with the development of data-preservation and data-collection efforts described in this Statement of Work;

(iv)     Provide digital forensic and related services (including, but not limited to, forensic preservation and collection of electronic data), to be performed at the direction of the Trustee;

(v)      Assist the Trustee with its communications with third-party IT providers and other parties-in-interest;

(vi)     Assist the Trustee in responding to information requests submitted by statutory committees and their legal and/or financial counsel; and

(vii)    Provide additional services as requested from time to time by the Company and agreed to by Grant Thornton.

Grant Thornton and the Company recognize that certain services listed above may not be performed or that certain other services may be performed depending on facts and circumstances that may emerge during the course of this engagement. In the event that Grant Thornton determines, in its sole discretion, that additional Services requested are beyond the scope of this original engagement, the Company agrees to file a motion seeking to approve the expansion of Grant Thornton's retention to include these additional Services.

GT US Shared Services Center India Private Limited ("GTSSC") and/or the Grant Thornton Knowledge and Capability Center India Private Limited ("KCC"), affiliates of Grant Thornton located in Bangalore, India – may assist us in providing our professional services.

2



CAH Acquisition Company 12, LLC
d/b/a Fairfax Community Hospital
Engagement Letter dated April 11, 2019
Statement of Work dated April 11, 2019

**Additional Services Available – Change Order**

It is understood that during the performance of the procedures, additional items may arise that you determine require additional investigation. While such additional investigation is not contemplated by this Statement of Work, or our fee estimate, we will be pleased to perform any additional procedures you deem necessary and request in writing. Prior to performing any additional procedures, we will discuss the scope of the procedures with you and the related fees in a change order or in a writing describing the additional work. Any additional procedures performed are subject to all the terms and conditions of this Agreement.

**Fees and Expenses**

Johnny Lee will maintain overall responsibility for the scope of the engagement described in this Statement of Work and will provide field support services and coordinate daily management of the engagement. Other professionals who may be identified during the course of the engagement may also provide additional services.

Fees are based on actual hours incurred and the following hourly billing rates for the resources utilized. The hourly rates charged by Grant Thornton for the Services provided by its personnel differ based upon, among other things, each professional's level of experience, and types of Services being provided. In the ordinary course of business, Grant Thornton periodically revises its hourly rates to reflect promotions and other changes in personnel responsibilities, increases in experience, and increases in the cost of doing business. The next rate change is expected to occur on or about August 1, 2019.

In exchange for the Services summarized previously, Grant Thornton will be entitled to compensation at discounted hourly rates for professional services. The professional fees shall be calculated by multiplying the actual hours expended providing the agreed-upon Services by the discounted hourly billing rates for the specific personnel involved. At present, Grant Thornton's standard hourly rates and applicable discounted hourly rates by classification are as follows:

| Professional | Standard Hourly Rates | Discounted Hourly Rates |
| --- | --- | --- |
| Partner / Principal | $870 | $620 |
| Managing Director | $800 | $620 |
| Director | $710 | $500 |
| Senior Manager | $710 | $500 |
| Manager | $590 | $450 |
| Senior Associate | $450 | $310 |
| Associate | $320 | $250 |

Changes in regular hourly rates will be noted on the invoices for the first period in which the revised rates become effective.

3



CAH Acquisition Company 12, LLC
d/b/a Fairfax Community Hospital
Engagement Letter dated April 11, 2019
Statement of Work dated April 11, 2019

We will provide regular communication (written or verbal) on the status of our fees during the life of the engagement. If it appears that the stated fee estimate will be exceeded, we will consult with you before continuing with the engagement.

In addition, Grant Thornton will be entitled to reimbursement of reasonable expenses incurred in connection with this engagement, including but not limited to travel, report production, delivery services, photocopying and other costs incurred in providing the Services. Our expenses will include an administrative charge of 6.0% of standard fees to cover items such as copies, postage, supplies, computer and technology usage, software licensing, research and library databases, and similar expense items.

Grant Thornton will also request compensation for any time and expenses (including, without limitation, reasonable legal fees and expenses of Grant Thornton's own counsel) that may be incurred in considering or responding to discovery requests or other requests for documents or information, or in participating as a witness or otherwise in any legal, regulatory, or other proceedings arising from or relating to Grant Thornton's performance of these Services.

From time to time, Grant Thornton may receive certain incentives in the form of bonuses and rewards from its corporate card and other vendors. Such incentives to the extent received will be retained by Grant Thornton to cover firm expenses. Bills for our Services will be issued periodically. Our fees are not contingent upon the confirmation of a Plan of Reorganization. Invoices are due upon receipt.

The Company understands and acknowledges that Grant Thornton will apply for compensation for professional services to be rendered in connection with this Chapter 11 case and for reimbursement of expenses incurred, in accordance with applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules of the United States Bankruptcy Court for the Eastern District of North Carolina, the applicable United States Trustee Guidelines, and any applicable orders of this Court (the "Payment Rules, Guidelines and Orders"). Payment of fees and reimbursement of expenses will be subject to ultimate allowance and approval by the Bankruptcy Court, and any additional orders governing interim payment of professionals in the Case.

Grant Thornton does not have any agreement to share its revenues from the Services for which it is seeking to be retained hereunder with any other non-affiliated entity. Grant Thornton has not been paid any retainer against which to bill fees and expenses incurred in this case.

**Entire Agreement**

This Statement of Work represents the parties' entire understanding with respect to the Services in this document. This Statement of Work does not modify or amend the Agreement. In the event of a conflict between this Statement of Work, Attachment A – Standard Grant Thornton LLP Engagement Terms, and any other exhibit or attachment included in the Agreement, the terms of the Attachment A shall govern.



CAH Acquisition Company 12, LLC
d/b/a Fairfax Community Hospital
Engagement Letter dated April 11, 2019
Statement of Work dated April 11, 2019

**Agreed and Accepted**

The undersigned hereby agree to the terms and conditions as set forth above.

**GRANT THORNTON LLP**

_____     Date:   4/11/19   _____

Johnny Lee, Principal

CAH Acquisition Company 12, LLC d/b/a Fairfax Community Hospital

_____     Date:   4/11/19   _____

Thomas W. Waldrep Jr., Trustee

5

**Grant Thornton LLP**
U.S. member firm of Grant Thornton International Ltd

CAH Acquisition Company 12, LLC
d/b/a Fairfax Community Hospital
Engagement Letter dated April 11, 2019
Statement of Work dated April 11, 2019

**Grant Thornton**

## Attachment B – Forensic Technology Services

The terms in this Attachment B apply to the Statement of Work dated April 11, 2019 for the Services to be provided by Grant Thornton LLP ("Grant Thornton LLP", "we" or "us") to CAH Acquisition Company 12, LLC d/b/a Fairfax Community Hospital ("Client", "Company" or "you"). In the event that there is a conflict between the Agreement and this Attachment B, the terms of this Attachment B shall control. Any capitalized terms herein that are undefined shall have the meaning assigned to them elsewhere in the Agreement.

### 1   Data Analytics

a. Database Fees

| Standard Database Set-up | • Creation of a database where data can be stored and analyzed<br>• If requested, field-level encryption can be implemented within the Standard Database. | $2,250 per database |
|---|---|---|
| Standard Database Hosting | • Monthly hosting charge per database. | $750 per month |
| Encrypted Database Set-up & Hosting | • The creation of a dedicated, matter-specific database with full database encryption. | $4,500 per month per database[1] |
| Database Archiving | • Data will be removed from an active database and archived offline (on separate media).<br>• This charge will persist until the archived data are returned to the Client or are destroyed, each at the written request of the Client. | $250 per month per database |

b. Data Visualization Fees

| Visualization Server Site Set-up | • Visualization Server site accessible to Client via the Internet. | $2,500 per site[2] |
|---|---|---|
| Visualization User Licensure | • A user login so that the Client can access the Visualization Server site. | $500 per user, per month |

---

[1] This pricing is for each database that stores up to one (1) Terabyte of data. Each additional Terabyte of data (beyond the first Terabyte) incurs an additional charge of $250 per month.

[2] Please note that Database Archiving fees will apply for all established data visualization sites regardless of whether such sites have active Server Users.

**Grant Thornton**

CAH Acquisition Company 12, LLC
d/b/a Fairfax Community Hospital
Engagement Letter dated April 11, 2019
Statement of Work dated April 11, 2019

## 2   Evidence Collection Fees

| | | |
|---|---|---|
| Forensic Imaging | • Forensically sound, bit-by-bit copy of a storage device, including chain-of-custody documentation. | $800 – $1,250 per Device/Drive (up to 2 TB)[3] |
| Server Share Logical Image | • Forensically sound, bit-by-bit copy of server share files, including chain-of-custody documentation. | $1,000 – $1,200 per Server Share[3] |
| Backup Tape File Listing | • A comprehensive listing of all files resident on a backup tape. | $150 – $200 per Backup Tape |
| Backup Tape Data Extraction | • The extraction of data from a given backup tape to new media. | $250 – $300 per Backup Tape[3,4] |

## 3   Data Processing and Review

a.   Data Processing

| | | |
|---|---|---|
| Processing Set-Up | • Fee related to the steps involved with the ingestion of a logical unit of data processing. | $500 per Logical Unit[5] |
| Processing & Review Promotion | • Extracted Data from data sources are processed within an eDiscovery platform.<br>• De-duplication can be performed post-processing, either globally or per custodian.<br>• The promotion of fully processed and delimited subset(s) of data from the original data sources provided by Client. | $75 - $150 per GB[6] |
| Optical Character Recognition | • Perform Optical Character Recognition (OCR) on additional data to extract text content upon request | $35 per GB[7] |

---

[3]  Note that this process requires that content be written to sterile media.  The actual cost of such media will be billed separately as an expense.

[4]  Extraction of data will be performed as stated above for up to two (2) hours. Extractions that exceed two (2) hours will be charged at the prevailing hourly rates until extraction is complete.

[5]  A "logical unit" of processing is defined as one data source for one custodian.

[6]  The per-GB charge is based upon total data volume to be processed, with total data volume calculated as the raw data volume following the extraction and expansion of any container files.

[7]  This OCR capability subjects processed data to another layer of machine processing to perform OCR on individuated files.  As such, this cost is additional to the Processing cost outlined above.  Manual quality reviews of machine-based OCR are also available, and such work is performed upon request at the prevailing hourly rates.

7



CAH Acquisition Company 12, LLC
d/b/a Fairfax Community Hospital
Engagement Letter dated April 11, 2019
Statement of Work dated April 11, 2019

| Load File Creation | • Known file exclusion as requested based on public list (e.g. NIST Reference Data Set) or list provided by Client.<br>• Processed and indexed data are formatted into an industry-standard file format, suitable for import into a chosen review platform. | $150 per GB[8] |
|---|---|---|
| Machine Translation | • The use of software to translate file text from one language to another | $0.12 - $0.15 per file[9] |
| Load File Ingestion | • Importation of data sets that were previously indexed and catalogued by an eDiscovery processing platform.<br>• Upon ingestion, data delimiters (e.g., search terms) can be applied and made available for review. | $125 per GB |

b. Analytics / Hosting / Review

| Document Imaging | • Documents are imaged from our eDiscovery Platform into TIFF or JPG format and made available for redaction, highlighting and production | No unit-based charge[10] |
|---|---|---|
| Conceptual Analytics / Assisted Review ("Predictive Coding") | • Group documents into clusters based on conceptual relationships to help quickly understand the case and identify important topics<br>• Automatically categorize documents within a project based upon training sets coded by a subject matter expert from Client<br>• Identification of similar documents by concept or textual analysis to increase the efficiency of review workflows and enhance quality control review<br>• Email threading to enable advanced workflows that defensibly reduce the review population | $200 per GB[11] |
| User Licensing | • Per-user (i.e., per reviewer) monthly license to use the platform | $100 per user per month |
| Offline Hosting | • Storage of all matter-related data on GT servers. | $5 per GB per month |
| Data Hosting | • Storage of matter-related data on active review platform. | $10 - $35 per GB per month |

---

[8] This charge pertains to the exporting of processed data from a Grant Thornton eDiscovery platform to load in another review platform, and the cost range varies based upon data volume.

[9] This $0.15 per-file cost applies to the first 1,000,000 files translated. Files processed in excess of 1,000,000 will be translated at $0.12 per file. Please note that files greater than 20KB in size will be split into 20KB segments, with each 20KB segment of a file incurring the translation cost of $0.15 or $0.12 per file (segment), depending on the current overall count of files. There is a $2,000 minimum charge for machine translation services.

[10] While there is no unit-based charge for document imaging, the time and materials required for the Grant Thornton team to assist with these items will be charged at the prevailing hourly rates.

[11] This per-GB charge is a one-time fee incurred when data are added (or "promoted") to the enhanced Analytics module of the eDiscovery review platform.

8



CAH Acquisition Company 12, LLC
d/b/a Fairfax Community Hospital
Engagement Letter dated April 11, 2019
Statement of Work dated April 11, 2019

## 4   Other Matters

a.  All other e-Discovery project management aspects are charged on a time-and-material basis at the hourly rates agreed upon within an executed engagement letter.  These may include, but are not limited to, the following:

- Intake, inventory, and cataloguing of received data and evidence;
- Decryption of encrypted or password-protected file(s)[12];
- Advanced creation of search-term queries and the application of these to existing data sets;
- Customizations to review, issue codes, or coding panels;
- Production requests;
- Creation of customized reports; and
- Other consultative services, as requested.

Computer forensics and data analysis procedures will be performed on a time-and-materials basis at the hourly rates agreed upon within this Agreement.

---

[12] Such files will be identified, and a list will be provided to the Client.  Written approval is sought and obtained prior to incurring billable time on this kind of work.

9

## BUSINESS ASSOCIATE AGREEMENT
## FOR HEALTH CARE PROVIDERS

This Agreement is entered into by and between CAH Acquisition Company 12, LLC d/b/a Fairfax Community Hospital ("Covered Entity") and **Grant Thornton LLP** ("Business Associate") to set forth the terms and conditions under which "Protected Health Information"("PHI"), as defined by the Health Insurance Portability and Accountability Act of 1996, and any modifications and/or amendments as may hereinafter, from time to time, become effective (HIPAA) as well as Subtitle D of the Health Information Technology for Economic and Clinical Health Act (the "HITECH Act"), as Title XIII of Division A and Title IV of Division B of the American Recovery and Reinvestment Act of 2009 (Pub. L. 111-5), and Regulations enacted thereunder, received by Business Associate on behalf of Covered Entity may be used or disclosed.

This Agreement is subject to approval by the United States Bankruptcy Court for the Eastern District of North Carolina and the obligations herein shall continue in effect so long as Business Associate uses, discloses, or otherwise possesses any PHI received by and/or on behalf of Covered Entity. In the event that there is any conflict between this Agreement and the engagement letter between the parties, this Agreement shall control.

1.      Business Associate may use and disclose PHI created, received, maintained or transmitted by Business Associate on behalf of Covered Entity if necessary to perform the functions, activities, or services for, or on behalf of, Covered Entity (collectively, the "Services"), as specified in Statement of Work, dated April 11, 2019 (the "Services Agreement"), or if necessary for the proper management of Business Associate, provided that any disclosure is:

      a.   Required by Law, or

      b.   Business Associate obtains reasonable assurances from the person to whom the PHI is disclosed that (i) the PHI will be held confidentially and used or further disclosed only as required by law or for the purpose for which it was disclosed to the person; and (ii) the Business Associate will be notified of any instances of which the person is aware in which the confidentiality of the information is breached, or

      c.   Required to perform the Services.

2.      a.      Business Associate hereby agrees to maintain the confidentiality, security and privacy of all PHI in a manner consistent with state and federal laws and regulations, including the HIPAA, the HITECH Act and Regulations thereunder, and all other applicable law. Business Associate shall only use and disclose PHI if such use or disclosure complies with each applicable requirement of 45 C.F.R. § 164.504(e). Business Associate shall be directly responsible for full compliance with the relevant requirements of the Privacy Rule and the Security Rule to the same extent as Covered Entity.

      b.     Furthermore, in the event of an unauthorized use or disclosure of PHI or a Breach of Unsecured PHI, Business Associate shall mitigate, to the extent practicable, any harmful effects of said unauthorized use or disclosure that are or should be known to it. "Breach" shall have the same meaning as the term "breach" in 45 CFR 164.402 and §13400 of the HITECH Act and shall include the unauthorized acquisition, access, use, or disclosure of PHI that compromises the security or privacy of such information. "Unsecured PHI" shall mean PHI that is not secured through the use of a technology or methodology specified by the Secretary in guidance or as otherwise defined in 45 CFR 164.402 and § 13402(h) of the HITECH Act.

3.     In respect to the HIPAA security standards as codified in 45 CFR Parts 160 and 164 (the "Security Rule"), the Business Associate will:

     a.   Implement administrative, physical, and technical safeguards that reasonably and appropriately protect the confidentiality, integrity, and availability of the Electronic Protected Health Care Information or "EPHI", as defined in 45 CFR Section 160.103, that it creates, receives, maintains, or transmits on behalf of the Covered Entity;

     b.   Ensure that any agent, including a subcontractor, to whom it provides such information agrees in writing to a Business Associate Agreement no less protective than this Agreement including the obligation to comply with the Security Rule; and

     c.   Business Associate agrees that it shall request from Covered Entity and disclose to its affiliates, subsidiaries, agents and subcontractors or other third parties, only a Limited Data Set or, if that is not practicable, only the minimum necessary PHI to perform or fulfill a specific function required or permitted hereunder;

     d.   Report to the Covered Entity any Security Incident, as defined in 45 CFR Section 164.304, in the following time and manner:

         (i)    any actual, successful Security Incident will be reported to the Covered Entity as soon as practicable, and in any event, in writing within ten (10) business days of the date on which the Business Associate becomes aware of such actual successful Security Incident.

         (ii)   any attempted, unsuccessful Security Incident, of which Business Associate becomes aware, will be reported to Covered Entity in writing, on a reasonable basis, at the written request of Covered Entity. If the Security Rule is amended to remove the requirement to report unsuccessful attempts at unauthorized access, this subsection (ii) shall no longer apply as of the effective date of the amendment of the Security Rule.

4.      Subject to consistency with the nature of the Services provided, within ten (10) business days of receipt of a request from Covered Entity, Business Associate shall provide to Covered Entity or, at its direction, to an Individual, PHI relating to that individual held by Business Associate or its agents or subcontractors in a Designated Record Set in accordance with 45 CFR 164.524.

5.      Subject to consistency with the nature of the Services provided, within ten (10) business days of receipt of a request from Covered Entity, Business Associate agrees to make any requested amendment(s) to PHI held by it or any agent or subcontractor in a Designated Record Set in accordance with 45 CFR 164.526.

6.      Within ten (10) business days after Business Associate, its agents or subcontractors makes any disclosure of PHI for which an accounting may be required under 45 CFR 164.528, Business Associate agrees to provide the information related to such disclosure as would be required to respond to a request by an Individual for an accounting in accordance with 45 CFR 164.528.

7.      Business Associate further agrees not to use or disclose PHI, except as expressly permitted by this Agreement, professional standards (such as those set forth by the American Institute of Certified Public Accountants or the SEC) and applicable law.

8.      Business Associate shall advise members of its workforce of Business Associate's privacy and security obligations under this Agreement.

9.      Business Associate shall not disclose PHI created or received by Business Associate on behalf of Covered Entity to a third party, including any agent or subcontractor of Business Associate but not including a member of Business Associate's own workforce, until such person agrees in writing to be bound by the provisions of this Agreement and applicable state or federal law.

10.     Covered Entity shall inform Business Associate of privacy practices and restrictions under HIPAA.

   a.  Covered Entity agrees to limit disclosure and access to the minimum amount of PHI, to the minimum number of personnel for the minimum of amount of time necessary for Business Associate to accomplish the intended purpose of such use, disclosure, or request, respectively.
   b.  Covered Entity shall notify Business Associate of any limitation(s) in its notice of privacy practices of Covered Entity in accordance with 45 CFR § 164.520, to the extent that such limitation may affect Business Associate's use or disclosure of Protected Health Information.
   c.  Covered Entity shall notify Business Associate of any changes in, or revocation of, permission by Individual to use or disclose Protected Health Information, to the extent that such changes may affect Business Associate's use or disclosure of Protected Health Information.

d.   Covered Entity shall notify Business Associate of any restriction to the use or disclosure of Protected Health Information that Covered Entity has agreed to in accordance with 45 CFR § 164.522, to the extent that such restriction may affect Business Associate's use or disclosure of Protected Health Information.

11.    Business Associate agrees to maintain a record of all disclosures of PHI, including disclosures not made for the purposes of this Agreement. Such record shall include the date of the disclosure, the recipient of the PHI, a brief description of the PHI disclosed, and the purpose of the disclosure.

12.    Business Associate agrees to report to Covered Entity any unauthorized use or disclosure of PHI by Business Associate or its workforce or subcontractors and the remedial action taken or proposed to be taken with respect to such use or disclosure.

13.    Business Associate agrees to make its internal practices, books, and records relating to the disclosure of a client's confidential information, such as PHI, received from Covered Entity, or created or received by Business Associate on behalf of Covered Entity, available to the Secretary of the United States Department of Health and Human Services, for purposes of determining the Covered Entity's compliance with HIPAA.

14.    Within thirty (30) days of a written request by Covered Entity, Business Associate shall allow Covered Entity to have access to and to copy PHI maintained by Business Associate (at Covered Entity's sole cost and expense), unless the information held by the Business Associate merely duplicates the information maintained by the Covered Entity.

15.    If Covered Entity determines that the Business Associate has breached a material term of this Agreement, Covered Entity may choose to: (i) provide Business Associate with ten (10) days written notice of the existence of an alleged material breach; and (ii) afford the Business Associate an opportunity to cure said alleged material breach to the satisfaction of Covered Entity within ten (10) days. The Business Associate's failure to cure shall be grounds for immediate termination of this Agreement and all related Agreements. Covered Entity's remedies under this Agreement are cumulative, and the exercise of any remedy shall not preclude the exercise of any other.

16.    Upon termination of this Agreement, Business Associate shall return or destroy all original PHI received from Covered Entity, or created, maintained or received by Business Associate on behalf of Covered Entity and that Business Associate maintains in any form. Business Associate's work papers may contain copies of PHI. However, Business Associate's work papers shall remain its sole and exclusive property and the protections of this Agreement shall extend to such PHI. At all times, Business Associate agrees to maintain the security and privacy of any PHI it retains, whether in the form of original PHI or copies, in a manner consistent with the obligations of this Agreement and as required by applicable law.

17.    Covered Entity may amend this Agreement by providing ten business (10) days prior written notice to Business Associate in order to maintain compliance with state or federal law. Such amendment shall be binding upon Business Associate at the end of the ten (10) day period and shall not require the consent of Business Associate. However, Business Associate

may elect to terminate this Agreement and any related agreements within the ten (10) day period, but Business Associate's duties hereunder to maintain the security and privacy of PHI shall survive such termination. Covered Entity and Business Associate may otherwise amend this Agreement by mutual written agreement and the Parties agree to take any such action as is necessary to amend this Agreement from time to time to comply with the requirements of HIPAA and any other applicable law.

18.    Miscellaneous

    a.  <u>Regulatory References.</u> A reference in this Agreement to a section of HIPAA Rule means the section as in effect or as amended.

    b.  <u>Interpretation.</u> Any ambiguity in this Agreement shall be resolved to permit Covered Entity to comply with the Privacy Rule.

    c.  <u>Definitions.</u> Any terms not defined in this Agreement, shall have the meanings provided under HIPAA.

    d.  <u>Incorporation.</u> This Agreement is incorporated into, and subject to the terms of, the Services Agreement.

CAH Acquisition Company 12 LLC d/b/a Fairfax Community Hospital

_____    _____
Thomas W. Waldrep Jr., Trustee                                              Date

Grant Thornton LLP

_____    _____
Grant Thornton LLP                                                            Date
Johnny Lee, Principal

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that this day he served a copy of the foregoing on the

parties in interest either electronically or by depositing copies of same in a depository under the

exclusive care and custody of the United States Postal Service, in a postage-paid envelope,

addressed as follows:

Marjorie K. Lynch                              *(via CM/ECF)*
Office of the Bankruptcy Administrator

Rayford K. Adams, III                          *(via CM/ECF)*
Counsel for the Debtor

This the 24th day of April, 2019.

**WALDREP LLP**

/s/ *Thomas W. Waldrep, Jr.* _____
Thomas W. Waldrep, Jr. (N.C. State Bar No. 11135)
James C. Lanik (N.C. State Bar No. 30454)
Jennifer B. Lyday (N.C. State Bar No. 39871)
Francisco T. Morales (N.C. State Bar No. 43079)
John R. Van Swearingen (N.C. State Bar No. 53646)
101 S. Stratford Road, Suite 210
Winston-Salem, NC 27104
Telephone: 336-717-1440
Telefax: 336-717-1340
Email: notice@waldrepllp.com