**SO ORDERED.**

**SIGNED this 14 day of February, 2020.**



_____
**Joseph N. Callaway**
**United States Bankruptcy Judge**

_____

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF NORTH CAROLINA
## GREENVILLE DIVISION

| | |
|---|---|
| IN RE:                                                         ) | |
|                          ) | **Case No. 19-01697-5-JNC** |
| CAH ACQUISITION COMPANY 12,   ) | |
| LLC, d/b/a FAIRFAX COMMUNITY   ) | **Chapter 11** |
| HOSPITAL,                                             ) | |
|                          ) | |
|        Debtor.                              ) | |

## ORDER (A) APPROVING SALE FREE AND CLEAR OF ALL LIENS, CLAIMS, INTERESTS, AND ENCUMBRANCES, (B) AUTHORIZING ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (C) GRANTING RELATED RELIEF

THIS MATTER came before the Court upon the _Trustee's Motion for (I) an Order (A) Establishing Bidding Procedures, (B) Approving Form and Manner of Notices, (C) Scheduling Hearing to Consider Final Approval of Sale and Treatment of Executory Contracts and Unexpired Leases, and (D) Granting Related Relief; and (II) an Order (A) Approving Sale Free and Clear of All Liens, Claims, Interests, and Encumbrances, (B) Authorizing Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (C) Granting Related Relief_ (the "Sale Motion") [Dkt. No. 330] filed on November 6, 2019, by Thomas W. Waldrep, Jr., Chapter 11 trustee (the "Trustee") for the above-captioned debtor (the "Debtor"), for entry of an order (the "Sale

Order" or the "Order") (a) authorizing and approving the Sale[1] of the Transferred Assets[2] free and clear of all liens, claims, and interests under Section 363(f) of the Bankruptcy Code (defined below) pursuant to that certain Asset Purchase Agreement (the "APA" or the "Agreement"), in substantially the form attached as **Exhibit A** to this Sale Order, by and between the Debtor (the "Seller") and Rural Wellness Fairfax, Inc. or its designee ("Rural Wellness" or the "Purchaser"); (b) approving the Agreement; and (c) granting related relief; and the Court having entered the *Order (A) Establishing Bidding Procedures, (B) Approving Form and Manner of Notices, (C) Scheduling Hearing to Consider Final Approval of Sale and Treatment of Executory Contracts and Unexpired Leases, and (D) Granting Related Relief* on November 27, 2019 (the "Bidding Procedures Order") [Dkt. No. 351]; and upon adequate and sufficient notice of the Sale Motion, the hearings before the Court on January 16, 2020, January 22, 2020, and January 29, 2020 (collectively, the "Sale Hearing"); and the Court having reviewed and considered (x) the Sale Motion and all relief related thereto, (y) the objections thereto, and (z) the statements of counsel and evidence presented in support of the relief requested at the Sale Hearing; and it appearing that the Court has jurisdiction over this matter; and it further appearing that the legal and factual bases set forth in the Sale Motion and at the Sale Hearing establish just cause for the relief granted herein; and it appearing that the relief requested in the Sale Motion is in the best interest of the Debtor, its estate, and creditors, and other parties-in-interest; and upon the record of the Sale Hearing and all other pleadings and proceedings in this Chapter 11 case, including the Sale Motion; and after due deliberation thereon and good and sufficient cause appearing therefore, the

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Sale Motion.

[2] As used in this Order, the term "Transferred Assets" shall have the meaning ascribed to the term "Assets" in the Agreement (hereinafter defined).

Court hereby finds and determines that: [3]

<h2 align="center">Jurisdiction and Venue</h2>

1.      This Court has jurisdiction to hear and determine the Sale Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (N), and (O). Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory predicates for the relief requested in the Motion are section 105, 363 and 365 of the Bankruptcy Code as well as rules 2002, 6004 and 6006 of the Federal Rules of Bankruptcy Procedure.

<h2 align="center">Sale Necessity and Purpose</h2>

3.      The Debtor does not have the resources to continue to operate within the confines of a bankruptcy case and will likely experience cashflow and financing issues if the Sale is not approved.  There is insufficient time to obtain confirmation of the Trustee's Amended Chapter 11 plan, filed on October 17, 2019 [Dkt. No. 480] prior to the Sale.

4.      This Court approved and expedited a post-petition marketing period in recognition of this reality.  The marketing in this case was conducted by the sales agent to the Trustee, Sherwood Partners, Inc. ("Sherwood").

5.      On November 6, 2019, the Trustee filed the Sale Motion.  With respect to the Sale Order requested therein, the Trustee filed a brief and memorandum of law in this case in support of the Trustee's Motion addressing the Trustee's ability to sell, transfer, and assign the Debtor's provider agreement (the "Provider Agreement") with the Centers for Medicare and Medicaid Services ("CMS") free and clear of any successor liability for underpayments owed to CMS (the

---

[3] The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent that any of the following conclusions of law constitute findings of fact, they are adopted as such.

"Trustee's Brief") [Dkt. No. 524 in Case No. 19-00730-5-JNC].

6.      On November 15, 2019, Complete Business Solutions Group, Inc. ("CBSG") filed a response and objection to the Trustee's motion for entry of the Bidding Procedures Order [Dkt. No. 340].  On December 24, 2019, Paul Nusbaum and Steve White ("Nusbaum/White") filed their objection to the Sale Motion (the "Nusbaum/White Objection") [Dkt. No. 393].  On December 27, 2019, the United States Department of Health and Human Services ("USDHHS") filed its objection to the Sale Motion (the "USDHHS Objection") [Dkt. No. 394].  On January 6, 2019, Cohesive Healthcare Management and Consulting, LLC ("Cohesive") filed its objection to the Sale Motion (the "Cohesive Objection," and together with the CBSG Objection, the Nusbaum/White Objection, and the USDHHS Objection, the "Sale Objections") [Dkt. No. 405].

7.      After a hearing on November 19, 2019, the Court entered the Bidding Procedures Order on November 27, 2019.  The Bidding Procedures Order granted the Trustee, in consultation with the Consultation Parties, defined in the Bidding Procedures Order to include the Town of Fairfax, Nusbaum/White, and the Bankruptcy Administrator (the "BA"), broad latitude to conduct a sale with the primary purpose of maximizing the return for all constituencies in this case. Certain assets were marketed for sale as defined in the Bidding Procedures Order as Transferred Assets while other assets were excluded from the Sale, as specifically set forth in Schedule A to the Agreement.

8.      In a case such as this, those constituencies include entities beyond the creditors, and can include the community, such as the one in which the Debtor's hospital is located. Specifically, the Bidding Procedures Order provided that, notwithstanding any other provisions in the Bidding Procedures Order, the Debtor, in consultation with the Consultation Parties, was permitted "to conduct the auction in any manner that may result in one or more of the highest and

best offers for any or all of the Transferred Assets that will maximize the value of any of the Transferred Assets."

**Auction**

9.      Pursuant to the Bidding Procedures Order, the Bidding Procedures Order and the notice containing the date of the Auction (defined below), the Sale Hearing, and the deadline to file objections to the Sale were provided to all potential purchasers previously identified or solicited by the Trustee and its professionals, the Consultation Parties, all parties that were known to possess or assert a lien, claim, encumbrance, or interest in or upon any of the Transferred Assets, all applicable federal, state, and local regulatory or taxing authorities, recording offices, or any governmental entity that have a reasonably known interest in the Transferred Assets, and all parties on the most current master service list filed in this case.

10.      In accordance with the Bidding Procedures Order, potential bidders were required to submit bids by 5:00 p.m. Eastern Time on December 12, 2019.  Pursuant to the provisions of the Bidding Procedures Order, the Trustee extended the bid deadline to 10:00 a.m. Eastern Time on December 16, 2019.  The Trustee received four bids from bidders deemed to be qualified pursuant to the Bidding Procedures Order: Cohesive; Rural Wellness, One Cura Wellness, Inc., and Transcendental Union with Love and Spiritual Advancement ("TULSA").

11.      The Trustee, with the assistance of Sherwood, conducted an auction of the Debtor's assets pursuant to the Bidding Procedures Order on December 19, 2019 in Charlotte, North Carolina (the "Auction").  At the close of bidding, the Trustee determined that Rural Wellness' bid of $2.1 million constituted the highest and best offer.  The Trustee designated Cohesive as the backup bidder entitled to purchase the Transferred Assets subject to bankruptcy court approval if the sale to the Purchaser was not consummated or was otherwise disapproved

by the Court. [4]

12.     Pursuant to the Bidding Procedures Order, the Sale Hearing was originally set for January 2, 2020.  On December 30, 2019, the Trustee filed the *Motion to Continue Sale Hearings* [Dkt. No. 347] seeking a continuance to January 16, 2020.  On December 31, 2019, the Court entered an order granting the requested continuance [Dkt. No. 348].

13.     On January 14, 2020, the Trustee filed his response to the Sale Objections (the "Sale Objections Response") [Dkt. No. 362].

### Sale Hearing

14.     At the Sale Hearing on January 16, 2020, the Trustee presented evidence in support of his request to approve his proposed Sale of the Transferred Assets to Rural Wellness.  Such evidence included testimony from the Trustee, David M. Johnson of Sherwood, and an Affidavit from Dr. Elizabeth Pusey, M.D., President of Rural Wellness.  The Sale Objections other than the USDHHS Objection had been settled prior to the Sale Hearing, and all parties attending the Sale Hearing other than the USDHHS supported the entry of this Sale Order.  The January 16, 2020 Sale Hearing was continued until January 22, 2020 so that the USDHHS Objection might be resolved.  The USDHHS Objection was resolved prior to the January 22, 2020 Sale Hearing, but the January 22, 2020 Sale Hearing was continued again to January 29, 2020 because TULSA indicated prior to such hearing that it intended to submit a bid to the Trustee that was substantially higher than Rural Wellness' $2.1 million bid.  Prior to the continued hearing, however, TULSA withdrew from further bidding.  Accordingly, the Court approved the proposed Sale of the

---

[4] Footnote 5 of the Trustee's Notice of Successful Bids and Next Highest Bids filed on December 20, 2019 [Dkt. No. 391] incorrectly notes that the Purchaser is acquiring the assets of Oswego Community Hospital, which is subject to its own separate bankruptcy case, In re CAH Acquisition Company #2, LLC, No. 19-01230 (Bankr. E.D.N.C.). For the avoidance of doubt, the Court notes that the sale and related transactions discussed in this Order relate to those of the Fairfax hospital facility subject to the instant case and not the bankruptcy case of Oswego Community Hospital.

Transferred Assets to the Purchaser at the January 29, 2020 Sale Hearing.

## Notice of Sale

15.     Notice of the Sale of the Transferred Assets and the Sale Hearing was reasonably calculated to provide all interested parties with timely and proper notice of the Sale and Sale Hearing.  As evidenced by the affidavits of service previously filed with the Court, proper, timely, adequate, and sufficient notice of the Sale Hearing, and the transaction contemplated thereby, was provided in accordance with the orders previously entered by this Court, Section 363 of Title 11 of the United States Code (the "Bankruptcy Code"), and Rules 2002, 6004, 6006, 9007, and 9008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").  The notices described herein were good, sufficient, and appropriate under the circumstances, and no other or further notice of the Sale Motion, Sale Hearing, or Sale shall be required.  The disclosures made by the Trustee concerning the Sale Motion, the Auction, and the designations regarding the successful and backup bidders were good, complete, and adequate.  A reasonable opportunity to object and to be heard with respect to the Sale and the Sale Motion and the relief requested has been afforded to all interested persons and entities.

## Good Faith of the Purchaser

16.     The Sale was negotiated, proposed, and entered into by the Trustee and by the Purchaser without collusion, in good faith and from arms-length bargaining positions.  The Purchaser is not an insider or affiliate of the Debtor as those terms are defined by the Bankruptcy Code.  Neither the Trustee nor the Purchaser have engaged in any conduct that could cause or permit the Agreement to be avoided or costs and damages to be imposed under Section 363(n) of the Bankruptcy Code.  Specifically, the Purchaser has not acted in a collusive manner with any person, and the aggregate price paid by the Purchaser for the Transferred Assets was not

controlled by an agreement among the bidders.  The Purchaser is purchasing the Transferred Assets in good faith and is a good faith buyer within the meaning of Section 363(m) of the Bankruptcy Code.  The Purchaser proceeded in good faith in all aspects of the Sale; accordingly, the Purchaser is entitled to all of the protections afforded under Section 363(m) of the Bankruptcy Code.

### No Fraudulent Transfer

17.     The consideration provided by the Purchaser pursuant to the Agreement (i) is fair and reasonable, (ii) is the highest or otherwise best offer for the Transferred Assets, (iii) will provide a greater recovery for the Debtor's estate than would be provided by any other available alternative, and (iv) constitutes reasonably equivalent value (as those terms are defined in each of the Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, and Section 548 of the Bankruptcy Code) and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia.  The Trustee's determination that the Agreement constitutes the highest or otherwise best offer for the Transferred Assets constitutes a valid and sound exercise of the Trustee's business judgment. Approval of the Sale Motion and the Agreement, and the consummation of the transactions contemplated thereby, is in the best interests of the Debtor, its estate, creditors, and other parties-in-interest.

18.     The Purchaser is not a mere continuation of the Debtor or its estate, and there is no continuity of enterprise between the Purchaser and the Debtor.  The Purchaser is not holding itself out to the public as a continuation of the Debtor.  The Purchaser is not a successor to the Debtor or its estate, and the Sale does not amount to a consolidation, merger, or de facto merger of the Purchaser and the Debtor.

**Validity of Transfer**

19.     The Trustee has, on behalf of the Debtor, (i) full corporate power and authority to execute and deliver the Agreement and all other documents contemplated thereby, (ii) all corporate and partnership authority necessary to consummate the transactions contemplated by the Agreement, and (iii) taken all corporate action necessary to authorize and approve the Agreement and the consummation of the transactions contemplated thereby.  The Sale has been duly and validly authorized by all necessary corporate action.  No consents or approvals, other than those expressly provided for in the Agreement, are required for the Trustee to consummate the Sale, Agreement, or transactions contemplated thereby.

20.     The Agreement was not entered into for the purpose of hindering, delaying, or defrauding creditors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession, or the District of Columbia.  Neither the Trustee nor the Purchaser is fraudulently entering into the transaction contemplated by the Agreement.

21.     The Debtor has good and marketable title to the Transferred Assets and is the lawful owner of the Transferred Assets.  Subject to the indefeasible payment in full of the purchase price by the Purchaser and all other provisions of the Agreement, and pursuant to Section 363(f) of the Bankruptcy Code, the transfer of the Transferred Assets to the Purchaser will be, as of the closing of the transaction contemplated by the Agreement and this Order (the "Closing Date"), a legal, valid, and effective transfer of the Transferred Assets, which will vest the Purchaser with all right, title, and interest of the Seller to the Transferred Assets free and clear, to the fullest extent permitted under applicable law, of (i) all liens (as that term is defined in Section 101(37) of the Bankruptcy Code), claims, and Encumbrances (defined below) (including any right of first offer or refusal regarding or option to purchase any real property) relating to,

accruing or arising any time prior to the Closing Date (collectively, the "Liens") and (ii) all debts arising under, relating to, or in connection with the Debtor or claims (as that term is defined in Section 101(5) of the Bankruptcy Code), liabilities, obligations, demands, guaranties, options, rights, contractual commitments, restrictions, interests, and matters of any kind and nature, whether arising prior to or subsequent to the commencement of this case, and whether imposed by agreement, understanding, law, equity, or otherwise (including, without limitation, rights with respect to Claims (defined below) and Liens (x) that purport to give to any party a right of setoff or recoupment against, or a right or option to effect any forfeiture, modification, profit sharing interest, right of first refusal, purchase, or repurchase right or option, or termination of, the Trustee's, the Debtor's, or the Purchaser's interests in the Transferred Assets, or any similar rights, or (y) in respect of taxes, restrictions, rights of first refusal, charges of interests of any kind or nature, if any, including, without limitation, any restriction of use, assignment, voting, transfer, receipt of income or other exercise of any attributes of ownership) (collectively, as defined in this clause (ii), "Claims"), relating to the Debtor, accruing, or arising any time prior to the Closing Date, except as expressly provided in this Order and/or the Agreement.

22.    This Order shall be the Court's determination that all Liens, Claims, Encumbrances, and other interests have been unconditionally released, discharged, and terminated from the Transferred Assets with all such Liens, Claims, Encumbrances, and other interests attaching only to the sale proceeds of the Transferred Assets with the same priority, validity, force, and effect, if any, as they now have in or against the Assets subject to all claims and defenses the Debtor, the Trustee, and other parties-in-interest may possess with respect thereto.

## MEDIATED SETTLEMENT WITH NUSBUAM/WHITE, COHESIVE, & CBSG

23.     As set forth above, objections to the Sale were filed by Nusbaum/White, Cohesive, and CBSG.  Nusbaum/White, Cohesive, and CBSG have consented to the Sale on the terms set forth herein.

24.     All of the proceeds from the sale, after payment of the fees owed to Sherwood Partners, Inc., shall be placed into a segregated account controlled by the Trustee. Additionally, all proceeds from the collection of cost report receivables shall be placed into the foregoing segregated account. The amounts placed into trust pursuant to this paragraph are referred to herein as the "Collateral Trust Funds."

25.     The Trustee is authorized to use and disburse the remaining cash on hand in the bankruptcy estate's bank accounts as of the Closing to the extent provided in the cash collateral orders and debtor in possession financing orders of this Court, with the understanding that if the case is or becomes administratively insolvent then the Court may compel return of any funds used and disbursed.  All parties retain their respective rights and interests pursuant to such cash collateral and debtor in possession financing orders and rights under 506(c) of the Bankruptcy Code.

26.     The Collateral Trust Funds shall be allocated between (i) a carve-out or surcharge for the benefit of the estate, (ii) the rights, claims, and interests of Nusbaum/White,(iii) the rights, claims, and interests of Cohesive, and (iv) the rights, claims, and interests of CBSG, as shall be determined and/or approved by this Court pursuant to further order(s) of this Court.  Provided, however, nothing herein shall be construed as a stipulation as to the validity of any surcharge rights, lien rights, or any other right or interests, and the parties reserve their rights and arguments on these issues in all respects.

27.     The Trustee, Nusbaum/White, Cohesive, and CBSG shall participate in a mediated settlement conference pursuant to E.D.N.C. LBR 9019-2, for the purpose of attempting to negotiate and resolve the disposition of the Collateral Trust Funds.  The mediator shall be selected pursuant to E.D.N.C. LBR 9019-2(2), and the cost of the mediator shall be divided equally among the parties pursuant to E.D.N.C. LBR 9019-2(4)(d).  All persons required by Rule 9019-2(4)(a) to attend the conference shall be physically present unless such physical presence is excused pursuant to an agreement between the parties and the mediator, or by an order of the Court.  The mediator and the parties shall schedule the date, time, and location of the conference, and shall conduct such mediation within 60 days after the closing of the Sale. All individuals and entities attending the settlement conference shall hold all statements made and conduct occurring at the conference confidential except as necessary to obtain approval of any settlement reached and as provided in E.D.N.C. LBR 9019-2(7).

## Section 363(f) Is Satisfied

28.     The conditions of Section 363(f) of the Bankruptcy Code have been satisfied in full because all persons known to have an interest in the Transferred Assets have consented to the Sale; therefore, the Debtor may sell the Transferred Assets free and clear of all Liens, Claims, Interests, and Encumbrances of any kind or nature whatsoever against the Debtor, its estate, or any of the Transferred Assets (except as otherwise provided in this Order).

## Compelling Circumstances for an Immediate Sale

29.     Good and sufficient reasons for approval of the Agreement and the Sale have been articulated.  The relief requested in the Sale Motion is in the best interests of the Debtor, its estate, its creditors, and other parties-in-interest.  The Trustee has demonstrated (i) good, sufficient, and sound business purposes and justifications for approving the Agreement and (ii) compelling

circumstances for the Sale outside of (a) the ordinary course of business, pursuant to Section 363(b) of the Bankruptcy Code and (b) a Chapter 11 plan, in that, among other things, the immediate consummation of the Sale to the Purchaser is necessary and appropriate to maximize the value of the Debtor's estate and the Sale will provide the means for the Trustee to maximize distributions to the creditors of the Debtor.

30.     Given all of the circumstances of this Chapter 11 case and the adequacy and fair value of the consideration under the Agreement, the proposed Sale constitutes a reasonable and sound exercise of the Trustee's business judgment and should be approved.

31.     The Sale does not constitute a sub rosa Chapter 11 plan for which approval has been sought without the protections that a disclosure statement would afford.  The Sale neither impermissibly restructures the rights of the Debtor's creditors nor impermissibly dictates a liquidating plan of reorganization for the Debtor.

32.     The inclusion of patients' personally identifiable information in the Transferred Assets is consistent with the Debtor's pre-petition privacy policy because the transfer is necessary to the ongoing provision of health care services.  Pursuant to 11 U.S.C. § 363(b)(1)(A), the Trustee may sell patients' personally identifiable information without the need for the appointment of a consumer privacy ombudsman.

33.     The consummation of the Sale is legal, valid, and properly authorized under all applicable provisions of the Bankruptcy Code, including, without limitation, Section 363(b), Section 363(f), and Section 363(m) thereof.

**IT IS HEREBY ORDERED THAT:**

<u>**General Provisions**</u>

34.     The relief requested in the Sale Motion, including the Sale, is granted and approved

to the extent set forth in this Sale Order.

35.     Any objections to the Sale Motion or the relief requested therein that have not been withdrawn, waived, or settled by announcement to the Court during the Sale Hearing, the provisions of this Order, or by stipulation filed with the Court, including any and all reservations of rights included in such objections or otherwise (except the reservations of right and objections expressly preserved in this Order), are hereby denied and overruled with prejudice.

## Approval of the Agreement

36.     The Agreement and all of the terms and conditions thereof are hereby approved and incorporated herein by reference.

37.     The Sale of the Transferred Assets and the consideration provided by the Purchaser under the Agreement is fair and reasonable and shall be deemed for all purposes to constitute a transfer for reasonably equivalent value and fair consideration under the Bankruptcy Code and any other applicable law.

38.     Pursuant to Sections 363(b) and (f) of the Bankruptcy Code, the Trustee is authorized and empowered to take any and all actions necessary or appropriate to (i) consummate the Sale pursuant to and in accordance with the terms and conditions of the Agreement, (ii) close the Sale as contemplated in the Agreement and this Order, and (iii) execute and deliver, perform under, consummate, implement, and fully close the Agreement to the Purchaser, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Agreement and the Sale.

39.     This Order shall be binding in all respects upon (a) the Trustee, (b) the Debtor, (c) the Debtor's estate, (d) all creditors of the Debtor, (e) all holders of Liens, Claims, Encumbrances or other interests (whether known or unknown) in, against, or on all or any portion of the

Transferred Assets, (f) the Purchaser and all successors and assigns of the Purchaser, (g) the Transferred Assets, and (h) any trustees, if any, subsequently appointed in the Debtor's Chapter 11 case or upon a conversion of this case to a case under Chapter 7 under the Bankruptcy Code. This Order and the Agreement shall inure to the benefit of the Debtor, its estate and creditors, the Purchaser, and the respective successors and assigns of each of the foregoing.

**<u>Transfer of the Assets</u>**

40.     Pursuant to Sections 363(b) and 363(f) of the Bankruptcy Code, the Trustee is authorized to transfer the Transferred Assets to the Purchaser on the terms and conditions stated in the Agreement (as it may be amended from time to time in the manner permitted by this Order), and, upon the Closing, the Purchaser shall be vested with title to the Transferred Assets free and clear of all Liens, Claims, Encumbrances and other interests of any kind or nature whatsoever (except as otherwise provided in this Order) to the fullest extent of applicable law, including but not limited to, successor or successor-in-interest liability and Claims, with such Liens, Claims, Encumbrances and other interests to attach to the proceeds of the Sale in the order of their priority, with the same validity, extent, force, and effect that they have against the Transferred Assets as of the Closing Date.  Upon the closing of the Sale (the "<u>Closing</u>"), the Purchaser shall take title to and possession of the Transferred Assets subject only to any interests and/or obligations expressly provided for in this Order and/or the Agreement.

41.     Except as expressly provided for in this Order and/or the Agreement, all persons and entities that are in possession of some or all of the Transferred Assets on the Closing Date are directed to surrender possession of such Transferred Assets to the Purchaser or its assignee at the Closing.  The provisions of this Order authorizing the sale of the Transferred Assets free and clear of Liens, Claims, Encumbrances and other interests of any kind or nature whatsoever (other than

as expressly provided for in this Order and/or the Agreement) shall be self-executing, and neither the Trustee nor the Purchaser shall be required to execute or file releases, termination statements, assignments, consents, or other instruments in order to effectuate, consummate, and implement the provisions of this Order; provided, however, that this paragraph shall not excuse the Trustee or the Purchaser from performing any and all of their respective obligations under the Agreement.

42.     Upon entry of the Sale Order, the Trustee is hereby authorized to take any and all actions necessary to consummate the Agreement without need for further approval. If Purchaser fails to consummate the Sale by the Closing Date and the conditions in Articles VI and Articles VII in the Agreement have been satisfied or otherwise waived in writing by Purchaser, then the Trustee is authorized (but not required) to effect the sale of the Assets to one or more third parties as soon as is commercially reasonable subject to further order of the Bankruptcy Court.

43.     After the Closing has occurred in accordance with the Agreement and this Order, a certified copy of this Order may be filed with the appropriate clerk and/or recorded with the recorder to act to cancel any liens and other Encumbrances (defined below) of record except with respect to any interests expressly provided for in this Order and/or the Agreement.

44.     On the Closing Date (and after the Closing has occurred in accordance with the Agreement and this Order), this Order shall be construed and shall constitute for any and all purposes a full and complete general assignment, conveyance, and transfer of the Seller's interests in the Transferred Assets.  This Order is and shall be effective as a determination that, on the Closing Date (and after the Closing has occurred in accordance with the Agreement and this Order), all encumbrances and other interests of any kind or nature whatsoever existing as to the Transferred Assets prior to the Closing Date, including without limitation any hypothecation, encumbrance, liability, Lien, Claim, interest, security interest, security agreement, interest,

16

mortgage, pledge, restriction, covenant, charge, license, preference, reclamation claim, cause of action, suit, contract, right of first refusal, offset and recoupment (except as specifically excepted in this Order and/or the Agreement), alter-ego, transferee, or successor liability claims, tax (including federal, state, and local tax), governmental order of any kind or nature, conditional sale, or other title retention agreement or lease having substantially the same effect as any of the foregoing, assignment or deposit arrangement in the nature of a security device, whether secured, unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, contingent or non-contingent, perfected or unperfected, allowed or disallowed, matured or unmatured, disputed or undisputed, material or immaterial, known or unknown (referred collectively, whether having arisen, been incurred or accrued pre-petition or post-petition, whether imposed by agreement, understanding, law, equity, or otherwise, as "Encumbrances") pursuant to Section 363(f) of the Bankruptcy Code, except as otherwise provided in this Order, shall have been unconditionally released, discharged, and terminated, and that the conveyances described herein have been effected.  This Order is and shall be binding upon and govern the acts of all persons and entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease; and each of the foregoing persons and entities is hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the Agreement.

45.    To the greatest extent available under applicable law, the Purchaser shall be authorized, as of the Closing Date (and after the Closing has occurred in accordance with the Agreement and this Order) to operate under any (i) federal, state, or local governmental or regulatory license, permit, registration, and (ii) governmental authorization or approval of the Debtor with respect to the Transferred Assets, and all such licenses, permits, registrations, and governmental authorizations and approvals are deemed to have been, and hereby are, deemed to be transferred to the Purchaser as of the Closing Date free and clear of Liens, Claims, Encumbrances and other interests of any kind or nature whatsoever.

46.    To the extent permitted by Section 525 of the Bankruptcy Code, no governmental unit may revoke or suspend any permit or license relating to the operation of the Transferred Assets sold, transferred, or conveyed to the Purchaser on account of the filing or pendency of the Debtor's Chapter 11 case or the consummation of the transactions contemplated by the Agreement.  Each and every federal, state, and local governmental agency or department is hereby authorized to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Agreement and this Order.

47.    Notwithstanding anything contained in this Order or the Agreement to the contrary, nothing in this Order or the Agreement releases the Purchaser from compliance, after the Closing, with any applicable governmental license, permit, registration, authorization, or approval of or with respect to a governmental unit as though such sale took place outside of bankruptcy.  The Purchaser shall continue to honor and comply with the terms and requirements of any such applicable license, permit, registration, authorization, or approval.

48.    Notwithstanding anything contained in this Order or the Agreement to the contrary, nothing in this Order or the Agreement shall authorize the transfer or assignment of any

governmental license if such transfer or assignment is prohibited by applicable non-bankruptcy law.

49.     The Trustee is authorized and empowered to cause to be filed with the secretary of state of any state or other applicable officials of any applicable governmental units any and all certificates, agreements, or amendments necessary or appropriate to effectuate the transaction contemplated by the Agreement, any related agreements, and this Order, including amended and restated certificates or articles of incorporation and by-laws or certificates or articles of amendment, and all such other actions, filings, or recordings as may be required under appropriate provisions of the applicable laws of all applicable governmental units or as any of the professionals of the Trustee may determine are necessary or appropriate.  The execution of any such document or the taking of any such action shall be, and hereby is, deemed conclusive evidence of the authority of such person to so act.  Without limiting the generality of the foregoing, this Order shall constitute all approvals and consents, if any, required by the applicable business corporation, trust, and other laws of the applicable governmental units, including for the change of the Debtor's corporate name, with respect to the implementation and consummation of the Agreement, any related agreements and this Order, and the transactions contemplated thereby and hereby.

50.     For the avoidance of doubt, nothing in this Sale Order shall limit, modify, or in any way affect the United States Secretary (the "Secretary") of Health and Human Services' authority to regulate Debtor's or the Purchaser's enrollment or participation as a Medicare supplier (to the extent the Purchaser enrolls or participates as a Medicare supplier) or the right and authority of the Secretary, CMS, or its contractors to review, approve, deny, or pay Medicare claims in the ordinary course of business in accordance with the Medicare Statute and regulations, and the policies and

procedures thereunder. The United States takes no position with respect to, and nothing herein shall be construed as the Secretary's consent to, or acceptance of, the Agreement or any underlying transactions described in or supporting the Agreement.

51.     For the avoidance of doubt, the Debtor's Medicare provider agreement as listed in Schedule 2.7 of the Agreement shall, as of the Closing, be deemed assumed by the Debtor and assigned to Purchaser, including, without limitation, any and all liability arising from or under the Medicare provider agreement, pursuant to and in accordance with Section 365 of the Bankruptcy Code and the Medicare Statute, the regulations promulgated under the Medicare Statute, and CMS' Medicare policies and procedures; provided further the provider agreement may not be terminated, or modified in any respect by any party thereto as a result of the consummation of the of the Sale.

52.     For the avoidance of doubt, notwithstanding any other provision of this Sale Order, the Agreement, or any other document implementing the Sale, the Trustee and the Purchaser have agreed that (i) the Debtor shall not assume and assign or otherwise transfer any national provider identifier, provider transaction access number, or Medicare enrollment agreement to the Purchaser other than as listed in Section 2.7 of the Agreement; and (ii) the Debtor shall not loan or otherwise permit the Purchaser to use or submit claims under the Debtor's provider transaction access number or Medicare enrollment agreement, except in accordance with the Agreement, the Medicare Statute, the regulations promulgated under the Medicare Statute, and CMS' Medicare policies and procedures and with the approval of CMS.

53.     Any cure amount set forth by the Debtor or the Trustee is not binding on the United States or the State of Oklahoma, and shall not be interpreted to set a cure amount related to the Debtor's Medicare provider agreement or limit successor liability with respect to the Debtor's Medicare provider agreement that is assumed and assigned to the Purchaser.

54.     All persons and entities are hereby forever prohibited and enjoined from taking any action that would adversely affect or interfere with the ability of the Debtor to sell and transfer the Transferred Assets to the Purchaser in accordance with the terms of the Agreement and this Order.

**Assumption and Assignment of Executory Contracts and Unexpired Leases**

55.     Pursuant to Sections 365(a), (b), (c), and (f) of the Bankruptcy Code, the Trustee, on behalf of the Debtor, is authorized to assume and assign the Assumed Contracts, which are referred to as the Assumed Contracts in the APA.

56.     In accordance with Sections 365(b)(2) and (f) of the Bankruptcy Code, upon assignment of the Assumed Contracts to the Purchaser, (i) the Purchaser shall have all of the rights of the Trustee or Debtor thereunder and each provision of such Assumed Contracts shall remain in full force and effect for the benefit of the Purchaser notwithstanding any provision in any such Assumed Contract or in applicable law that prohibits, restricts, or limits in any way such assignment or transfer, and (ii) no Assumed Contract may be terminated, or the rights of any party modified in any respect, including pursuant to any "change of control" clause, by any other party thereto as a result of the consummation of the transactions contemplated by the Agreement.

57.     The failure of the Trustee or the Purchaser to enforce, at any time, one or more terms or conditions of any Assumed Contract shall not be a waiver of such terms and conditions or of the Trustee's or the Purchaser's rights to enforce every term and condition of the Assumed Contracts.

58.     In the event that the Sale does not close, none of the Debtor's executory contracts or unexpired leases shall be assumed or rejected by virtue of this Order and shall remain subject to further administration in this case.

## Other Provisions

59.      This Order and the Agreement shall be binding in all respects upon the Trustee, the Purchaser, all creditors of the Debtor, all successors and assigns of the Debtor, any of their respective affiliates and subsidiaries, and any trustees, examiners, "responsible persons," or other fiduciaries appointed in the Debtor's bankruptcy case or upon a conversion of such case to a case under Chapter 7 of the Bankruptcy Code in accordance with the Bankruptcy Code and other applicable law.   The Agreement shall not be subject to rejection or avoidance under any circumstances.

60.      The Agreement may be modified, amended, or supplemented by the parties thereto in a writing signed by the parties, and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment, or supplement does not have a material adverse effect on the Debtor's estate and is consistent with the terms of this Order.

61.      The consideration provided by the Purchaser to the Trustee pursuant to the Agreement for the Transferred Assets constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, and under the laws of the United States, any state, territory, possession or the District of Columbia.

62.      Except as otherwise expressly provided for in this Order, the Purchaser shall not assume, nor be deemed to assume, or in any way be responsible, and all persons are prohibited and enjoined from asserting against the Purchaser any Claim, for any liability or obligation of the Trustee, the Debtor and/or its estate, including, but not limited to, any bulk sales or similar law, successor or transferee liability, antitrust law, labor law, de facto merger or substantial continuity, whether known or unknown as of the Closing Date, now existing or hereafter raised, which may

be asserted or unasserted, fixed or contingent, liquidated or unliquidated with respect to the Debtor, or any of their predecessors or affiliates or any obligations of the Debtor or their predecessors or affiliates arising prior to the Closing Date, for any liabilities, debts, commitments or obligations (whether known or unknown, disclosed or undisclosed, absolute, contingent, inchoate, fixed or otherwise) in any way whatsoever relating to or arising from the Transferred Assets or the Trustee's or the Debtor's operation of the Debtor's businesses or use of the Transferred Assets on or prior to the Closing Date, including, but not limited to, any liabilities, debts, commitments, or obligations arising prior to the Closing and under or in connection with: (a) any employment or labor agreements (including any collective bargaining agreements), consulting agreements, severance arrangements, change-in-control agreements or other similar agreement to which the Debtor is a party; (b) any pension, welfare, compensation or other employee benefit plans, agreements, practices and programs, including, without limitation, any pension plan of the Debtor; (c) the cessation of the Debtor's operations, pension, welfare, compensation, or other employee benefit plans, agreements, practices, and programs, obligations that might otherwise arise from or pursuant to applicable law; (d) workmen's compensation, occupational disease, or unemployment or temporary disability insurance claims; (e) environmental liabilities, debts, claims, or obligations arising from conditions first existing on or prior to Closing; (f) any liabilities, debts, commitments or obligations of, or required to be paid by, the Trustee or the Debtor for any taxes of any kind for any period; (g) any liabilities, debts, commitments or obligations for any taxes relating to the business of the Trustee, the Debtor, or the Transferred Assets for or applicable to the pre-Closing period; (h) any litigation; (i) any products liability, other tort or similar claims, whether pursuant to any state or any federal law; and (j) any other excluded liabilities under the Agreement.

       63.     The transactions contemplated by the Agreement are undertaken by the Purchaser

without collusion and in good faith, as that term is defined in section 363(m) of the Bankruptcy Code, and, accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the Sale, unless such authorization and such Sale are duly stayed pending such appeal.  The Purchaser is a good faith buyer within the meaning of Section 363(m) of the Bankruptcy Code and, as such, is entitled to the full protections of Section 363(m) of the Bankruptcy Code.

64.     Nothing contained in any plan of reorganization or liquidation, or order of any type or kind entered in (a) this Chapter 11 case, (b) any subsequent Chapter 7 case into which this Chapter 11 case may be converted, or (c) any related proceeding subsequent to entry of this Order, shall conflict with or derogate from the provisions of the Agreement (as modified by this Order) or the terms of this Order.

65.     The failure to specifically include any particular provision of the Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Agreement be authorized and approved in its entirety; *provided*, *however*, that this Order shall govern if there is any inconsistency between the Agreement (including all ancillary agreements) and this Order.  Likewise, all of the provisions of this Order are non-severable and mutually dependent.

66.     As the sale, transfer, assignment, conveyance and delivery of the Transferred Assets are in exchange for the purchase price and provisions of the Agreement, no withholding of U.S. federal income tax pursuant to sections 1441 or 1442 of the Internal Revenue code is required.

67.     The Court shall retain jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of this Order and the Agreement, all amendments thereto and any waivers and consents thereunder and each of the agreements executed in connection therewith to

which the Trustee or the Debtor is a party, and to adjudicate, if necessary, any and all disputes concerning or relating in any way to the Sale, including, but not limited to, retaining jurisdiction to (a) compel delivery of the Transferred Assets to the Purchaser, (b) interpret, implement, and enforce the provisions of this Order, and (c) protect the Purchaser against any Liens, Claims, Encumbrances or other interest in or against the Debtor or the Transferred Assets of any kind or nature whatsoever.

68.     This Order shall take effect immediately, shall not be stayed, and the Court finds and concludes that good cause exists to waive any applicable stay provided under Bankruptcy Rules 6004(g), 6004(h), 6006(d), 7062, 9014, or otherwise.  Accordingly, any such stay is hereby waived, and the Trustee and the Purchaser are authorized to close the Sale immediately upon entry of this Order in accordance with and subject in all respects to the terms and conditions of the Agreement.

69.     This Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a) notwithstanding Bankruptcy Rules 6004(h) and 6006(d). To any extent necessary under Bankruptcy Rule 9014 and Federal Rule of Civil Procedure 54(b), as made applicable by Bankruptcy Rule 7054, this Court expressly finds that there is no just reason for delay in the implementation of this Sale Order and that waiver of any applicable waiting period is appropriate, and expressly directs entry of judgment as set forth in this Order.

70.     To the extent that this Order is inconsistent with any prior order or pleading with respect to the Sale Motion in this Chapter 11 case, the terms of this Sale Order shall govern.

71.     The Trustee and the Purchaser shall provide reasonable updates to the Bankruptcy Administrator and those parties asserting liens on the Transferred Assets regarding their respective efforts to satisfy the conditions to Closing set forth in the Agreement.  If it becomes apparent that

25

the Trustee and the Purchaser will be unable to satisfy any condition to Closing set forth in the Agreement, the Trustee and the Purchaser shall promptly notify each other, the Bankruptcy Administrator, those parties asserting liens on the Transferred Assets, and if necessary, the Court.

72.     Subject to the entry of an order confirming a plan of liquidation in this case or other further order of this Court, there shall be no distribution of cash proceeds of the Sale to any party, except as set forth herein.

73.     Nothing contained in this Order shall be deemed an allocation of the purchase price to any of the Transferred Assets, and all rights, claims, and objections of all parties in interest with respect to such an allocation are expressly reserved and preserved.

--END OF DOCUMENT--

**EXHIBIT A**

---

---

**ASSET PURCHASE AGREEMENT**


**BY AND BETWEEN**

**THOMAS W. WALDREP, JR., AS CHAPTER 11 TRUSTEE FOR CAH ACQUISITION COMPANY 12 d/b/a FAIRFAX COMMUNITY HOSPITAL,**

(AS SELLER)


**AND**

**RURAL WELLNESS FAIRFAX, INC., OR ITS DESIGNEE,**

(AS PURCHASER)


**Dated as of February ___, 2020**

---

# TABLE OF CONTENTS

**Page**

ARTICLE I DEFINITIONS .................................................................................................. 1

    1.1    Certain Definitions ................................................................................. 1

    1.2    Other Definitional and Interpretive Matters ........................................ 10

ARTICLE II PURCHASE AND SALE OF ASSETS ...................................................... 10

    2.1    Sale of Assets ........................................................................................ 11

    2.2    Purchase of Assets ................................................................................ 12

    2.3    Excluded Liabilities .............................................................................. 12

    2.4    Excluded Assets .................................................................................... 14

    2.5    Nonassignable Assets ........................................................................... 14

    2.6    Method of Conveyance ......................................................................... 14

    2.7    Assumed Contracts ............................................................................... 15

    2.8    Assumption of Liabilities ..................................................................... 15

    2.9    Taxes and Assessments ........................................................................ 16

    2.10    Intentionally Deleted ........................................................................... 16

    2.11    Purchaser's Deposit ............................................................................. 16

    2.12    Purchase Price ...................................................................................... 16

    2.13    Order of the Bankruptcy Court ............................................................ 17

    2.14    Closing ................................................................................................. 17

    2.15    Medicare and Medicaid Provider Agreements .................................... 18

    2.16    Closing Payments .................................................................................. 19

    2.17    Closing Deliveries of Seller ................................................................. 19

    2.18    Closing Deliveries of Purchaser .......................................................... 19

    2.19    Intentionally Deleted ........................................................................... 20

    2.20    Further Conveyances and Assumption ................................................ 20

ARTICLE III REPRESENTATIONS AND WARRANTIES OF SELLER ............................. 20

    3.1    Power of Seller ..................................................................................... 21

    3.2    Validity and Enforceability of Agreement .......................................... 21

    3.3    Consents; Waivers and Approvals ....................................................... 21

    3.4    No Conflict ........................................................................................... 21

    3.5    Rights to Acquire Assets ...................................................................... 21

## TABLE OF CONTENTS
(continued)

Page

| | | |
|---|---|---|
| 3.6 | Title to and Adequacy of the Assets | 21 |
| 3.7 | Government Reimbursement Participation; Health Care Law Compliance | 22 |
| 3.8 | Existing Medicare and Medicaid Provider Agreements | 22 |
| 3.9 | Real Property | 22 |
| 3.10 | No Broker | 23 |
| 3.11 | Employment Matters | 23 |
| 3.12 | Intentionally Deleted | 24 |
| 3.13 | Intentionally Deleted | 24 |
| 3.14 | Compliance with Laws; Permits | 24 |
| ARTICLE IV REPRESENTATIONS AND WARRANTIES OF PURCHASER | | 24 |
| 4.1 | Corporate Existence of Purchaser | 24 |
| 4.2 | Validity and Enforceability of Agreement | 25 |
| 4.3 | Authorization and Authority | 25 |
| 4.4 | No Conflict | 25 |
| 4.5 | Ability to Consummate Transaction | 25 |
| 4.6 | Litigation and Arbitration | 25 |
| 4.7 | Brokers and Intermediaries | 26 |
| 4.8 | Solvency | 26 |
| ARTICLE V CERTAIN COVENANTS AND AGREEMENTS OF SELLER AND PURCHASER | | 26 |
| 5.1 | Access and Information | 26 |
| 5.2 | Authorizations | 28 |
| 5.3 | Conduct of Business | 29 |
| 5.4 | Commercially Reasonable Efforts | 31 |
| 5.5 | Adequacy of Purchaser's Review | 31 |
| 5.6 | Intentionally Deleted | 31 |
| 5.7 | Tax Matters | 31 |
| 5.8 | Announcement | 32 |
| 5.9 | Post-Closing Business Operations Commitment | 32 |

**TABLE OF CONTENTS**

(continued)

**Page**

| | | |
|---|---|---|
| 5.10 | Risk of Loss; Casualty Loss | 32 |
| 5.11 | Bankruptcy Actions | 33 |
| 5.12 | Collections on Assets. | 34 |
| 5.13 | DISCLAIMERS | 34 |
| 5.14 | Further Assurances | 34 |
| 5.15 | Confidentiality | 34 |
| 5.16 | Acceptance and Discharge | 36 |
| 5.17 | Cooperation | 36 |
| 5.18 | Surrender of License | 36 |
| 5.19 | Removal of Certain Liens | 36 |
| 5.20 | Insurance | 37 |
| 5.21 | Final Cost Report | 37 |
| ARTICLE VI CONDITIONS TO PURCHASER'S AND SELLER'S OBLIGATIONS | | 37 |
| 6.1 | Sale Order | 37 |
| 6.2 | No Injunctions | 37 |
| 6.3 | Compliance with Applicable Law | 37 |
| 6.4 | Consents | 37 |
| ARTICLE VII CONDITIONS TO PURCHASER'S OBLIGATIONS | | 37 |
| 7.1 | Representations and Warranties of Seller | 38 |
| 7.2 | Schedules | 38 |
| 7.3 | Documents | 38 |
| 7.4 | Performance of Obligations | 38 |
| 7.5 | No Material Adverse Effect | 38 |
| 7.6 | Assumed Contracts | 38 |
| 7.7 | Release of Liens | 38 |
| 7.8 | Consents | 38 |
| 7.9 | Intentionally Deleted. | 38 |
| 7.10 | No Disposition | 38 |
| 7.11 | No Dismissal or Conversion | 38 |

-iii-

# TABLE OF CONTENTS
### (continued)

**Page**

7.12 Deliveries ................................................................................................... 39

7.13 Rural Health Designations ......................................................................... 39

ARTICLE VIII CONDITIONS TO SELLER'S OBLIGATIONS ............................................. 39

8.1 Representations and Warranties of Purchaser ........................................... 39

8.2 Performance of this Agreement .................................................................. 39

8.3 Payment of Purchase Price; Bill of Sale, Assignment and Assumption ............. 39

8.4 Documents ................................................................................................... 39

ARTICLE IX SURVIVAL ........................................................................................................ 39

9.1 Survival ....................................................................................................... 39

ARTICLE X LIMITED AGREEMENT TERMINATION RIGHTS ....................................... 40

10.1 Termination of Agreement .......................................................................... 40

10.2 Procedure for Termination .......................................................................... 40

10.3 Effects of Termination ................................................................................ 41

ARTICLE XI MISCELLANEOUS ......................................................................................... 41

11.1 Assignment; Binding Agreement ................................................................ 41

11.2 Post-Closing Cooperation ........................................................................... 41

11.3 Expenses ..................................................................................................... 42

11.4 Entire Agreement and Modification ........................................................... 42

11.5 Severability ................................................................................................. 42

11.6 Waiver ......................................................................................................... 42

11.7 Counterparts ................................................................................................ 42

11.8 Headings; Interpretation ............................................................................. 43

11.9 Governing Law ........................................................................................... 43

11.10 Bankruptcy Court Jurisdiction ................................................................... 43

11.11 Notices ........................................................................................................ 43

11.12 Effectiveness ............................................................................................... 44

11.13 No Third Party Beneficiaries ...................................................................... 44

# ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement is made as of the _____ day of February, 2020, by and between Thomas W. Waldrep, Jr., as Chapter 11 Trustee for CAH Acquisition Company 12, LLC d/b/a Fairfax Community Hospital ("Seller" or "Trustee") and Rural Wellness Fairfax, Inc., an Oklahoma corporation, or its designee ("Purchaser").

## WITNESSETH:

WHEREAS, Debtor is a hospital organized as a limited liability company under the laws of the State of Delaware, operating in the Town of Fairfax, Oklahoma, and entitled to be reimbursed as a Critical Access Hospital under 42 CFR Part 485, Subpart F;

WHEREAS, Purchaser is a corporation organized under the laws of Oklahoma for the purpose of, among others, owning and operating critical access hospitals;

WHEREAS, Debtor presently owns and operates the Hospital, provides hospital services and other health care programs and services at the Hospital; operates the Other Business, and owns the Assets;

WHEREAS, Seller desires to sell to Purchaser all right, title, and interest of Seller and Debtor's bankruptcy estate in, to, and under the Assets and to assign to Purchaser the Assumed Contracts, on the terms and conditions set forth in this Agreement, pursuant to sections 363 and 365 of the Bankruptcy Code;

WHEREAS, Purchaser desires to purchase from Seller all right, title, and interest of Seller and Debtor's bankruptcy estate in, to, and under the Assets and to assume the Assumed Contracts, on the terms and conditions set forth in this Agreement, pursuant to sections 363 and 365 of the Bankruptcy Code; and

WHEREAS, the execution and delivery of this Agreement and Seller's ability to consummate the transactions set forth in this Agreement are subject to entry of the Sale Order.

NOW, THEREFORE, in consideration of the foregoing recitals and the mutual covenants hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, hereby agree as follows:

## ARTICLE I
## DEFINITIONS

1.1    **Certain Definitions**.  For purposes of this Agreement, defined terms used herein have the meanings specified in this Section 1.1.

"Action" means any suit, action, Claim, hearing, administrative action, demand, demand letter, Governmental investigation, notice of violation, or proceeding arising out of any violation or alleged violation of any Law or any breach or alleged breach of any Contract or Order.

"<u>Affiliate</u>" means a Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, the Person referred to. In this definition, "control" means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of securities, by contract, or otherwise.

"<u>Agreement</u>" means this Agreement, as hereafter amended, supplemented, or otherwise modified.

"<u>Assessed Cost Report Liability</u>" means the aggregate liability as finally determined and assessed by any Healthcare Program arising from any Cost Reports ending prior to the Effective Time.

"<u>Assets</u>" has the meaning ascribed to it in Section 2.1 herein, provided that (whether or not expressly stated) for all purposes of this Agreement, Assets always exclude Excluded Assets.

"<u>Assumed Contracts</u>" has the meaning ascribed to such term in Section 2.7.

"<u>Assumed Liabilities</u>" has the meaning ascribed to it in Section 2.8(a).

"<u>Authorizations</u>" means all Healthcare Regulatory Consents, Permits, licenses, certificates, accreditations, approvals, grants, or other authorizations of Governmental Authorities.

"<u>Bankruptcy Case</u>" means the case under Chapter 11 of the Bankruptcy Code, styled, *CAH Acquisition #12, LLC, d/b/a Fairfax Community Hospital*, Case No. 19-01697-5-JNC, pending before the Bankruptcy Court.

"<u>Bankruptcy Code</u>" means title 11 of the United States Code Section 101, et seq. (11 U.S.C. § 101, *et seq.*).

"<u>Bankruptcy Court</u>" means the United States Bankruptcy Court for the Eastern District of North Carolina and, to the extent of the withdrawal of any reference made pursuant to 28 U.S.C. § 157, the United States District Court for the Eastern District of North Carolina with jurisdiction over the Bankruptcy Case.

"<u>Benefit Plans</u>" has the meaning ascribed to such term in Section 2.3(c).

"<u>Bill of Sale, Assignment and Assumption</u>" has the meaning ascribed to it in Section 2.6.

"<u>Billing Services</u>" means health care services provided after the Effective Time, as determined by the episode discharge date. For the avoidance of doubt, if the episode discharge date is on or after the Closing Date, all health care services associated with such episode will be deemed to have been provided by Purchaser.

"<u>Books and Records</u>" includes, without limitation, books, ledgers, files, reports, records, inventory data, accounts receivable records, accounts payable records, vendor lists,

financing records, personnel and payroll records and other business books and records (including without limitation documents), regardless of the form of and the medium on which such books and records are maintained.

"Business" means the Hospital, the services and programs provided thereat, and the Other Business.

"Business Day" means any day of the year, other than Saturday or Sunday, on which national banking institutions in North Carolina are open to the public for conducting business and are not permitted, required, or authorized to close.

"Business Confidential Information" has the meaning ascribed to it in Section 5.15(b).

"Business Records" has the meaning ascribed to it in Section 5.1(e).

"Capital Expenditures" has the meaning ascribed to it in Section 2.12(b).

"Capital Improvements" has the meaning ascribed to it in Section 2.12(b).

"Casualty" has the meaning ascribed to it in Section 5.10.

"Claims" has the meaning given that term in Section 101(5) of the Bankruptcy Code and includes, *inter alia*, any and all deeds of trust, Liens, mortgages, assessments, security interests, encumbrances, claims, defenses, demands, damages, causes of action, offset rights, setoff rights, recoupment rights, interests, debts, obligations, guaranties, options, commitments, product liability claims (relating to all products sold or produced prior to the Closing), warranty claims, claims of employees or former employees or their beneficiaries or dependents, including but not limited to, severance or termination payments, pension or employee benefit claims, Taxes, all tort or contractual claims and any claims or obligations arising from Environmental Law, whether absolute or contingent, matured or unmatured, accrued or unaccrued, asserted or unasserted, known or unknown, in law or in equity, including, without limitation, any claims predicated upon any theory of successor liability or any similar theory, and all Liabilities or guaranties of any kind or nature, arising from or in any way connected with any action or inaction of Seller, arising prior to the Closing Date but excluding the Permitted Encumbrances.

"CLIA" means Clinical Laboratory Improvement Amendments (CLIA) of 1988, which are United States federal regulatory standards that apply to all clinical laboratory testing performed on humans in the United States.

"Closing" means the consummation of the transactions contemplated by this Agreement.

"Closing Date" means such date following the satisfaction of each Party's conditions to Closing or, where permitted, waiver by each Party of the other Party's conditions to Closing as set forth in Articles VI, VII and VIII to this Agreement, as shall be selected by the Parties, but in no event later than thirty (30) days from the entry of the Sale Order, or such later date, as may be required to obtain Authorizations, or as the Parties may in writing agree; provided

3

that if the Closing shall not have occurred by such outside date and this Agreement shall not have been terminated in accordance with its terms by a Party based on an uncured material breach hereunder by the other Party, then either Party shall have the right to extend the outside closing date for an additional sixty (60) days.

"CMS" means the Centers for Medicare & Medicaid Services.

"Code" means the Internal Revenue Code of 1986, as amended.

"Contract" means any contract, agreement, arrangement, understanding, lease, indenture, note, bond, evidence of indebtedness, license, sublicense, undertaking, binding commitment or instrument, or purchase order entered into or made by or on behalf of Debtor in connection with the Business or Other Business.

"Cost Reports" means all cost and other reports filed pursuant to the requirements of Healthcare Programs for payment or reimbursement of amounts due from such programs for services provided.

"Court" means any court, administrative or regulatory body, Government agency, arbitration or mediation panel or similar body.

"Cure Payments" means the amounts necessary to cure defaults, if any, under each Assumed Contract.

"Data Room" has the meaning ascribed to it in Section 1.2(a)(viii) herein.

"Debtor" means CAH Acquisition #12, LLC, d/b/a Fairfax Community Hospital.

"Deed" has the meaning ascribed to it in Section 2.6.

"Deposit" has the meaning ascribed to it in the Order (A) Establishing Bidding Procedures, (B) Approving Form and Manner of Notices, (C) Scheduling Hearing to Consider Final Approval of Sale and Treatment of Executory Contracts and Unexpired Leases, and (D) Granting Related Relief, entered on November 27, 2019 [Docket No. 351].

"DIP Order" means the Final Order (A) Authorizing the Trustee, on Behalf of the Debtor, to Obtain Secured Post-Petition Financing Pursuant to Section 364(c)(1) and (2) of the Bankruptcy Code and Bankruptcy Rule 4001 and (B) Granting Super-Priority Administrative Expense Treatment and Certain Liens on the Debtor's Property to the Lender as Security for the Obligations Hereunder, entered by the Bankruptcy Court on May 15, 2019 [Docket No. 130],

"DMA" has the meaning ascribed to it in Section 2.15.

"Dispute" has the meaning ascribed to it in Section 11.10(a).

"Effective Time" means the effective time of the Closing, which shall be as of 12:00:01 a.m. prevailing Eastern Time, on the day of the Closing Date.

"Environmental Law" means any federal, state or local statute, law, regulation, code, ordinance, or rule of common law currently in effect relating to the protection or pollution of the environment or natural resources, including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act (42 U.S.C. § 9601 *et seq.*), the Hazardous Materials Transportation Act (49 U.S.C. App. § 1801 *et seq.*), the Resource Conservation and Recovery Act (42 U.S.C. § 6901 *et seq.*), the Clean Water Act (33 U.S.C. § 1251 *et seq.*), the Clean Air Act (42 U.S.C. § 7401 *et seq.*) the Toxic Substances Control Act (15 U.S.C. § 2601 *et seq.*), the Federal Insecticide, Fungicide, and Rodenticide Act (7 U.S.C. § 136 *et seq.*), The Medical Waste Tracking Act (42 U.S.C. § 6992 *et seq.*), the Oil Pollution Act (33 U.S.C. § 2701 *et seq.*), the Emergency Planning and Community Right to Know Act (42 U.S.C. § 11001 *et seq.*), the Occupational Safety and Health Act (29 U.S.C. § 651 *et seq.*), and the Occupational Safety Health Act (29 U.S.C. § 651 *et seq.*).

"Environmental Permits" means all permits, licenses, certificates, approvals, authorizations, consent or registrations issued by a Governmental Authority pursuant to an Environmental Law.

"Excluded Assets" means those assets of Debtor that are set forth on Schedule A attached hereto.

"Excluded Liabilities" has the meaning ascribed to such term in Section 2.3.

"Excluded Records" means (a) any materials about employees, disclosure of which would violate Law, (b) any materials that are subject to a Privilege or requirement to maintain confidentiality or (c) any Patient Records but only to the extent access to Patient Records is prohibited by Law.

"Exhibits" means the exhibits provided for and referred to in this Agreement.

"Final Cost Report Liability" means the amounts necessary, if any, to satisfy liability incurred as a result of the filing of any Cost Report including, without limitation, the Assessed Cost Report Liability.

"Final Order" means an order or judgment of the Bankruptcy Court or any other court of competent jurisdiction that has not been reversed, vacated, or stayed and as to which (a) the time to appeal, petition for certiorari, or move for a stay, new trial, reargument, or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for stay, new trial, reargument, or rehearing shall then be pending or (b) if an appeal, writ of certiorari, stay, new trial, reargument, or rehearing has been sought, (i) such order or judgment shall have been affirmed by the highest court to which such order was appealed, certiorari shall have been denied, or a stay, new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and (ii) the time to take any further appeal, petition for certiorari, or move for a stay, new trial, reargument or rehearing shall have expired; *provided*, *however*, that the possibility that a motion under section 502(j) of the Bankruptcy Code, Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or applicable state court rules of civil procedure may be, but has not been, filed with respect to such order shall not cause such order not to be a Final Order.

"FPCG" has the meaning ascribed to such term in Section 11.1(a).

"Government" or "Governmental" means or refers to the United States of America, any other nation or sovereign state, any federal, bilateral or multilateral governmental authority, state, possession, territory, county, district, city or other governmental unit or subdivision, and any branch, agency, or judicial body of any of the foregoing.

"Governmental Authority" means (i) any federal, state, county, municipal or other local Government or governmental authority, including, without limitation, any regulatory or administrative agency, commission, department, board, bureau, agency, instrumentality or Court and (ii) any arbitrator or arbitral body of any Government.

"Hazardous Substance" means any "pollutant", "contaminant", "solid waste", "hazardous waste", "hazardous material" or "hazardous substance" as defined under any Environmental Law, including medical wastes, toxic or hazardous air or water pollutants or any other toxic, infectious or noxious substances or any waste or recycled products thereof or asbestos or mold (including biological agents, such as mold or fungi that can or are known to produce mycotoxins or other bioaerosols such as antigens, bacteria, amoebae and microbial volatile organic compounds).

"Health Care Laws" means, all applicable laws of any Governmental Authority regulating health services or payment, including, but not limited to, the federal Anti-Kickback Statute (42 U.S.C. § 1320a-7b(b)), the Stark Law (42 U.S.C. § 1395nn), the Anti-Inducement Law (42 U.S.C. § 1320a-7a(a)(5)), the civil False Claims Act (31 U.S.C. § 3729 et seq.), the administrative False Claims Law (42 U.S.C. § 1320a-7b(a)), the exclusion laws (42 U.S.C. § 1320a-7), the civil monetary penalty laws (42 U.S.C. § 1320a-7a), the Health Insurance Portability and Accountability Act of 1996 (42 U.S.C. §§ 1320d-1320d-8), the Medicare Prescription Drug, Improvement and Modernization Act of 2003, Medicare (Title XVIII of the Social Security Act), Medicaid (Title XIX of the Social Security Act), the Food, Drug and Cosmetic Act (21 U.S.C.§§ 301 et seq.), the Prescription Drug Marketing Act of 1987, the Deficit Reduction Act of 2005, the Controlled Substances Act (21 U.S.C. §§ 801 et seq.), the regulations promulgated pursuant to such laws, and any other law, regulation, guidance document, manual provision, program memorandum, opinion letter, or other issuance of any Governmental Authority with legally binding effect which regulates kickbacks, patient or program charges, recordkeeping, claims process, documentation requirements, medical necessity, referrals, the hiring of employees or acquisition of services or supplies from those who have been excluded from government health care programs, quality, safety, privacy, security, pharmacy practice, licensure, accreditation or any other aspect of providing health care.

"Healthcare Programs" shall have the meaning set forth in Section 3.7 of this Agreement.

"Healthcare Regulatory Consents" means in respect of Seller or Purchaser, as the case may be, such consents, approvals, Authorizations, waivers, Orders, licenses or Permits of any Governmental Authority as shall be required to be obtained by such party in order for such party to consummate the transactions contemplated of it by this Agreement in compliance with all applicable Law relating to health care or healthcare services of any kind, to the extent necessary,

6

under or through CLIA, CMS, DEA, and any other approvals, Authorizations, waivers, Orders, licenses, or Permits of any Governmental Authority required to consummate the transactions contemplated hereby and for Purchaser to operate the Business and the Other Business.

"Hospital" means the hospital operated by Seller located in the town of Fairfax, Oklahoma, known as Fairfax Community Hospital and operated in connection with the Business.

"Knowledge" means (a) as to Seller, the actual knowledge of the Seller and (b) as to Purchaser, the actual knowledge, after due inquiry, of the President of Purchaser.

"Law" means any statute, law, code, treaty, ordinance, rule, regulation, instrument, directive, decree, agreement, policy, Order, consent decrees and consent orders, or injunction of or with any Government, Governmental Authority, quasi-Governmental Authority, or Court, and includes, without limitation, all judicial and administrative interpretations thereof, and all rules or regulations of any regulatory or self-regulatory authority compliance with which is required by Law.

"Lease" and "Leases" have the meaning ascribed to such terms in Section 3.9(d).

"Leased Real Property" has the meaning ascribed to such term in Section 3.9(d).

"Legal Requirement" means any federal, state, provincial, local, municipal, foreign, international, multinational, or other administrative Order, constitution, law, ordinance, principle of common law, regulation, rule, statute or treaty.

"Liabilities" means debts and liabilities, whether known or unknown, contingent or absolute, liquidated or unliquidated, and whether or not required to be reflected on the financial statements of a business, whether arising under any Contract, Law, Lien, Order or otherwise.

"Lien" means any lien, security interest, mortgage, deed of trust, option, lease, tenancy, occupancy, covenant, condition, easement, agreement, royalty, pledge, hypothecation, charge, claim or other encumbrance, right or interest.

"Material Adverse Effect" means any change, effect, fact, event, occurrence, state of facts or development that, individually or together with any other changes, effects, facts, events, occurrences, states of facts or developments, not a result of or caused by the action or inaction of Purchaser, that materially and adversely affects, or would reasonably be expected to materially and adversely affect (a) the financial condition, results of operations, Assets, Liabilities or income of the Business (taken as a whole), (b) the ability of Seller to perform its obligations under this Agreement, or (c) Purchaser's ability to operate the Business as of the Effective Time or use the Assets and rights granted under this Agreement, in the aggregate.

"Nonassignable Asset" shall have the meaning set forth in Section 2.5 of this Agreement.

"Oklahoma Regulations" means the Oklahoma General Statutes as well as the rules and regulations imposed by the Oklahoma State Department of Health.

"Order" means any order, judgment, writ, injunction, award or decree of any Court or Governmental Authority.

"Ordinary Course of Business" means with respect to the Business, the ordinary course of commercial operations customarily engaged in by the Business or the Other Business, as applicable, reasonably consistent with past practices.

"Other Business" means the outpatient, ancillary, and other healthcare businesses incident to the operation of the Hospital set forth in Schedule B attached hereto.

"Party" or "party" means either Purchaser or Seller, and "Parties" means both Purchaser and Seller together.

"Patient Records" shall mean any documents containing information concerning medical, health care or behavioral health services provided to, or the medical, health care or behavioral health of any individual, or that are otherwise subject to regulation under applicable Law, including the Health Insurance Portability and Accountability Act of 1996 and all regulations promulgated pursuant thereto, including the Transaction Code Set Standards, the Privacy Rules and the Security Rules set forth at 45 C.F.R. Parts 160 and 164 (collectively, "HIPAA").

"Permits" means any approvals, Authorizations, Healthcare Regulatory Consents, licenses, permits, provider numbers, including, without limitation, Medicare and Medicaid provider numbers and agreements, certificates of need, certificates of exemption, franchises, accreditations, registrations or certificates of a Governmental Authority.

"Permitted Encumbrances" means those Liens or exceptions listed on or described in Schedule C attached hereto.

"Permitted Parties" has the meaning ascribed to it in Section 5.1(e).

"Person" means any natural person, any corporation, partnership, limited liability company, limited liability partnership, joint venture, trust, association, company, or other legal entity, and any Government or Governmental Authority.

"Private Programs" means any private insurance or reimbursement programs.

"Privilege" means the attorney-client privilege (including the common interest privilege) or the attorney work product doctrine.

"Privileged Materials" means any materials that are protected by or the subject of a Privilege.

"Provider Agreements" means Debtor's existing provider agreements with the Medicare and Medicaid programs.

"Purchase Deposits" means all deposits related to the Assets (including customer deposits and security deposits for rent, electricity, utilities and otherwise) and prepaid charges and expenses of Seller.

"Purchased Intellectual Property Licenses" means those intellectual property related licenses of the Debtor included within the Assets.

"Purchase Price" has the meaning ascribed to it in Section 2.12(a).

"Purchaser" has the meaning set forth in the Preamble to this Agreement.

"Purchaser's Discretion" means the sole and absolute discretion of Purchaser.

"Records Custody Agreement" means the agreement, in the form mutually agreed to by Purchaser and Seller under which, among other things, at the Closing (i) Seller will transfer to Purchaser, as permitted by and in accordance with HIPAA, custody of certain of Seller's medical records and related business and administrative records that Purchaser, in Purchaser's Discretion, determines will be needed by Purchaser to utilize the Assets on a going forward basis; (ii) Purchaser and Seller will agree to maintain records for as long as retention is mandated by law; and (iii) as permitted by and in accordance with HIPAA, Purchaser and Seller will each permit the other, and individuals with rights to access such records, to access records in their respective possessions.

"Real Property" means each parcel of real property included in the Assets, including, without limitation, all rights of way, easements, facilities and other improvements and fixtures thereon and appurtenances thereto and all rights associated therewith, to the extent owned or leased by Debtor as set forth in Schedule D attached hereto.

"Relating to" means arising from, in connection with or otherwise relating to. "Relates to" and "relate to" have corresponding meanings.

"Release" means any past or present spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping or disposing of a Hazardous Substance into the Environment (including the abandonment or discharging of barrels, containers and other closed receptacles containing any Hazardous Substance).

"RHCs" means the two Rural Health Clinics described in Schedule B.

"Sale Hearing" means the hearing(s) on the Sale Motion held before the Bankruptcy Court.

"Sale Motion" means the Trustee's Motion for (I) an Order (A) Establishing Bidding Procedures, (B) Approving Form and Manner of Notices, (C) Scheduling Hearing to Consider Final Approval of Sale and Treatment of Executory Contracts and Unexpired Leases, and (D) Granting Related Relief; and (II) an Order (A) Approving Sale Free and Clear of All Liens, Claims, Interests and Encumbrances, (B) Authorizing Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (C) Granting Related Relief filed on November 6, 2019 [Docket No. 330].

"Sale Order" means an Order of the Bankruptcy Court, in form and substance acceptable to Purchaser in its sole and absolute discretion, pursuant to, inter alia, Bankruptcy Code sections 363 and 365, authorizing and approving, among other things, (1) the sale of the Assets to

Purchaser on the terms and conditions set forth herein, free and clear of all Liens and Claims, to the fullest extent permissible under the Bankruptcy Code, (2) the assumption and assignment of the Assumed Liabilities, and (3) the assumption and assignment of the Assumed Contracts, which such Order has become a Final Order, unless waived by Purchaser.

"Schedules" means the schedules provided for and referred to in this Agreement.

"Seller" has the meaning set forth in the Preamble to this Agreement.

"Seller's Confidential Information" has the meaning ascribed to it in Section 5.15(a).

"Tax" or "Taxes" means (i) all federal, state, local or foreign taxes, charges or other assessments, including all net income, gross receipts, capital, sales, use, ad valorem, value added, transfer, franchise, profits, inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation, property, excise taxes under section 4979 of the Code, unrelated business income taxes, and estimated taxes, whether disputed or not, and (ii) all interest, penalties, fines, additions to tax or additional amounts imposed by any taxing authority in connection with any item described in clause (i).

"Taxing Authority" means any Government or Governmental Authority responsible for the imposition or collection of any Tax.

"Transferred Business Records" has the meaning ascribed to it in Section 5.1(f).

"Transfer Taxes" means all excise, sales, use, transfer (including Real Property transfer or gains), value added, stamp, documentary, filing, recording and similar Taxes and fees which may be imposed or assessed as a result of the transactions effected pursuant to this Agreement together with any interest, additions, penalties with respect thereto and any interest in respect of such additions or penalties.  Income taxes do not constitute Transfer Taxes.

"Working Capital" has the meaning ascribed to it in Section 2.12(b).

1.2     **Other Definitional and Interpretive Matters**.

(a)     Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

(i)     Calculation of Time Periods.  When calculating the period before which, within which, or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded. If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

(ii)     Dollars.  Any reference in this Agreement to "$" means United States dollars.

10

(iii)    Exhibits/Schedules.  All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any matter or item disclosed on one Schedule shall be deemed to have been disclosed on each other Schedule to the extent it is reasonably apparent that it is pertinent to the subject matter of such other Schedule. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

(iv)    Gender and Number.  Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

(v)    Headings.  The provision of a Table of Contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement.  All references in this Agreement to any "Section" are to the corresponding Section of this Agreement unless otherwise specified.

(vi)    Herein.  The words such as "herein," "hereinafter," "hereof," and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

(vii)    Including.  The word "including" means "including, without limitation," and "includes" and "include" have corresponding meanings, and such words shall not be construed to limit any general statement to the specific or similar items or matters immediately following it.

(viii)    Made Available to Purchaser.  The phrase "made available to Purchaser" means, for all purposes of this Agreement, made available to Purchaser through posting in Seller's electronic data room (the "Data Room"), via email, facsimile or other electronic transfer or through other written means for all purposes of this Agreement.

(b)    No Construction Against Drafter.  No presumption, burden of proof, burden of persuasion or similar method of interpretation or standard shall arise or otherwise apply favoring or disfavoring any Party (including, without limitation, the draftsperson) by virtue of the authorship of any one or more provisions of this Agreement, including in any arbitration or litigation proceeding.

**ARTICLE II**
**PURCHASE AND SALE OF ASSETS**

2.1    **Sale of Assets**.

(a)    At the Closing and as of the Effective Time but in all events subject to the approval of the Bankruptcy Court by and through the Sale Order, Seller agrees, upon and subject to the terms and conditions hereinafter set forth, to sell, transfer, convey, assign, and deliver or cause to be sold, transferred, conveyed, assigned, and delivered to Purchaser, all right, title, and interest of Seller and Debtor's bankruptcy estate in, to and under all of the assets and properties and associated rights and interests, real, personal, and mixed, tangible and intangible, of whatever

11

kind, owned by Debtor (no matter where located, including without limitation, on leased property) and used in or related to the Business and the Other Business, but excluding the Excluded Assets (collectively, after excluding the Excluded Assets, the "Assets"). The Assets shall include, to the extent transferrable, all Patient Records (Seller and its representatives shall continue to have access to all Patient Records as necessary to respond to governmental or other inquiries or issues and to defend malpractice claims upon request as set forth in this Agreement) but excluding any Excluded Documents. None of the Excluded Assets shall be conveyed to Purchaser.

(b)    At any time prior to three (3) Business Days prior to the Closing Date, Purchaser may, in its sole discretion by written notice to Seller, designate any of the Assets as additional Excluded Assets, which notice shall set forth in reasonable detail the Assets so designated. Purchaser acknowledges and agrees that there shall be no reduction in the Purchase Price if it elects to designate any Assets as Excluded Assets. Notwithstanding any other provision hereof, the Liabilities of Seller under or related to any Asset excluded under this paragraph shall constitute Excluded Liabilities.

2.2    **Purchase of Assets**. Purchaser agrees to purchase the Assets upon and subject to the terms, conditions and provisions set forth herein and pursuant to the terms in the Sale Order.

2.3    **Excluded Liabilities**. Notwithstanding any provision in this Agreement to the contrary, Purchaser shall not assume and shall not be obligated to assume or be obliged to pay, perform or otherwise discharge any Liability of Seller, whether presently in existence or arising hereafter, known or unknown, disputed or undisputed, contingent or non-contingent, liquidated or unliquidated, or otherwise, and Seller shall be solely and exclusively liable with respect to all Liabilities of Seller, other than the Assumed Liabilities (collectively the "Excluded Liabilities"). For the avoidance of doubt, the concept of Excluded Liabilities is intended to be construed as broadly as possibly under applicable law, including section 363 of the Bankruptcy Code as interpreted, and shall include, without limitation, the following:

(a)    any Liability of Seller or its directors, officers, stockholders or agents (acting in such capacities), arising out of, or relating to, this Agreement or the transactions contemplated by this Agreement, whether incurred prior to, at or subsequent to the Closing Date, including, without limitation, all finder's or broker's fees and expenses and any and all fees and expenses of any Representatives of Seller;

(b)    any Liability relating to events or conditions occurring or existing in connection with or arising out of, the Business or the Other Business as operated by Seller, or the ownership, possession, use, operation or sale or other disposition prior to the Closing Date of any Assets (or any other assets, properties, rights or interests associated, at any time prior to the Closing Date, with the Business or Other Business), including trade obligations (except for Cure Payments to be paid or otherwise satisfied by Purchaser pursuant to Section 2.8(b));

(c)    other than as specifically set forth herein, any Liability to any Persons at any time employed by Seller or its predecessors-in-interest at any time or to any such Person's spouses, children, other dependents or beneficiaries, with respect to incidents, events, exposures or circumstances occurring at any time during the period or periods of any such person's employment by Seller or its predecessors-in-interest, whenever such claims mature or are asserted,

12

including without limitation, all Liabilities arising (i) under any employee benefit plans as defined by section 3(3) of ERISA (collectively, "Benefit Plans"), (ii) under any employment, wage and hour restriction, equal opportunity, discrimination, plant closing or immigration and naturalization laws, (iii) under any collective bargaining laws, agreements or arrangements or (iv) in connection with any workers' compensation or any other employee health, accident, disability or safety claims;

(d)      all Liabilities of Seller, or with respect to the Business or Other Business, in connection with claims of professional malpractice or tort;

(e)      all Liabilities of Seller or with respect to the Business or Other Business for violations of any Legal Requirement;

(f)      any Liability of Seller relating to the Assets connected with, arising out of or relating to: (i) Hazardous Substances or Environmental Laws, (ii) claims relating to employee health and safety, including claims for injury, sickness, disease or death of any Person or (iii) compliance with any Legal Requirement relating to any of the foregoing;

(g)      any liability of Seller or any ERISA Affiliate under Title IV of ERISA, including with respect to any single employer plan, multiemployer plan or multiple employer plan;

(h)      any Liability of Seller under any Benefit Plans including any pension, retirement or retiree health and welfare Liability to Seller's current or former employees;

(i)      any Liability of Seller under COBRA or similar state law;

(j)      any Liability of Seller under the WARN Act or similar state law;

(k)      any Liability of Seller under any Benefit Plans ever maintained or offered by Seller to its employees, including any pension, retirement, or retiree health and welfare Liability to Seller's current or former employees;

(l)      all Liabilities owed by Seller to Sellers' employees;

(m)      any Liability, known or unknown, fixed, contingent or otherwise, the existence of which is a breach of, or inconsistent with, any representation, warranty, covenant, obligation or agreement of Seller set forth in this Agreement;

(n)      any Liability of Seller for Taxes, including Taxes attributable to, resulting from, or otherwise arising from the transaction contemplated by this Agreement;

(o)      any Liability to any Person or Seller on account of any Action;

(p)      any Liability of Seller under any collective bargaining agreements;

(q)      any Liability of Seller on account of any private sector cost reimbursement programs or insurance coverage;

13

(r)      any experience ratings of Seller maintained by taxing authorities such as unemployment boards;

(s)      any Liability of Seller relating to or arising out of the ownership or operation of an Excluded Asset; including, without limitation, any Liability of Seller with respect to any Lien or Encumbrance affecting the Real Property; and

(t)      Subject to, and consistent with the Sale Order, Purchaser shall not be responsible for any Liabilities of Debtor related to Debtor's participation in the Healthcare Programs, including any liability or obligation for overpayments, recapture, recoupment, or set off for previously paid or reimbursed amounts except to the extent of any Assumed Liabilities.

(u)      The Parties hereto further agree that, as between Purchaser and Seller, all the Excluded Liabilities shall remain the sole, exclusive obligation and responsibility of Seller.

(v)      Notwithstanding the foregoing, Purchaser shall be responsible for all Assumed Liabilities, each only to the extent such Assumed Liabilities are to be initially performed, or accrue, on or after the Effective Time that relate to the Business, the Hospital, or Purchaser's post-Closing ownership or operation of the Assets; provided, however, that no statement made in this Agreement shall be deemed to allocate or attribute any Liability or obligation to Purchaser which has been released pursuant to the Sale Order.  To the extent this Section 2.3(v) conflicts with any other provision of this Agreement, this Section 2.3(v) controls.

2.4      **Excluded Assets**.  Nothing herein contained shall be deemed to obligate Seller to sell, transfer, assign, or convey any Excluded Asset to Purchaser.  Seller shall retain all right, title, and interest to, in, and under the Excluded Assets. If any Excluded Asset and/or proceeds thereof come into the Possession of the Purchaser, (i) the Purchaser shall hold such Excluded Asset and/or proceeds thereof in trust for the benefit of the Debtor and (ii) the Purchaser shall promptly deliver such Excluded Asset and/or the proceeds thereof to the Trustee or his designee; provided, however for the avoidance of doubt notwithstanding the foregoing, to the extent any Asset consists of proceeds derived from an Excluded Asset, then such proceeds shall not be subject to this Section 2.4's turnover requirements.  To the extent this Section 2.4 conflicts with any other provision of this Agreement, this Section 2.4 controls.  This Section 2.4 shall survive the closing.

2.5      **Nonassignable Assets.**  To the extent that the assignment of any Asset shall require the consent of any other party and such consent shall still be required notwithstanding the Sale Order and sections 363 and 365 of the Bankruptcy Code (each, a "Nonassignable Asset"), nothing in this Agreement nor the consummation of the transactions contemplated hereby shall be construed as an attempt or agreement to assign such Nonassignable Asset unless and until such consent shall have been obtained.

2.6      **Method of Conveyance**.  The sale, transfer, conveyance, assignment, and delivery by Seller of the Assets to Purchaser hereunder shall be effected on the Closing Date by delivery by Seller of: (a) a non-warranty deed deed, substantially in the form of **Exhibit A**, conveying to Purchaser all right, title, and interest of Debtor in and to the Real Property, such title to be free and clear of all Liens pursuant to section 363 of the Bankruptcy Code and the Sale Order, except for Permitted Encumbrances (the "Deed"); and (b) a bill of sale, assignment and assumption

14

agreement in the form of **Exhibit B** (the "Bill of Sale, Assignment and Assumption") conveying all right, title, and interest of Seller and Debtor's bankruptcy estate in all of the Assets, including separate assignment(s) of any U.S. trademark registrations and applications, if any, included within the purchased intellectual property in a form suitable for recording with the U.S. Patent and Trademark Office, all to the fullest extent permitted by Law, free and clear of any and all Liens, except for Permitted Encumbrances.

2.7    **Assumed Contracts**.

(a)    On and after the Effective Time, Purchaser shall assume and be responsible for all obligations (i) arising after the Effective Time with respect to the executory Contracts and unexpired Leases identified on Schedule 2.7 (the "Assumed Contracts").  Except for the Assumed Contracts, Purchaser shall not assume and shall not be responsible for any of Debtor's Contracts or Leases.

(b)    At any time at least five (5) days prior to the Closing Date, Purchaser, in its discretion by written notice to Seller, may (i) exclude from being assigned pursuant hereto any Contracts or Leases that may have previously been set forth on Schedule 2.7, it being acknowledged and agreed to by the Parties that all such Contracts and Leases shall not constitute Assumed Contracts hereunder and that Purchaser shall not acquire any rights or assume any Liabilities with respect thereto, and (ii) include as being assigned pursuant hereto any Contracts or Leases that may have not been previously set forth on Schedule 2.7, and it being acknowledged and agreed to by the Parties that all such Contracts and Leases shall constitute Assumed Contracts hereunder.  Upon Purchaser's reasonable request, Seller shall provide, if available, additional detailed information as to the Liabilities under the Contracts and Leases.

2.8    **Assumption of Liabilities**.

(a)    As of the Effective Time, Purchaser shall assume and be responsible for the Liabilities of Seller under the Assumed Contracts, each only to the extent such Liabilities are to be initially performed, or accrue, on or after the Closing Date and relate solely to dates of service from and after the Closing Date (the "Assumed Liabilities").

(b)    As of the Effective Time, Purchaser shall be responsible for the payment of the Cure Payments, if any, pertaining to the Assumed Contracts with said payments to be made to the counterparty to the Assumed Contracts when the Cure Payments become due pursuant to the Sale Order unless the Purchaser and the counterparty to an Assumed Contract agree otherwise.

(c)    Notwithstanding anything to the contrary in this Agreement: (i) Purchaser shall not modify any terms of any Assumed Contract without the prior written consent of Seller if such modification would be or could reasonably be expected to be adverse to Seller in any respect, and (ii) the rights of Seller to object to such terms are expressly preserved and reserved. Notwithstanding anything to the contrary in this Agreement, Purchaser shall not assume a Contract or Lease from Debtor, and Debtor shall not assign such Contract or Lease to Purchaser, unless Purchaser expressly agrees to pay the full Cure Payment with respect to any such Contract or Lease so assumed, unless Purchaser provides proof of agreement with the applicable counterparty to the Contract of Lease of a reduced Cure Payment not less than two (2) days prior to the Closing Date.

15

(d)     Purchaser shall be responsible for prosecuting all objections to the Cure Payments.  Purchaser shall, at Purchaser's sole cost, (i) negotiate the amount of all Cure Payments and/or (ii) pay all of Purchaser's legal and other fees and expenses relating to any litigation or other dispute in connection with or otherwise relating to Cure Payments.

2.9     **Taxes and Assessments**.  The Liability for payment of accrued but unbilled or unpaid Taxes (including, but not limited to, real estate taxes, personal property tax, ad valorem tax and similar non-income Taxes) and other assessments relating to, or arising out of the ownership or transfer of, the Assets or the Assumed Contracts (including, but not limited to any water, sewer and other municipal charges owed to any Governmental Authority), imposed on a periodic basis beginning before and ending after the Effective Time or as a result of the consummation of the transactions evidenced by this Agreement or otherwise, shall be paid by Seller at the Closing, provided that Seller has received at Closing the Purchase Price required to be paid by Purchaser pursuant to this Agreement.  All Taxes and other assessments shall be listed on Schedule E, which shall be prepared and delivered at Closing.  If any Taxes or other assessments paid by Seller at any time on or prior to the Closing Date are attributable in whole or in part to any period following the Closing, then the Purchase Price payable at Closing shall be increased to adjust for the prior payment of such Taxes and assessments by Seller attributable to the post-closing period.  Purchaser shall be obligated to pay when due the Taxes (including, but not limited to, real estate taxes, personal property tax, ad valorem tax and similar non-income Taxes) and other assessments relating to, or arising out of, the ownership or transfer of the Assets or the Assumed Contracts by or to Purchaser as of the Effective Time.

2.10    **Intentionally Deleted**.

2.11    **Purchaser's Deposit**.

(a)     Upon entry of the Sale Order, Seller and Purchaser shall have the obligation to consummate the Closing pursuant to and subject to the terms of this Agreement and the Sale Order.  If Purchaser fails to consummate the purchase of the Assets on or before thirty (30) days following the Sale Order's entry (unless such failure arises from Seller's uncured material breach and unless Seller and Purchaser agree to extend such deadline in writing), Seller is authorized but not required to effect the sale of the Assets to one or more third parties as soon as is commercially reasonable subject to further Orders of the Bankruptcy Court.  If Purchaser fails to consummate the purchase of Assets hereunder through no fault of its own, Seller shall not consummate any transaction unless the Deposit is repaid to Purchaser.  If Purchaser fails to consummate the transaction as a result of Purchaser's uncured material default, the entire Deposit and all accrued interest thereon will be retained by Seller as liquidated damages (it being agreed that it may be difficult to measure damages arising from such failure and such amount is a reasonable estimate of the amount of damages Seller will suffer under the circumstances), which, except in cases of an intentional tort, shall constitute Seller's sole or exclusive remedy and limitation of damages for any default hereunder by Purchaser.

2.12    **Purchase Price**.

(a)     In consideration of the sale, transfer, conveyance, and assignment of the Assets to Purchaser, Purchaser shall at Closing pay or deliver to Seller cash by wire transfer of

16

immediately available funds in the amount of: (i) Two Million One Hundred Thousand Dollars ($2,100,000) (the "Cash Purchase Price"), minus (ii) the amount of the Deposit; plus (iii) the amount required under Section 2.9, if any (collectively, the "Purchase Price").

(b)     As additional consideration for the sale, transfer, conveyance, and assignment of the Assets to the Purchaser, Purchaser shall spend at least Five Hundred and Fifty Thousand Dollars ($550,000) in capital expenditures (the "Capital Expenditures") at the Hospital during the eighteen (18) month period following the Closing Date, in additional to funding working capital (the "Working Capital" and, together with the Capital Expenditures, the "Capital Investments") of not less than Three Million Dollars ($3,000,000) during the eighteen (18) month period following the closing date (which capital investments shall be determined by Purchaser in its sole discretion).  As used in this Section 2.12(b), the term "Capital Investments" shall include investments in new equipment that may include, without limitation, information technology systems, equipment replacement, facility renovations, new facilities (including additional personnel), medical office space, development of new services and expansion of existing clinical services, working capital, information systems, physician recruitment, and other capital improvements, including commitments incurred pursuant to operating or capital leases, or other off balance sheet financing mechanisms.  The dollar amount of capitalized expenditures made under this Section 2.12(b) will be determined in accordance with GAAP.

(c)     Purchaser shall be entitled to deduct and withhold from all payments made pursuant to this Agreement such amounts (if any) as Purchaser is required to deduct and withhold under the Code or any provision of state, local or foreign law.  To the extent that amounts are so withheld and paid over to the appropriate Governmental Authority, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to Seller from which such deduction and withholding was made.

(d)     The Purchase Price shall be allocated among the Purchased Assets in a manner prescribed by Purchaser by notice given to Seller at or prior to the Closing. To the extent required by federal tax requirements, as determined by Purchaser, Purchaser and Seller will each file IRS Form 8594 and Seller shall file all Tax Returns in accordance with Purchaser's allocation. Purchaser and Seller acknowledge that such allocation shall be without prejudice to the valuation ascribed to specific assets for federal bankruptcy purposes.

2.13    **Order of the Bankruptcy Court**.  Seller and Purchaser shall take all reasonable steps and use all reasonable efforts necessary or appropriate in order (a) to obtain the Sale Order from the Bankruptcy Court authorizing Seller to sell the Assets to the Purchaser; and (b) to consummate the transactions contemplated by the Sale Order.

2.14    **Closing**.  The Closing shall take place at 10:00 a.m., prevailing Eastern Time, on the Closing Date at the offices of Purchaser's counsel, or at such other time and place as the Parties may agree in writing.  The Closing shall be deemed to have occurred and to be effective as between the parties as of the Effective Time.  Seller will operate the Business and Other Business until immediately prior to the Effective Time.

2.15    **Medicare and Medicaid Provider Agreements**.

(a)    Purchaser shall seek to have assigned to Purchaser all current and valid provider contracts of Debtor with the Medicare, Medicaid and TRICARE programs, including, without limitation, the Provider Agreements, subject to all HealthCare Regulatory Consents necessary for Seller's assignment and Purchaser's assumption of such provider contracts. Seller shall provide Purchaser with information and other assistance as may be reasonably requested by Purchaser with respect to its request to assume the Provider Agreements. To the extent any Provider Agreement is an Assumed Contract, Purchaser shall be solely liable for any and all amounts that are or may become due in connection with the assignment of such Provider Agreements.

(b)    Upon the Effective Time, to the extent permitted by applicable laws, Purchaser may use Debtor's National Provider Identifier and Medicare/Medicaid provider/supplier numbers and provider/supplier agreements to submit claims to the Part A Medicare Administrative Contractor and the Oklahoma State Department of Health ("DMA", collectively with the Part A Medicare Administrative Contractor, the "Payors") for Billing Services.

(c)    Seller agrees not to take any action to change its EFT/bank account information used by Payors to deposit monies to be paid as a result of the Billing Services (any such monies deposited to be referred to herein as a "Payment"). Seller acknowledges and agrees that any Payments deposited into the Seller's bank account for Billing Services for services provided after the Effective Time shall be the property of Purchaser and shall be provided to Purchaser by wire transfer along with an accounting of all payments received on a weekly basis or by some other method mutually agreed to by the parties. For the avoidance of doubt, if the episode discharge date is on or after the Closing Date, all health care services associated with such episode will be deemed to have been provided by Purchaser. The Parties acknowledge and agree that the continued use of the Debtor's EFT/bank account information shall be in accordance with the statutes and regulations governing the change of ownership of accounts receiving Payments in accordance with Provider Agreements. The Parties acknowledge and agree that the Debtor's current bank account will be subject to close on March 31, 2020 per the stated intention of the depository institution, U.S. Bank, and the Parties shall work in concert after the Effective Time (a) to establish a new account, maintained in joint control, to permit the escrow, analysis, and segregation of proceeds received from the Excluded Assets and the Assets, and (b) to coordinate the transfer of post-Effective Time payments received pursuant to the Provider Agreements to such new account; provided, however, that the Parties shall work towards a consensual arrangement with U.S. Bank to keep the bank account in question open on and after March 31, 2020 to facilitate transitional arrangements with Medicare or otherwise.

(d)    In the event Seller receives notice of any adjustment to any Payments related to Billing Services, Seller agrees to inform Purchaser and send a copy of such notice to Purchaser by overnight mail or electronic transmission no later than three (3) business days after receipt of such notice.

(e)    Whenever a Payor sends other notice to or requests information from Seller regarding a claim for services rendered after the Closing Date, Seller shall send a copy of such

18

notice or inform Purchaser of such request by overnight mail or electronic transmission no later than three (3) business days after receipt of such notice or request.

2.16    **Closing Payments**.  No later than five (5) Business Days prior to the Closing Date, Seller shall provide to Purchaser, in writing, Seller's calculation of the Closing payments due as of the Effective Time based on the payment of the Purchase Price, as set forth in Section 2.12, and the estimated apportionment of Taxes and assessments related to the transactions contemplated herein, which shall require the written approval of Purchaser.  If within three (3) Business Days following receipt of such calculation, Purchaser has not provided Seller written notice of its good faith objections to Seller's calculation, then the transaction shall close based on Seller's calculation.  If Purchaser provides such notice of objection, the Parties shall work together in good faith to resolve the estimated apportionment of Taxes and assessments, provided that, if they are unable to agree, the Parties shall close and the disputed amount shall be escrowed appropriately.

2.17    **Closing Deliveries of Seller**.  At the Closing, in addition to any other documents, assignments, certificates, letters, orders, or agreements described in Section 2.6 or otherwise required to be delivered pursuant to the terms of this Agreement, and the satisfaction of all the conditions set forth in Articles VI and VIII, Seller shall deliver to Purchaser the following:

(a)    the execution and delivery of this Agreement by Seller;

(b)    the Bill of Sale, Assignment and Assumption, Deed, and the Records Custody Agreement, each duly executed by Seller;

(c)    certificates executed by Seller, in the form prescribed under Treasury Regulation section 1.1445-2(b), that Seller is not a foreign person within the meaning of section 1445(f)(3) of the Code;

(d)    copies of Debtor's then most recent Cost Reports as filed with the Medicare and Medicaid programs;

(e)    a certificate from the Trustee certifying to Purchaser (i) compliance in all material respects with Seller's covenants set forth in this Agreement to be complied with as of the Closing, (ii) that all of the conditions contained in Articles VI and VIII have been satisfied except those, if any, waived in writing by Seller, and (iii) that all of the representations and warranties set forth in Article III are true and correct in all material respects as of the Closing Date;

(f)    the certificates required to be delivered by Seller pursuant to Sections 7.1 and 7.2; and

(g)    such other bills of sale, deeds, endorsements, assignments and other good and sufficient instruments of conveyance and transfer, in form reasonably satisfactory to Purchaser, as are necessary or otherwise customary to vest in Purchaser all the right, title and interest of Seller in, to or under any or all the Assets and other transfer tax forms, affidavits and certificates customarily delivered in connection therewith.

2.18    **Closing Deliveries of Purchaser**.  At the Closing, in addition to any other documents otherwise required to be delivered by Purchaser pursuant to the terms of this Agreement

19

and the satisfaction of all other conditions set forth in Articles VI and VII, Purchaser shall deliver to Seller the following:

(a)     the payment of the Purchase Price by wire transfer of immediately available funds, pursuant to Section 2.12 herein;

(b)     a certificate of existence of Purchaser from the State of Oklahoma, together with a certificate by an authorized officer of Purchaser that to Purchaser's Knowledge nothing has occurred since the date of issuance of the certificate of existence that would adversely affect Purchaser's existence;

(c)     certificate from an authorized officer of Purchaser as to the incumbency and signatures of each officer of Purchaser executing this Agreement and any other documents required under this Agreement;

(d)     a certificate of an officer of Purchaser certifying to Seller (a) compliance in all material respects with Purchaser's covenants set forth in this Agreement to be complied with as of the Closing, (b) that all of the conditions contained in Articles VI and VII have been satisfied except those, if any, waived in writing by Purchaser, and (c) that all of the representations and warranties set forth in Article IV are true and correct in all material respects as of the Closing Date; and

(e)     copies of the resolutions of the board of directors and shareholders of Purchaser necessary to authorize the transactions contemplated hereby, authorizing the purchase of the Assets and the execution and delivery by Purchaser of this Agreement and the consummation by Purchaser of the transactions contemplated hereby, certified by an authorized signatory of Purchaser.

2.19    **Intentionally Deleted.**

2.20    **Further Conveyances and Assumption**.  Following the Closing Date, each Party shall acknowledge, and shall cause their respective Affiliates to execute, acknowledge, and deliver all such further conveyances, notices, assumptions, releases, and other instruments, and shall take such further actions, as may be reasonably necessary or appropriate (i) to assure fully to Purchaser and its successors and permitted assigns, all of the properties, rights, titles, interests, estates, remedies, powers, and privileges intended to be conveyed to Purchaser under this Agreement and (ii) to assure fully to Seller and its successors and permitted assigns, the assumption of the Assumed Liabilities and other obligations intended to be assumed by Purchaser under this Agreement, and to otherwise make effective the transactions contemplated herein.  Without limiting the generality of the foregoing, if Seller receives any Assets or payments related to the Assets after the Closing Date, it will promptly turn over same to Purchaser.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller hereby makes the following representations and warranties, subject to any exceptions included in Seller's Disclosure Schedule and in such representations and warranties:

3.1    **Power of Seller**.  Seller has the power to enter into this Agreement, to perform its obligations hereunder, and to consummate the transactions contemplated hereby.  Seller has all necessary power and authority to enter into this Agreement and all other documents that the Seller is required to execute and deliver hereunder, to perform its obligations hereunder and thereunder, and to consummate the transactions contemplated hereby and thereby.

3.2    **Validity and Enforceability of Agreement**.  Upon the entry of the Sale Order approving the sale of the Assets to the Purchaser, this Agreement constitutes a legal, valid, and binding obligation of Purchaser, this Agreement constitutes, and all documents required to be executed and delivered at Closing by Seller hereunder or in connection herewith will each constitute, the legal, valid, and binding obligations of Seller, enforceable against it in accordance with their respective terms, subject to, inter alia, general principles of equity.

3.3    **Consents; Waivers and Approvals**.  Except for the approval of the Bankruptcy Court as required by section 363 of the Bankruptcy Code and approvals relating to the Healthcare Regulatory Consents, no consent, waiver, approval, authorization, license or order of, registration or filing with, or notice to, any Governmental Authority or any other Person is necessary to be obtained, made or given by Seller in connection with the execution and delivery of this Agreement, the performance by Seller of its obligations hereunder or the consummation by Seller of the transactions contemplated hereby.

3.4    **No Conflict**.  Subject to the issuance of the Sale Order and approvals relating to the Healthcare Regulatory Consents and the transfer of the Provider Agreements, the execution and delivery by Seller of this Agreement and the other agreements, documents and instruments required to be executed and delivered by Seller pursuant to this Agreement and the consummation by Seller of the transactions contemplated hereby or thereby, and compliance by Seller with any of the provisions hereof or thereof, will not violate (with or without the giving of notice or the lapse of time or both) any Law or any Order to which Seller, the Assets, or the Business or the Other Business is subject to.

3.5    **Rights to Acquire Assets**.  Except for Ordinary Course of Business transactions involving the disposition of personal property that are not, individually or in the aggregate, material to the Seller, there are no agreements, options, or other rights to which Seller is a party pursuant to which a Claim exists that Seller is, or may become, obligated to sell or grant any Lien in any of the Assets.  Notwithstanding the foregoing, Seller acknowledges and agrees that the Assets shall be transferred pursuant to the Sale Order and section 363 of the Bankruptcy Code, to the fullest extent permitted by applicable Law, free and clear of all Liens, Claims, interests, and encumbrances other than the Permitted Encumbrances.

3.6    **Title to and Adequacy of the Assets**.  Debtor owns each of the Assets and, subject to the approval of this Agreement by the Bankruptcy Court, title to the Assets will be transferred free and clear of any Liens by Order of the Bankruptcy Court pursuant to section 363 of the Bankruptcy Code, except for Permitted Encumbrances.  The Assets and the Real Property comprise all items used in the operation of the Hospital, the Business or the Other Business except for (i) Contracts that require consents to the transfer of Contracts made available to Purchaser prior to the date hereof that have not been obtained, (ii) Authorizations that are not transferrable or not transferrable without a consent that has not been obtained, and (iii) the Provider Agreements.

3.7    **Government Reimbursement Participation.** Schedule 3.7 sets forth a complete list of Debtor's Health Care Permits, including, where applicable, the Debtor's provider numbers under the Provider Agreements with the Medicare and Medicaid programs (collectively, the "Healthcare Programs").

3.8    **Existing Medicare and Medicaid Provider Agreements**.

(a)    Debtor is eligible to receive payment under Titles XVIII and XIX of the Social Security Act, is a "provider" under the Healthcare Programs through the applicable intermediaries.

(b)    Debtor is eligible for the exemption provided in 42 CFR section 412.22 and is reimbursed as a Critical Access Hospital under 42 CFR Part 485, Subpart F.

(c)    To Seller's Knowledge, the Business (including the Hospital) and the Other Business is in compliance with the conditions of participation for the Healthcare Programs in all material respects. Without limiting the generality of the foregoing, the facilities, equipment, staffing and operations of the Hospital satisfy all conditions of Medicare and Medicaid participation.

(d)    To Seller's Knowledge, there is not pending, or to Seller's Knowledge, threatened any proceeding or investigation under the Healthcare Programs involving Seller or any of the Assets.

(e)    To Seller's Knowledge, no employee or independent contractor of Seller has been excluded from participating in any federal health care program and neither the Business (including the Hospital), the Other Business nor Seller's officers, directors, agents or managing employees has been excluded from Medicare or any federal health care program or been subject to sanction or been convicted of a crime involving health care Legal Requirements

3.9    **Real Property**.

(a)    Schedule 3.9(a) lists and sets forth a legal description of the Real Property.

(b)    (i) To Seller's Knowledge, Seller has good and marketable title in fee simple to the Real Property, together with good and marketable title to all rights, privileges, interests, easements and appurtenances now or hereafter belonging or in any way pertaining to such Real Property, subject only to the Permitted Encumbrances; (ii) all buildings and other improvements situated on the Real Property form a part of the Real Property and are owned in fee by Seller subject only to the Permitted Encumbrances; and (iii) no Person, other than Seller as the owner, has any occupancy or use rights with respect to the Real Property and no option, right of first refusal or any other right to purchase exists, or has been granted, with respect to the Real Property.

(c)    Seller has not received written notice, nor is there pending or, to Seller's Knowledge, is there threatened any (i) condemnation, eminent domain, expropriation or similar proceeding affecting the Real Property, (ii) proceeding to change the zoning classification of any portion of the Real Property, (iii) imposition of any special assessments for public betterments affecting the Real Property, (iv) proceedings to widen or realign any street or highway adjacent to

22

the Real Property or (v) stop work order or other notice of violation of applicable building, land use, zoning or other municipal codes, rules or regulations.

(d)        Schedule 3.9(d) lists, as of the date of this Agreement, all leases, subleases, licenses or other use or occupancy agreements to which, to Seller's Knowledge, Debtor (or Seller in his capacity as trustee) is a party as lessee, sublessee, tenant, subtenant or in a similar capacity (collectively, "<u>Leases</u>" and each a "<u>Lease</u>") and sets forth the address of each parcel of real property and the improvements thereon that is the subject of any Lease (the "<u>Leased Real Property</u>").  To Seller's Knowledge, upon entry of the Sale Order and payment of the Cure Payments, (i) Seller will not be in breach or default of its obligations under any of the Leases that are Assumed Contracts, (ii) no condition exists that with notice or lapse of time or both would constitute a default under any of the Leases, and (iii) no other party to any of the Leases is in breach or default thereunder.

3.10    **No Broker.**  No broker, investment banker, financial advisor or other Person other than Sherwood Partners, Inc. is entitled to any broker's, finder's, financial advisor's or other similar fee or commission in connection with the transactions contemplated by this Agreement, based upon arrangements made by or on behalf of Seller or any of its respective Affiliates.  Seller is solely responsible for the compensation of Sherwood Partners, Inc. in connection its role with respect to the transactions contemplated by this Agreement or otherwise. To the extent allowed by Order of the Bankruptcy Court, any fees and expenses payable by Seller to Sherwood Partners, Inc. shall be paid from the cash proceeds of the Sale.

3.11    **Employment Matters**.

(a)        To the Seller's Knowledge, Seller is in compliance in all material respects with all applicable law respecting employment and employment practices, terms and conditions of employment and wages and hours.

(b)        To the Seller's Knowledge, Seller is not engaged in any unfair labor practice or other unlawful employment practice and there are no unfair labor practice charges or other employee-related complaints or claims against Seller pending or, to Seller's Knowledge, threatened before the National Labor Relations Board, the Equal Employment Opportunity Commission, the Occupational Safety and Health Review Commission, the Department of Labor or any other Governmental Authority by or concerning the employees, independent contractors or consultants of Seller.  Seller has not (i) been notified by any Governmental Authority of any alleged violation by Seller of applicable law that remains unresolved respecting employment, employment practices or terms and conditions of employment, or (ii) received any notice of the intent of any Government Authority to conduct an investigation of Seller and, to Seller's Knowledge, no such investigation is in progress.

(c)        Seller is not party to any collective bargaining agreement

(d)        There are no strikes, slowdowns or work stoppages pending or, to Seller's Knowledge, threatened with respect to Seller's employees.

(e)    Seller has not promised any of its management or other employees that any of such persons will be employed or engaged subsequent to the date hereof or the Closing Date.

3.12    **Intentionally Deleted.**

3.13    **Intentionally Deleted**.

3.14    **Compliance with Laws; Permits**.

(a)    To Seller's Knowledge, the Hospital and all operations of the Other Business are duly licensed, possess all Healthcare Regulatory Consents and are authorized by all applicable Governmental Authorities including, but not limited to, the State of Oklahoma, to operate all of its health care and medical services.

(b)    Schedule 3.14(b)(i) sets forth a current, complete and accurate list of all Permits issued to Seller, including the expiration dates thereof, if any. To the extent Seller has not provided true and correct copies to Purchaser, upon Purchaser's reasonable request, Seller shall use all reasonable efforts to provide true and correct copies of such Permits to Purchaser. To Seller's Knowledge, Seller has all permits that are necessary to enable it to own, lease or otherwise hold the Assets and to enable it to operate the Business and the Other Business as currently conducted.  All such permits are in full force and effect.  To the Knowledge of Seller, no proceedings are pending or threatened where the remedy sought is to revoke or materially modify any such permit, materially restrict any renewal of any such permit or deny the right to transfer any such permit that is permitted to be transferred with consent.  To the extent there exist any uncorrected deficiencies listed on Schedule 3.14(b)(ii) of which the Seller has Knowledge, Seller makes no representations as to the costs or capital expenditures necessary to correct such deficiencies.

(c)    To Seller's Knowledge, Seller is in compliance in all material respects with all applicable Laws respecting the Business and the Other Business. There are no charges of a material violation of a Law pending or to the Knowledge of Seller threatened against Seller.

(d)    There is not now pending or, to Seller's Knowledge, threatened, any claim, investigation or enforcement action by any governmental authority (whether judicial, executive or administrative) concerning Seller's potential liability under Environmental Laws in connection with the ownership or operation of the Business, the Other Business or the Assets.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby makes the following representations and warranties:

4.1    **Corporate Existence of Purchaser**.  Purchaser is a statutory entity created by the State of Oklahoma, validly existing and in good standing in the State of Oklahoma, and Purchaser is duly authorized to conduct business in the State of Oklahoma.  Purchaser has all necessary power and authority to enter into this Agreement and all other documents that the Purchaser is required

24

to execute and deliver hereunder, to perform its obligations hereunder and thereunder, and to consummate the transactions contemplated hereby and thereby.

4.2     **Validity and Enforceability of Agreement**.  Upon the entry of the Sale Order approving the sale of the Assets to the Purchaser, this Agreement constitutes, and all documents executed and delivered by Purchaser at Closing hereunder or in connection herewith will each constitute, the legal, valid, and binding obligations of Purchaser, enforceable against it in accordance with their respective terms, except as enforcement hereof may be limited by general principles of equity.

4.3     **Authorization and Authority**.  The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby have been duly authorized, approved and ratified by all necessary action on the part of Purchaser.  Purchaser has full authority to enter into and deliver this Agreement, to perform its obligations hereunder, and to consummate the transactions contemplated hereby.

4.4     **No Conflict**.  Neither the execution and delivery by Purchaser of this Agreement nor the performance by Purchaser of its obligations hereunder, (a) (i) violates or breaches the terms of or causes a default under any legal requirement applicable to Purchaser, (ii) contravenes the certificate of incorporation or bylaws or other organizational documents of Purchaser, or (iii) violates or breaches the terms or causes a default under any contract, indenture, evidence of indebtedness or other commitment to which Purchaser is a party or by which it or its properties are bound, or (b) will, with or without the passage of time, the giving of notice or the taking of any action by a third person, have any of the effects set forth in this subsection, except to the extent that any such matter would reasonably be expected to have a material adverse change with regard to Purchaser.

4.5     **Ability to Consummate Transaction**.  Purchaser has or will have sufficient immediately available funds and/or access to credit facilities necessary to consummate the purchase of the Assets and perform of its obligations under this Agreement.

4.6     **Litigation and Arbitration**.

(a)     There is no Action pending or, to the Knowledge of Purchaser, threatened against Purchaser, including any before any Governmental Authority or any arbitration panel, that seeks to prevent the consummation of the transactions contemplated by this Agreement.

(b)     There is no Action pending or, to the Knowledge of Purchaser, threatened against Purchaser or any of its Affiliates, or any of their respective members, owners, managers, officers, directors, or other senior executives, and there are no existing facts relating to any Person referred to in this Section 4.6(b), that may cause any required Health Care Regulatory Consent or other consent to the transactions contemplated hereby to not be given.

(c)     There is no Action pending or, to the Knowledge of Purchaser, threatened against Purchaser or any of its Affiliates, or any of their respective members, owners, managers, officers, directors, or other senior executives or to which Purchaser is otherwise a party before any Governmental Authority, which, if adversely determined, would reasonably be expected to have a material adverse effect on the ability of Purchaser to perform its obligations under this Agreement

25

or the ability of Purchaser to consummate the transactions contemplated hereby. Purchaser or any of its Affiliates, or any of their respective members, owners, managers, officers, or senior executives are not subject to any Order of any Governmental Authority except to the extent the same would not reasonably be expected to have a material adverse effect on the ability of Purchaser to perform its obligations under this Agreement or the ability of Purchaser to consummate the transactions contemplated hereby.

4.7 **Brokers and Intermediaries**. Neither Purchaser nor any of its Affiliates has employed any broker, finder, advisor or intermediary that is entitled, in connection with the consummation of the transactions contemplated hereby, to a broker's, finder's, or similar fee or commission, provided, however, that the Parties acknowledge and agree that, to the extent allowed by Order of the Bankruptcy Court, any fees and expenses payable by Seller to Sherwood Partners, Inc. shall be paid from the cash proceeds of the Sale.

4.8 **Solvency.** Purchaser is solvent, and there are no conditions, obligations or commitments of Purchaser, or Claims against Purchaser, which will or could be reasonably expected to prevent Purchaser from paying its valid debts as they become due.

## ARTICLE V
## CERTAIN COVENANTS AND AGREEMENTS OF SELLER AND PURCHASER

5.1 **Access and Information**.

(a) Subject to and in compliance with HIPAA, Purchaser agrees to retain and maintain all employee and medical records as required under all applicable laws and regulations.

(b) Before the Closing and to the extent permitted by Law, and except as required to preserve any Privilege, Seller will provide Purchaser and its representatives with reasonable access during normal business hours, to all of the assets, properties, facilities, employees, contract employees, independent contractors, medical staff members, agents, accountants and books and records of Seller and will furnish or make available to Purchaser and its representatives during such period all such information and data concerning Seller in its possession or control as Purchaser reasonably may request; *provided, however*, such access shall be coordinated through such persons as may be designated in writing by Seller for such purpose. Purchaser's access shall include IT access to allow Purchaser to prepare to transition/preserve any electronic data as may be customary or required.

(c) Before the Closing, Seller shall permit Purchaser or its representatives to engage in discussions and negotiations with Debtor's vendors for the purpose of negotiating the terms of contracts between Purchaser and such vendors in connection with Purchaser's purchase of the Assets.

(d) Before the Closing, Seller, or Seller's management company, shall grant Purchaser and its representatives reasonable access to the employees, contract employees and independent contractors within the Hospital for the purpose of administering the hiring and/or retention process as to such employees, contract employees and independent contractors. Thus, by way of example and without limitation, except to the extent prohibited by applicable Law,

26

Seller will grant reasonable access to enable Purchaser and its representatives to disseminate documents and information to such employees; collect documents and information from such employees; interview such employees and their supervisors and managers; investigate the backgrounds, experience, education, qualifications and work records of such employees; offer employment to such employees; and hire such employees.  Purchaser agrees to conduct all such activities in compliance with applicable Law.

(e)     After the Closing, subject to and in compliance with all applicable laws, including HIPAA, Purchaser shall permit, for a period of not less than six (6) years, each of the Seller, any direct or indirect successor to the Seller and their respective professionals (collectively, the "Permitted Parties") reasonable access, upon no less than two (2) Business Day's prior request specifying the scope of the access, to all Books and Records that are in connection with or that otherwise relate to the Hospital (including the Business) prior to the Closing and/or to Seller and that are in the control or the possession of Purchaser or any of its Affiliates or their respective agents or representatives except for Excluded Records (collectively, "Business Records") for the purposes of (i) pursuing, assessing, settling, or otherwise dealing with any Excluded Assets, (ii) pursuing, assessing, defending, settling, or otherwise dealing with (including, without limitation, exercising rights and remedies with respect to) any Claim, Action, or cause of action, including, without limitation, any objection or motion, that any Permitted Party has the right to pursue, (iii) performing and/or otherwise dealing with any obligations of the Seller pursuant to this Agreement, including the Excluded Liabilities, (iv) assisting any one or more of the Permitted Parties in connection with or otherwise relating to the Claims reconciliation process relating to Seller, including, without limitation, with respect to Claims against any Person, including, without limitation, assessing, resolving, settling, and/or otherwise dealing with priority and administrative Claims and any other general unsecured Claims that accrue prior to the Closing Date and (v) without limiting the generality of the immediately preceding clauses (i) through (iv), otherwise administering Debtor's estate including, without limitation, the preparation and confirmation of a plan relating to Debtor and the preparation of a disclosure statement relating to Debtor, and compliance with any subpoena, document request, or order of any court compelling any Permitted Party to produce documents to third parties, winding down Debtor's estate, preparing or filing tax returns and causing audits to be performed and/or for any other reasonable purpose.  Any access of Seller or the Permitted Parties to Books and Records pursuant to this Section 5.1 shall not interfere with the operation of the Hospital or the Business or Other Business and shall be at the sole cost and expense of Seller or the Permitted Parties for any out-of-pocket costs or charges.

(f)     The right of access for the Permitted Parties shall include, without limitation, (a) (i) the right of such Permitted Party to copy at the Hospital at each requesting Permitted Party's expense, such documents and records as they may request in furtherance of any of the purposes referred to in Section 5.1(e) and (ii) Purchaser's copying and delivering, at the Permitted Party's cost, to such Permitted Party such documents and records as may be requested, but only to the extent as to this clause (ii) such Permitted Party furnishes Purchaser with reasonable written descriptions of the materials to be so copied.  Other than in the Ordinary Course of Business, Purchaser shall not dispose of or destroy any of the Business Records transferred to Purchaser ("Transferred Business Records") before the seventh anniversary of the Closing Date and will provide the Seller with at least ninety (90) days written notice before doing so and will provide each Party that requests copies of any Transferred Business Records within such ninety

27

(90) day period copies of all requested Transferred Business Records at the cost of the requesting Permitted Party.

(g)     Subsequent to the Closing Date, Purchaser will cooperate with each of the Permitted Parties relating to all matters in connection with the administration of Debtor's estate, including without limitation, in connection with all Claims, Actions, and causes of action relating to the Excluded Assets or Excluded Liabilities that any Permitted Party elects to pursue, dispute, or defend.  Without limiting the generality of the preceding sentence, Purchaser shall use commercially reasonable efforts to make reasonably available to Seller employees of the Business who became employees of Purchaser to assist Seller in connection with the administration of Debtor's estate, including, without limitation, in connection with Excluded Assets and/or Excluded Liabilities. Any costs associated with Purchaser's compliance with this Section 5.1 shall be borne solely by the Permitted Parties.

(h)     Seller shall provide to Purchaser at the Closing or as soon thereafter as is reasonably possible all appropriate books and records and other documents in the possession or control of Seller, its representatives or its agents relating to the Assets being sold pursuant to this Agreement and the transactions contemplated hereby.  Such books, records, and documents shall include, but are not limited to, patient records, all paper and electronic financial, operational, administrative, research, regulatory reporting, maintenance, and HR records.

(i)     From the date of approval of the Sale Order until the Closing Date, Seller shall provide Purchaser with a weekly written report and participate on a weekly telephone conference regarding the following information, as well as any other operational information reasonably requested by Purchaser:

(i)     Patient census;

(ii)     Significant    conversations    with/changes    to    vendor relationships/agreements;

(iii)     Changes in staffing; and

(iv)     Any communications from regulatory agencies or Novitas/CMS.

5.2     **Authorizations**.  The Parties shall each use their commercially reasonable efforts to promptly obtain all Authorizations required to enable Purchaser to purchase the Assets and/or operate the Hospital.  In furtherance of the foregoing, Seller agrees to execute and deliver such instruments and documents reasonably satisfactory to Seller, and to take all such other and further actions reasonably satisfactory to Seller, that Purchaser cannot take or cause to be taken by any Person other than Seller, that are required to enable Purchaser to obtain such Authorizations or transfer such Authorizations from Seller to Purchaser,  provided that Seller shall not be obligated to undertake any material Liabilities or other obligations, individually or in the aggregate, relating to such obligations.  Notwithstanding the foregoing, Purchaser shall not be obligated to consent to the imposition of materially burdensome conditions on Purchaser or its lenders in order to obtain the Authorizations, it being specifically understood and agreed that conditions required under the Oklahoma Regulations (or any Federal corollary) applicable to the Business or Other Business shall not constitute a materially burdensome condition.

28

5.3     **Conduct of Business**.

(a)     Prior to the Closing, except as otherwise contemplated by this Agreement or required by applicable Law or with the prior written consent of Purchaser (which consent shall not be unreasonably withheld or delayed), Seller shall:

(i)     operate the Business and the Other Business in the Ordinary Course of Business in all material respects;

(ii)     use commercially reasonable efforts to (A) maintain the Assets in good working order and condition consistent with past practices and (B) maintain the insurance coverage currently in place with respect to the Assets or obtain comparable replacement coverage;

(iii)     perform when due all undisputed post-petition obligations under its contracts, including leases of Real Property or personalty to the extent of available funds;

(iv)     comply in all material respects with all Laws and Orders pertaining to the Business, the Other Business and the Assets;

(v)     without being obligated to make any payment to any Person to preserve any goodwill or relationship, and subject to changes incident to Debtor's bankruptcy filing and related intention to sell its assets, use commercially reasonable efforts reasonably consistent with past practices to preserve the goodwill thereof and Debtor's relationships with the patients, employees, physicians, suppliers, and others with whom it deals; and

(vi)     perform all undisputed post-petition obligations under Excluded Contracts and timely pay, perform, and discharge in accordance with their respective terms the undisputed post-petition Excluded Liabilities to the extent of available funds.

(b)     Prior to the Closing, except as otherwise contemplated by this Agreement or required by applicable Law or with the prior written consent of Purchaser (which consent shall not be unreasonably withheld or delayed), Seller shall not:

(i)     make or enter into any Contract that would be required to be assumed by Purchaser;

(ii)     other than in the Ordinary Course of Business, (A) increase the annual level of compensation of any employee or other Person who works in the Business or the Other Business, (B) grant any bonus, similar benefit, or increase in other direct or indirect compensation to any employee or other Person who works in the Business or the Other Business, (C) with respect to any employee or other Person who works in the Business or the Other Business, increase the coverage or benefits available under any (or create any new) employee benefits plan, or (D) enter into any employment, deferred compensation, severance, consulting, non-competition, or similar agreement (or amend any such agreement) with any employee or other Person who works in the Business or the Other Business, except, as to each of clauses (A) through (D), as required by applicable Law from time to time in effect, by any employee benefits plan maintained or sponsored by Debtor or by any existing Contract or CBA made available to Purchaser that the Seller is a party to or bound by;

29

(iii)    subject any of the Assets to any Lien, other than (A) any Permitted Encumbrances or (B) as approved by Order of the Bankruptcy Court with the consent of Purchaser;

(iv)    other than pursuant to an existing Contract made available to Purchaser, acquire or lease any material assets that would be Assets or sell, assign, license, transfer, convey, lease, or otherwise dispose of any of the Assets, provided that any other removal shall be permitted if the assets removed, taken as a whole, are replaced with reasonably equivalent or better assets;

(v)    cancel or compromise any material debt or claim or waive or release any material right of Debtor that constitutes an Asset except in the Ordinary Course of Business;

(vi)    delay or accelerate payment of any account payable or other liability of the Business or Other Business beyond or in advance of its due date, except in the Ordinary Course of Business consistent with past practice;

(vii)    permit or allow relocation of (other than within the Hospital or the Hospital's owned Real Property), any services or programs of the Business or the Other Business;

(viii)    other than in the Ordinary Course of Business or pursuant to an existing Contract made available to Purchaser, remove from the Real Property any furniture, equipment, or other tangible personal property used in the Ordinary Course of Business provided further that any other removal shall be permitted if the assets removed, taken as a whole, are replaced with reasonably equivalent or better assets;

(ix)    enter into or amend (A) any third party payor contract or (B) any other agreement (or incur any commitment) that involves or may involve total annual expenditure or revenues (individually or in the aggregate) in excess of $50,000;

(x)    except pursuant to the DIP Order, incur any indebtedness for borrowed money, enter into any material guarantee, indemnity or other agreement to secure any obligation of a third party or create any Lien, Claim, interest or encumbrance for the benefit of a third party over any of the Assets;

(xi)    change any accounting policy or practice except in the Ordinary Course of Business;

(xii)    other than in the Ordinary Course of Business consistent with past practice, (i) modify or terminate any Assumed Contract, or (ii) enter into or modify any Contract or Lease containing material penalties which would be payable as a result of, and upon the consummation of, the transaction contemplated by this Agreement;

(xiii)    fail to maintain any of its business records in accordance with past practice;

(xiv)    allow inventory level to decline below the safety stock level necessary for the continued operation of the Business or Other Business; and

(xv)    take any action, or fail to take any action, that jeopardizes (A) the Hospital's eligibility for the exemption provided in 42 CFR section 412.22 to be reimbursed as a Critical Access Hospital under 42 CFR Part 485, Subpart F, or (B) the designation of the RHCs as rural health clinics pursuant to 42 CFR Part 491, Subpart A.

5.4    **Commercially Reasonable Efforts**.  Each Party shall use its commercially reasonable efforts to fulfill or cause the fulfillment of the conditions of the Closing, including, without limitation, the execution and delivery of all agreements contemplated hereunder to be so executed and delivered, provided that it shall be the responsibility of Purchaser to obtain the Authorizations and any required consents with respect to the assumptions of the Assumed Contracts and satisfy conditions required under the Oklahoma Regulations; provided further, that, for the avoidance of doubt, the Seller's obligations under Section 2.20 shall apply to the Purchaser's assumptions under this Section 5.4.

5.5    **Adequacy of Purchaser's Review.** Purchaser agrees that it (a) had a full and complete opportunity to conduct due diligence regarding the Assets prior to making its offer and does not require further due diligence and (b), except for Seller's representations and warranties in Article III hereof, has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Assets in making its bid and executing and delivering this Agreement and did not rely upon any written or oral statements, representations, promises, warranties, or guaranties of any kind or nature, including, without limitation, any that are express, are implied, arise by operation of law, or that may otherwise be deemed to apply, regarding the Assets, or the completeness of any information provided in connection therewith.

5.6    **Intentionally Deleted**.

5.7    **Tax Matters**.

(a)    The Parties agree to request that the Bankruptcy Court find that the sale of the Assets constitutes a sale in furtherance of effectuating a plan of reorganization, and, in accordance with section 1146(a) of the Bankruptcy Code, all transfers in connection therewith shall be exempt from any and all Transfer Taxes.  To the extent that the Bankruptcy Court does not so order, Seller shall be responsible for the payment of all Transfer Taxes (whether or not payable by Seller as a matter of law), including that Seller shall promptly reimburse Purchaser for its share of all Transfer Taxes paid by Purchaser upon receipt of reasonable documentation evidencing such amount.  Purchaser and Seller will cooperate in the timely preparation and filing of any Tax return that must be filed in connection with any Transfer Taxes.  Any such Taxes or fees resulting from any subsequent transfer of the acquired Assets or Assumed Contracts shall be borne by Seller.

(b)    After the Closing Date, Seller and Purchaser shall, and shall cause their respective Affiliates to:

(i)    assist the other Party and its Affiliates in preparing any tax returns that such Party is responsible for preparing and filing relating to the Assets, the Excluded Assets or the Business;

31

(ii)     cooperate fully in preparing for any tax audit relating to or arising out of the ownership or use of the Assets or the Business;

(iii)     make available to the other Party and its Affiliates and to any Taxing Authority as reasonably requested all information, Books and Records, and documents relating to Taxes arising out of the conduct of the Business or the ownership or use of the Assets; and

(iv)     furnish the other Party with copies of all correspondence received from any Taxing Authority in connection with any tax audit relating to the conduct of the Business or the ownership or use of the Assets with respect to any such taxable period.

5.8     **Announcement**.  Other than confirming information that is already a part of the public record or that is contained in filings a Party hereafter makes with the Bankruptcy Court, Seller will not issue any press release or otherwise make any public statement with respect to this Agreement or the transactions contemplated hereby without the prior written consent of Purchaser (which consent shall not be unreasonably withheld or delayed), except as may be required by applicable Law or the applicable regulations of any exchange.  Subject to the last sentence of this Section 5.8, if Seller is required by Law or pursuant to applicable regulations of any exchange to issue a press release or otherwise make any public statement or disclosure with respect to this Agreement and the transactions contemplated hereby, Seller will use commercially reasonable efforts to promptly notify Purchaser so that Purchaser may seek a protective order or other appropriate remedy, and in the event that no such protective order or other remedy is obtained, Seller may make such disclosure as Purchaser is advised in writing by counsel as may be required by Law or pursuant to applicable regulations of any exchange.  The preceding sentence shall not apply to any filing that Seller reasonably concludes may be required to be made with, or is appropriate to be made with, the Bankruptcy Court.

5.9     **Post-Closing Business Operations Commitment.**   To the extent financial feasible, as determined by Purchaser in its sole discretion, Purchaser shall operate the Hospital as an acute care hospital with an open and accessible emergency department and medical/surgical services for a period of not less than five (5) years after the Closing Date.

5.10     **Risk of Loss; Casualty Loss**.  All risk of loss or damage to or destruction of the Assets, in whole or in part, shall be and remain with Seller until the Effective Time and from and after the Effective Time, the risk of loss or damages to or destruction of the Assets in whole or in part shall be and remain with Purchaser.  If, between the date of this Agreement and the Closing, any of the Assets having a value in excess of $100,000, individually or in the aggregate, shall be destroyed or damaged in whole or in part by fire, earthquake, flood, other casualty or any other cause (the "Casualty"), individually or in the aggregate, then, with respect to a loss in value in excess of $100,000 (a) Purchaser shall have the option to acquire such Assets on an "as is" basis and take an assignment, without representation, warranty or recourse, from Seller of any insurance proceeds payable to Seller in respect of the Casualty (excluding proceeds under any directors or officers insurance policies) or (b) Seller shall have the option exercisable on or before the Closing Date by the delivery of written notice thereof to Purchaser (i) to fix such Casualty within sixty (60) days after the Closing Date, or (ii) pay Purchaser the loss in value arising from such Casualty, and if Seller does not elect within twenty (20) days of the occurrence of the Casualty an option set

32

forth in (b)(i) or (b)(ii) above, then Seller shall be deemed to have elected the option in clause (b)(ii).

5.11 **Bankruptcy Actions**.

(a) Seller and Purchaser acknowledge that this Agreement and the sale of the Assets are subject to Bankruptcy Court approval and entry of the Sale Order and Seller shall use reasonable best efforts to obtain entry of the Sale Order, in form and substance acceptable to Purchaser in its sole and absolute discretion, approving this Agreement and the transactions contemplated herein, granting, among other things, that (i) such sale shall be, to the fullest extent permitted by the Bankruptcy Code, pursuant to sections 105, 363(b) and 363(f) of the Bankruptcy Code, free and clear of all Claims, Liens, interests and encumbrances, other than Permitted Encumbrances and Assumed Liabilities; (ii) all Contracts and Leases required to be assumed by Sellers and assigned to Purchaser are so assumed and assigned free and clear of all Claims, Liens, interests and encumbrances, other than Permitted Encumbrances and Assumed Liabilities, to the fullest extent permitted by section 365 of the Bankruptcy Code; (iii) Purchaser is deemed to have purchased the Purchased Assets in good faith pursuant to section 363(m) of the Bankruptcy Code and that the provisions of section 363(n) of the Bankruptcy Code have not been violated; and (iv) Seller is authorized and directed to execute, upon request by Purchaser, one or more assignments in form, substance, and number reasonably acceptable to Purchaser, evidencing the conveyance of the Purchased Assets and Assumed Liabilities to Purchaser and/or its designees.

(b) Seller shall promptly make any filings, take all actions and use reasonable best efforts to obtain any and all relief from the Bankruptcy Court that is necessary or appropriate to consummate the transactions contemplated by this Agreement. Seller shall provide Purchaser with drafts of any and all pleadings and proposed orders to be filed or submitted in connection with this Agreement for Purchaser's prior review and comment and shall cooperate with Purchaser to make reasonable changes. In the event the entry of the Sale Order is appealed, Seller shall diligently defend such appeal and any stay pending appeal that may be filed in connection therewith. Notwithstanding the foregoing, any resulting changes to this Agreement or any other Ancillary Agreement or any resulting changes to the Sale Order shall be subject to Purchaser's approval in its sole and absolute discretion.

(c) If an appeal is taken or a stay pending appeal is requested, with respect to the Sale Order, Seller shall promptly notify Purchaser of such appeal or stay request. Seller shall promptly provide to Purchaser a copy of the related notice of appeal or order of stay. Seller shall also provide Purchaser with written notice of any motion or application filed in connection with any appeal from such order. In the event of an appeal of the Sale Order, Seller shall, at its own expense, be primarily responsible for drafting pleadings and attending hearings as necessary to defend against the appeal.

(d) From and after the date hereof, Seller shall not take any action that is intended to result in, or fail to take any action the intent of which failure to act would result in, the reversal, voiding, modification or staying of the Sale Order.

(e) Seller will provide Purchaser with a reasonable opportunity to review and comment upon all motions, applications, and supporting papers prepared by Seller (including

33

forms of orders and notices to interested parties) related to the Assets, the Business, or any appeal as described in paragraph 5.11(b), prior to the filing thereof in the Bankruptcy Case, except any involving adversarial matters between Seller and Purchaser, and shall consult in good faith with Purchaser regarding the content of such materials prior to any filing.

5.12    **Collections on Assets**. If, after the Closing Date, Seller shall receive payment with respect to any Assets, Seller shall immediately deliver such funds or assets to Purchaser and take all steps necessary to vest title to such funds or assets in Purchaser.  Seller hereby designates Purchaser and its respective officers as Seller's true and lawful attorney-in-fact, with full power of substitution, to execute and endorse for the benefit of Purchaser all checks, notes or other documents received by Seller in payment of or in substitution or exchange for any of the Assets. Seller hereby acknowledges and agrees that the power of attorney set forth in the preceding sentence in favor of Purchaser is coupled with an interest, and further agrees to execute and deliver to Purchaser from time to time any documents or other instruments reasonably requested by Purchaser to evidence such power of attorney. If after the Closing Date, Purchaser shall receive payment with respect to any Excluded Assets, Purchaser shall immediately deliver such funds or assets to Seller.

5.13    **DISCLAIMERS**.    EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES IN ARTICLE 3, SELLER MAKES NO REPRESENTATIONS OR WARRANTIES OF ANY KIND OR NATURE TO PURCHASER, EXPRESS OR IMPLIED, WITH RESPECT TO THE TRANSACTIONS CONTEMPLATED HEREBY.  EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES IN ARTICLE 3, OR EXCEPT AS EXPRESSLY SET FORTH IN THE SALE ORDER, THE ASSETS TO BE SOLD AND TRANSFERRED HEREUNDER SHALL BE SOLD (A) IN THEIR THEN EXISTING PHYSICAL CONDITION, WITH ALL DEFECTS, IF ANY, AND SUBJECT TO WEAR AND TEAR FROM THE DATE HEREOF TO THE CLOSING DATE AND (B) ON AN "AS IS, WHERE IS" BASIS

5.14    **Further Assurances**.  Each party shall use its commercially reasonable efforts to (i) take all actions necessary or appropriate to consummate the transactions contemplated herein and (ii) cause the fulfillment at the earliest practicable date of all the conditions to their respective obligations to consummate same.  Without limiting the generality of the foregoing, promptly after the discovery by Seller of any item included within the definition of Assets but not transferred, conveyed, or assigned to Purchaser, (x) Seller will deliver written notice to Purchaser of the existence and non-transfer, non-conveyance, or non-assumption of such item and provide Purchaser with all the information in Seller's possession about, and with access to such item in Seller's possession as Purchaser may reasonably request, and (y) if requested by Purchaser, Seller shall use commercially reasonable efforts to transfer, convey, or assign to Purchaser such item in the manner and on the terms and conditions as applicable to an Asset.

5.15    **Confidentiality**.

(a)    From and after the date hereof, Purchaser shall maintain in confidence, including that it shall not disclose to any third party without the prior written consent of Seller, and not use to the detriment of Seller, any Seller's Confidential Information relating to or obtained from Seller; provided, however, the foregoing restriction shall not apply to any disclosure by

34

Purchaser of Seller's Confidential Information to any Affiliate of Purchaser or to its lenders and legal and financial advisors.  For purposes of this Section 5.15, "Seller's Confidential Information" shall mean any information that is confidential or proprietary in nature that is related to the Assets, the Assumed Liabilities, the Business, the Excluded Assets, or the Excluded Liabilities, including methods of operation, patient information, prices, fees, costs, technology, software, know-how, marketing methods, plans, personnel, suppliers, competitors, markets or other specialized information or proprietary matters; provided, however, that Seller's Confidential Information does not include, and there shall be no obligation hereunder with respect to, information that (i) becomes generally available to the public other than as a result of a disclosure by Purchaser or its agents or other representatives, (ii) becomes available to Purchaser on a non-confidential basis from a source other than Seller, provided that such source is not known by Purchaser to be bound by a confidentiality agreement with, or other obligation of secrecy to, Seller, (iii) is lawfully received by Purchaser from a third party having the right to disseminate Seller's Confidential Information without restriction on disclosure or (iv) can be shown by Purchaser through written documents or evidence maintained by Purchaser to have been independently developed by Purchaser; and provided further, that upon the Closing, the restrictions contained in this Section 5.15 shall not apply to confidential or proprietary information related primarily to the Assets, the Assumed Liabilities or the Business or the Other Business.  Purchaser may disclose Seller's Confidential Information to those who need to know it for the purpose of effectuating the transactions contemplated herein and who agree to keep it confidential.  Purchaser shall instruct such Persons having access to Seller's Confidential Information of such obligation of confidentiality.  If Purchaser or anyone to whom they has transmitted Seller's Confidential Information subject to the confidentiality obligations herein becomes legally compelled, including, but not limited to, through an action brought to disclose any of such Confidential Information, Purchaser shall provide Seller with notice prior to making any disclosure so that Seller may seek a protective order or other appropriate remedy at Seller's sole cost and expense.  If such protective order or other remedy is not obtained, or Seller waives compliance with the provisions of this Section 5.15(a), Purchaser shall furnish only that portion of Seller's Confidential Information that it is advised by written opinion of counsel is legally required to be disclosed.  Purchaser shall have no liability to Seller with respect to the disclosure of Seller's Confidential Information ordered by a court of competent jurisdiction pursuant to applicable law or required by law or regulatory or accrediting agencies.

(b)    From and after the date on which the Sale Order is entered, unless this Agreement is terminated, Seller shall maintain in confidence, not disclose to any third party without the prior written consent of Purchaser, and not use to the detriment of Purchaser, any Business Confidential Information, other than in connection with (i) operating the Business in the Ordinary Course of Business prior to the Closing Date, (ii) any investigations by any Governmental Authority or any filings with the Bankruptcy Court, (iii) compliance activities prior to or after the Closing related to periods occurring prior to the Closing Date; (iv) any legal proceedings; (v) enforcing any rights or other claims of Seller under this Agreement or otherwise; and (vi) performing any obligations of Seller under this Agreement.  For purposes of this Section 5.15(b), "Business Confidential Information" means any information that is confidential or proprietary in nature that is related to Purchaser or to the Assets, the Assumed Liabilities or the Business, other than information primarily pertaining to the Excluded Assets, or the Excluded Liabilities, including methods of operation, patient information, prices, fees, costs, technology, software, know-how, marketing methods, plans, personnel, suppliers, competitors, markets or

35

other specialized information or proprietary matters; provided, however, that Business Confidential Information does not include, and there shall be no obligation hereunder with respect to, information that (i) becomes generally available to the public other than as a result of a disclosure by Seller (other than in connection with filings with the Bankruptcy Court), (ii) becomes available to Seller on a non-confidential basis from a source other than Purchaser, provided that such source is not known by Seller to be bound by a confidentiality agreement with, or other obligation of secrecy to, Purchaser or (iii) is lawfully received by Seller from a third party having the right to disseminate the Business Confidential Information without restriction on disclosure. Seller may disclose Business Confidential Information to those who need to know it for the purpose of effectuating the transactions contemplated herein and who agree to keep it confidential subject to the same confidentiality obligations herein. Seller shall instruct such Persons having access to Business Confidential Information of such obligation of confidentiality. If Seller or anyone to whom it has transmitted Business Confidential Information subject to the confidentiality obligations herein becomes legally compelled to disclose any of such Business Confidential Information (other than in connection with filings with the Bankruptcy Court), Seller shall provide Purchaser with prompt notice prior to making any disclosure so that Purchaser may seek a protective order or other appropriate remedy. If such protective order or other remedy is not obtained, or Purchaser waives compliance with the provisions of this Section 5.15(b), Seller shall furnish only that portion of the Business Confidential Information that it is advised by written opinion of counsel is legally required to be disclosed.

(c)     The obligations contained in this Section 5.15 shall survive the Closing and are in addition to any separate confidentiality agreements between Seller and Purchaser.

5.16    **Acceptance and Discharge**. Except to the extent, if at all, Liabilities of Seller to Purchaser are specifically stated herein to survive the Closing, (i) Seller shall cease to have any Liability of any kind or nature relating to its representations and warranties set forth in Article III, and (ii) Seller will, without any further writing or other act by Purchaser, at such time be fully and forever, irrevocably and unconditionally, released and discharged from all such Liabilities relating to its representations and warranties set forth in Article III, except in the case of fraud, willful misconduct or gross negligence.

5.17    **Cooperation**. Seller and Purchaser agree to reasonably cooperate with each other in good faith from the date hereof up through and following the Closing Date, in any effort to satisfy all further conditions, undertakings and agreements contemplated by this Agreement to be effected after the Closing.

5.18    **Surrender of License**. Following the Closing and in accordance with the timing and other requirements of applicable Law, Seller shall surrender all licenses, operating certificates and other Healthcare Regulatory Consents issued to it relating to the Business, except for those transferred to Purchaser pursuant to this Agreement.

5.19    **Removal of Certain Liens**. If any Liens other than Permitted Encumbrances encumber any Assets, and such lien is not terminated prior to the Closing Date, Seller shall terminate such lien on the Closing Date.

5.20    **Insurance**.  Neither Purchaser nor Seller shall have an obligation to purchase tail director and officer insurance coverage or tail professional liability insurance coverage.

5.21    **Final Cost Report.**  Seller shall file or cause to be filed on Seller's behalf, at Seller's sole cost, the final Cost Reports for the period prior to the Closing required to be filed with the Medicare or Medicaid programs or any other Third-Party Payor or Governmental Body as a result of the consummation of the contemplated transactions, including for any stub period prior to the Closing Date.  Any payments owed and paid to Seller for final settled Cost Reports for any periods prior to Closing are acknowledged as part of the Excluded Assets and are not conveyed to Purchaser by this Agreement.  All Cost Reports shall be prepared in accordance with applicable Law and consistent with past practices.

## ARTICLE VI
## CONDITIONS TO PURCHASER'S AND SELLER'S OBLIGATIONS

The obligations of each Party to consummate the transaction provided for in this Agreement shall be subject to the satisfaction of the following conditions on or before the Closing Date:

6.1    **Sale Order.**  The Bankruptcy Court shall have entered the Sale Order in the Bankruptcy Case in form and substance acceptable to the Purchaser in its sole and absolute discretion, and the Sale Order shall be a Final Order.

6.2    **No Injunctions.**   No injunction or restraining Order (whether temporary, preliminary or permanent) of any Governmental Authority shall exist against Purchaser or Seller that prevents the transactions contemplated hereby and approved in the Sale Order.  No other Governmental Authority shall have enacted, issued, promulgated, enforced, or entered any statute, rule, regulation, or non-appealable judgment which prohibits or renders illegal the consummation of the Closing or the transactions provided for herein and approved in the Sale Order.

6.3    **Compliance with Applicable Law**.  To the extent required by Law, the filing and waiting period requirements relating to any and all approvals necessary under the Healthcare Regulatory Consents and any other applicable Law, if necessary, relating to consummation of the Closing or the transactions provided for herein shall have been duly complied with and/or such approvals shall have been obtained.

6.4    **Consents**.  Purchaser shall have received (or shall have had transferred to it) those Healthcare Regulatory Consents and other Authorizations that Purchaser is required to apply for and/or obtain in order to operate the Business and the Other Business.

## ARTICLE VII
## CONDITIONS TO PURCHASER'S OBLIGATIONS

The obligations of Purchaser to consummate the transactions provided for in this Agreement shall be subject to the satisfaction of each of the following conditions on or before the Closing Date, subject to the right of Purchaser, in its sole discretion, to waive any one or more of the conditions set forth below:

37

7.1    **Representations and Warranties of Seller**.  The representations and warranties of Seller contained in this Agreement or in any other written instrument that Seller or any of its representatives delivers to Purchaser in connection with the Agreement shall be true and correct in all material respects on the Closing Date, except to the extent that any representation or warranty is made only as of a specified date, in which case the accuracy of such representation or warranty shall be measured as of such date, and except to the extent of changes permitted by the terms of this Agreement, and Purchaser shall have received a certificate of Seller to such effect signed by a duly authorized officer thereof.

7.2    **Schedules**.  All matters set forth on the Schedules shall be satisfactory to Purchaser in its sole discretion, and the matters set forth on the Schedules shall be true and correct in all material respects on the Closing Date, except to the extent of changes permitted by the terms of this Agreement, and Purchaser shall have received a certificate of Seller to such effect signed by a duly authorized officer thereof.

7.3    **Documents**.  Purchaser shall have received a signed copy of this Agreement with all Schedules and Exhibits attached, as updated through and including the Closing, together with copies of all other documents and certificates to be executed and delivered by Seller at Closing.

7.4    **Performance of Obligations**.  Seller shall have performed and complied in all material respects with all obligations and agreements required in this Agreement to be performed or complied with by it prior to the Closing Date.

7.5    **No Material Adverse Effect**.  Since the date of this Agreement, no Material Adverse Effect shall have occurred with respect to the Business or the Assets.

7.6    **Assumed Contracts**.  The Bankruptcy Court shall have approved and authorized the assignment and assumption of the Assumed Contracts.

7.7    **Release of Liens**.  All Liens on the Assets shall have been released, satisfied or otherwise removed or discharged pursuant to Bankruptcy Court order or otherwise, except for the Permitted Encumbrances.

7.8    **Consents**.  Purchaser shall have obtained (or shall have had transferred to it) all Healthcare Regulatory Consents and Authorizations to operate the Business and the Other Business, acquire any of the Assets, take assignment of the Assumed Contracts or complete the transactions contemplated hereunder.

7.9    **Intentionally Deleted.**

7.10    **No Disposition.**  Seller shall not have sold, transferred, or made any other disposition, directly or indirectly, of any portion of the Business or Other Business in connection with the closure, liquidation or winding up of the Business or Other Business, nor shall Seller have sought any relief from the Bankruptcy Court permitting it to do any of the foregoing.

7.11    **No Dismissal or Conversion**.  The Bankruptcy Case shall not have been dismissed or converted to a case under Chapter 7 of the Bankruptcy Code.

38

7.12    **Deliveries**.  Each of the deliveries required to be made to Purchaser pursuant to Section 2.17 shall have been so delivered and delivery by Seller to Purchaser of such other instruments, certificates, consents or other documents as are reasonably necessary or required to carry out the transactions contemplated by this Agreement or to comply with the terms hereof.

7.13    **Rural Health Designations.**  The Hospital shall remain in good standing and eligible for the exemption provided in 42 CFR section 412.22 to be reimbursed as a Critical Access Hospital under 42 CFR Part 485, Subpart F, and the RHCs shall remain in good standing and eligible to operate as rural health clinics pursuant to 42 CFR Part 491, Subpart A.

## ARTICLE VIII
## CONDITIONS TO SELLER'S OBLIGATIONS

The obligations of Seller to consummate the transactions provided for in this Agreement shall be subject to the satisfaction of each of the following conditions on or before the Closing Date, subject to the right of Seller, in its sole discretion to waive any one or more of the conditions set forth below:

8.1    **Representations and Warranties of Purchaser**.  The representations and warranties of Purchaser contained in this Agreement shall be true and correct in all material respects on the Closing Date, except to the extent that any representation or warranty is made as of a specified date, in which case such representation or warranty shall be true in all material respects as of such date, and except to the extent of changes permitted by the terms of this Agreement.

8.2    **Performance of this Agreement**.  Purchaser shall have materially performed or complied with all of the obligations to be performed or complied with by it under the terms of this Agreement on or prior to the Closing Date.  The Purchaser shall have delivered to the Seller a certificate signed by a duly authorized officer of the Purchaser, dated as of the Closing Date, to the foregoing effect.

8.3    **Payment of Purchase Price; Bill of Sale, Assignment and Assumption**.  Seller shall receive from Purchaser on the Closing Date the Purchase Price pursuant to Section 2.12 of this Agreement and the Bill of Sale, Assignment and Assumption duly executed by Purchaser.

8.4    **Documents**.  Seller shall have received a signed copy of this Agreement with all Schedules and Exhibits attached, as updated through and including the Closing and copies of all such other documents and certificates executed and delivered hereunder.

## ARTICLE IX
## SURVIVAL

9.1    **Survival**.  Sections 2.4, 2.7, 2.8, 2.9, 2.12, 2.15, 2.16, 2.20, 5.1, 5.5, 5.7, 5.8, 5.9, 5.12, 5.13, 5.14, 5.15, 5.16, 5.17, 5.18, 5.19, 5.20 and 5.21, this Section 9.1 and Article 11, and all defined terms used therein, shall survive the Closing, except to the extent (if at all) that such survival is expressly limited herein.  The representations and warranties of the Parties shall expire upon the consummation of the Closing.

## ARTICLE X
## LIMITED AGREEMENT TERMINATION RIGHTS

10.1    **Termination of Agreement**.  This Agreement and the transactions contemplated hereby may be terminated prior to the Closing Date only as follows:

(a)    by mutual written consent of Purchaser and Seller;

(b)    except as otherwise provided in this Agreement, by either Party if the Closing shall not have occurred on or before the Closing Date;

(c)    by Purchaser if any of the conditions to the obligations of Purchaser to close set forth in Article VII shall have become incapable of fulfillment other than because of a breach by Purchaser of any covenant or agreement contained in this Agreement and such condition is not waived by Purchaser;

(d)    by Purchaser if there shall be a material breach by Seller of the representations and warranties or of any covenant or agreement contained in this Agreement which breach cannot be or has not been cured within ten (10) Business Days after the giving of written notice by Purchaser to Seller of such breach;

(e)    by Seller if any of the conditions to the obligations of Seller to close set forth in Article VIII shall have become incapable of fulfillment other than as a result of a breach by Seller of any covenant or agreement contained in this Agreement and such condition is not waived by Seller;

(f)    by Seller if there is a material breach by Purchaser of the representations and warranties or of any covenant or agreement contained in this Agreement which breach cannot be or has not been cured within ten (10) Business Days after the giving of written notice by Seller to Purchaser of such breach;

(g)    by Seller or Purchaser if the Bankruptcy Court fails to approve this Agreement and enter the Sale Order by February 14, 2020; or

(h)    at the election of Purchaser or Seller if any action, suit or proceeding shall have been instituted and be continuing by or before any Governmental Authority with proper authority to restrain, modify or prohibit the carrying out of the transactions contemplated hereby, or if any court or Governmental Authority issues an order or takes any other action permanently restraining, enjoining or otherwise prohibiting the transactions contemplated under this Agreement and the agreements related hereto, and such court order or other action shall have become a Final Order.

10.2    **Procedure for Termination**.  If this Agreement is terminated by Purchaser or Seller, or both, pursuant to Section 10.1, written notice thereof shall forthwith be given to the other party, and upon the giving of such notice (or at such time as specified in the particular termination right set forth in Section 10.1) the transactions contemplated hereunder shall be abandoned and this Agreement shall terminate to the extent and with the effect provided in Section 10.3, without further action by the parties.

10.3    **Effects of Termination**.

(a)    If this Agreement is validly terminated as provided herein, then, except as provided for in this Section 10.3, each party shall be relieved of its duties and obligations arising under this Agreement after the date of such termination and such termination shall be without Liability to any party, except that nothing in this Agreement will relieve any party from liability for any willful breach of any representation, warranty, covenant or agreement set forth in this Agreement prior to such termination. The provisions of Sections 9.1 and 10.3 shall expressly survive the expiration or termination of this Agreement.  If this Agreement is terminated as provided herein, each party shall upon request redeliver or destroy as soon as practicable any or all documents, work papers and other material of the other party relating to its business or affairs or the transactions contemplated hereunder, whether obtained before or after the execution hereof, to the party furnishing the same, other than any material which is of public record.

(b)    In the event of termination of this Agreement pursuant to Sections 10.1(a), (b), (c), (d), (g), or Section 5.10, the Deposit shall be released to Purchaser.

(c)    In the event of termination of this Agreement by Seller pursuant to Section 10.1(f), the Deposit shall be released to Seller in full satisfaction of all damages incurred by Seller. Except for being allowed to keep the Deposit, Seller shall be entitled to no further direct or indirect or consequential damages, or otherwise.

(d)    In the event that the Sale Order is entered by the Bankruptcy Court, Purchaser shall be entitled to seek specific performance for a breach by Seller of its obligations hereunder.

**ARTICLE XI**
**MISCELLANEOUS**

11.1    **Assignment; Binding Agreement**.

(a)    Neither this Agreement nor any rights or obligations of a Party hereunder may be assigned or delegated without the other Party's prior written consent.  Any purported assignment or delegation without such consent shall be void; provided, however, Purchaser may assign any or all of its rights and obligations under this Agreement without the prior written consent of Seller if such assignment is to an Affiliate of Purchaser, to First Physicians Capital Group, Inc. ("FPCG") or an Affiliate of FPCG, an independent third party that has the financial backing of FPCG, or any successor to Purchaser or to Purchaser's lender if a sale/leaseback transaction is used to finance the transactions contemplated by this Agreement.

(b)    This Agreement shall be binding upon and shall inure to the benefit of and be enforceable by the Parties hereto and to their respective successors and permitted assigns. Nothing in this Agreement, express or implied, is intended to confer upon any other Person any rights, remedies, obligations, or Liabilities.

11.2    **Post-Closing Cooperation**.  From time to time after the Closing, Seller will execute and deliver, or cause to be executed and delivered, such documents to Purchaser as Purchaser shall reasonably request in order to consummate more effectively the transactions

contemplated by this Agreement, including, without limitation, the transfer of the Assets to Purchaser. From time to time after the Closing, Purchaser will execute and deliver, or cause to be executed and delivered, such documents to Seller as Seller shall reasonably request in order to consummate more effectively the transactions contemplated by this Agreement, including, without limitation, Purchaser's assumption of the Assumed Liabilities. From and after the Closing, Seller shall use its commercially reasonable efforts to deliver to Purchaser all such books, reports and other documents that constitute or relate to Assets (which may be redacted to the extent not relevant to the Assets) as may be requested by Purchaser which were not delivered on or before the Closing Date, and to assist the Purchaser in obtaining any Authorizations not obtained by Purchaser prior to the Closing.

11.3  **Expenses**.  Except as set forth in this Agreement, each Party shall pay the fees and expenses of its respective counsel, accountants, and other experts and shall pay all other expenses incurred by it in connection with the negotiation, preparation, and execution of this Agreement and the consummation of the transactions contemplated hereby.

11.4  **Entire Agreement and Modification**.  This Agreement, including any Exhibits and Schedules attached hereto and thereto and any other documents hereby required to be delivered at the Closing, and any confidentiality agreement previously executed by Seller and Purchaser or Purchaser's Affiliate, constitute the entire agreement between the Parties and supersede all prior discussions, negotiations, or agreements relating to the subject matter of this Agreement. No changes of, additions to, or other modifications of this Agreement shall be valid unless the same is in writing and signed by the Parties.

11.5  **Severability**.  If any provision of this Agreement shall be determined to be contrary to Law and unenforceable by any Court, the remaining provisions shall be severable and enforceable in accordance with their terms. To the extent any provision of this Agreement is enforceable in part but not in whole, such provision shall be enforced to the maximum extent permitted by applicable Law.

11.6  **Waiver**.  Any of the conditions to Closing set forth in this Agreement, except for those set forth in Article VI, may be waived at any time prior to or at the Closing hereunder by the Party entitled to the benefit thereof. Any such waiver shall only be effective if it is in writing and signed by the Party to be charged with such waiver. The failure of any Party hereto to enforce at any time any of the provisions of this Agreement shall in no way be construed to be a waiver of any other breach of such provision, nor in any way to affect the validity of this Agreement or any part hereof or the right of such Party thereafter to enforce each and every such provision. No waiver of any breach of or non-compliance with this Agreement shall be held to be a waiver of any other or subsequent breach or non-compliance.

11.7  **Counterparts**.  This Agreement may be executed in multiple counterparts, by the Parties hereto in separate counterparts, each of which when executed shall be deemed to be an original but all of which taken together shall constitute one and the same agreement. All signatures of the Parties to this Agreement may be transmitted by email or facsimile, and such email or facsimile of signature will, for all purposes, be deemed to be the original signature of such Party whose signature it reproduces and will be binding upon such Party.

42

11.8    **Headings; Interpretation**.  The table of contents and article and section headings contained in this Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

11.9    **Governing Law**.  This Agreement shall be construed and interpreted according to the Laws of the State of North Carolina, without regard to the application of the choice of law principles thereof.  All of the conveyance documents executed and delivered pursuant to the terms hereof shall be governed by and continued and interpreted according to the laws of the situs of the asset or assets conveyed by such documents, without regard to the application of the choice of law principles thereof.

11.10    **Bankruptcy Court Jurisdiction**.

(a)    Purchaser and Seller agree that the Bankruptcy Court shall have exclusive jurisdiction over all disputes, Claims, and other controversies (collectively, "Disputes") and other matters relating to (a) the interpretation and enforcement of this Agreement or any document executed pursuant hereto; (b) the Assets; (c) the Assumed Liabilities; and (d) any obligations surviving Closing, as long as the Bankruptcy Court reserves such jurisdiction, and Purchaser expressly consents to and agrees not to contest such exclusive jurisdiction.

(b)    The parties shall jointly request that the Bankruptcy Court reserve jurisdiction to consider Disputes arising under this Agreement even after the closing of the Bankruptcy Case.  To the extent allowed under existing and controlling law in the Fourth Circuit as of the Closing Date, the parties consent to the jurisdiction of the Bankruptcy Court to hear all such Disputes and to enter final orders with respect to all matters and issues raised therein.

11.11    **Notices**.  All notices, requests, demands and other communications hereunder shall be deemed to have been duly given if the same shall be in writing and shall be delivered or sent (a) by personal delivery against a receipted copy, (b) by certified mail, return receipt requested, or (c) by e-mail if the addressee confirms receipt of the e-mail, and addressed as set forth below:

If to Purchaser to:

Rural Wellness Fairfax, Inc.
Rural Wellness Fairfax, Inc.
C/O Hartzog Conger Cason
201 Robert S. Kerr Avenue, Suite 1600
Oklahoma City, Oklahoma 73102
ruralwellnessinc@gmail.com

Chris Kelly, Esq.
CKelly@hartzoglaw.com

With copies, which shall not constitute notice, to:

43

First Physicians Capital Group, Inc.
4323 NW 63rd Street
Oklahoma City, OK 73116
Attn: Adrian Reeder, CFO
areeder@fpcgok.com

Farrell Fritz, P.C.
400 RXR Plaza
Uniondale, NY 11556
Attn: Kristina M. Wesch, Esq.
kwesch@farrellfritz.com

If to Seller, to:

Thomas W. Waldrep, Jr.
Waldrep LLP
101 S. Stratford Rd., Suite 210
Winston-Salem, NC 27104
E-Mail: twaldrep@waldrepllp.com

With copies to:

James C. Lanik
Waldrep LLP
101 S. Stratford Rd., Suite 210
Winston-Salem, NC 27104
E-Mail: jclanik@waldrepllp.com

A Party may change the address to which notices hereunder are to be sent to it by giving notice of such change of address in the manner provided above.  Any notice delivered personally shall be deemed to have been given on the date it is so delivered, or upon attempted delivery if acceptance of delivery is refused.

11.12  **Effectiveness**.  This Agreement shall be effective only when duly signed by Purchaser and Seller in accordance with the order of the Bankruptcy Court approving the sale to Purchaser.

11.13  **No Third-Party Beneficiaries.** Nothing expressed or referred to in this Agreement will be construed to give any person other than the  Parties to this Agreement any legal or equitable right, remedy or claim under or with respect to this Agreement or any provision of this Agreement, except as such rights as shall inure to a successor or permitted assignee pursuant to this Agreement.

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the date first above written.

44

SELLER: Thomas W. Waldrep, Jr., as Chapter 11 Trustee for CAH Acquisition #12 d/b/a Fairfax Community Hospital

By:_____
Print Name: Thomas W. Waldrep, Jr.
Title: Trustee

PURCHASER: Rural Wellness Fairfax, Inc.

By:_____
Print Name: Elizabeth Pusey, M.D.
Title: President

45

## Schedules and Exhibits

| | |
|---|---|
| Schedule A | List of Excluded Assets |
| Schedule B | List of Other Business |
| Schedule C | List of Permitted Encumbrances |
| Schedule D | List of Real Property |
| Schedule E | List of Taxes and Assessments |
| Schedule 2.7 | Assumed Contracts |
| Schedule 3.7 | List of Debtor's Health Care Permits |
| Schedule 3.9(a) | Legal Description of Real Property |
| Schedule 3.9(d) | Real Estate Leases/Licenses |
| Schedule 3.14(b)(i) | Permits |
| Schedule 3.14(b)(ii) | Deficiencies |
| | |
| Exhibit A | Form of Deed |
| Exhibit B | Form of Bill of Sale, Assignment and Assumption |

## SCHEDULE A

### Excluded Assets

"Excluded Assets" means the following assets, properties, interests, and rights of Seller:

(a)     all Contracts of Seller that are not Assumed Contracts;

(b)     other than Purchase Deposits, all cash, securities, cash equivalents, investment accounts, notes or premium refunds or insurance proceeds;

(c)     any rights, Claims, counterclaims, third party Claims or causes of action of Seller against any Person and any actions under Chapter 5 of the Bankruptcy Code, including, without limitation, under sections 542, 544, 545, 547, 548, 549, 550, 551, 553 and 724(a) of the Bankruptcy Code;

(d)     all Actions and/or causes of actions that Seller has brought and/or may bring against any Person relating to any Excluded Asset and/or Excluded Liabilities, including, without limitation, all Actions and/or causes of action that Seller may bring against any current or former director, officer, employee or consultant;

(e)     all insurance policies and all rights to proceeds thereunder, including, without limitation, any director or officer insurance policies relating to any matter, event or circumstance occurring on or prior to the Closing Date, except as otherwise provided for in Section 5.10;

(f)     the residual rights in and proceeds of any employee benefits plans;

(g)     all Permits or other assets that are not transferable to Purchaser under applicable law;

(h)     all Contracts or other assets that require the consent of a third party in order to transfer such Contract or Asset to Purchaser, which consent has not been obtained as of the Closing Date;

(i)     all rights or documents relating to any Excluded Liability or other Excluded Asset;

(j)     any rights or remedies provided to Seller under this Agreement and applicable Law and each other document executed in connection with the Closing;

(k)     all rights relating to all applications for grants filed prior to the Effective Time, including all proceeds of grants awarded (including awards made and/or grant funds provided after the Closing);

(l)     any (i) personnel files for employees of Seller who are not hired by Purchaser; (ii) other books and records that Seller is required by Law to retain; provided, however, that except as prohibited by Law and subject to Article 5, Purchaser shall have the right, at Purchaser's sole expense, to receive or make copies of any portions of such retained books and records that relate to the Business and Other Business as conducted before the Closing or that relate to any of the Assets; (iii) documents which Seller is not permitted to transfer pursuant to any contractual obligation owed to any third party; (iv) documents primarily related to any

47

Excluded Assets; and (v) documents necessary to prepare tax returns (Purchaser shall be entitled to a copy of such documents referred to in this clause (v)).  With respect to documents necessary to prepare cost reports, which shall be specified in writing by the Purchaser, the Purchaser shall receive the original document (to the extent such original can reasonably be located by Seller) and Seller shall be entitled to retain a copy of such documents for any period ending on or prior to the Closing Date;

(m)     all of Debtor's deposits and other prepaid charges and expenses paid in connection with or relating to any Excluded Assets;

(n)     any assets disposed of or consumed in the Ordinary Course of Business (except any disposed of or consumed in breach of the provisions of this Agreement) during the period between the date hereof and the Closing Date;

(o)     Debtor's minute book and similar corporate records;

(p)     payments received from any Medicare Dependent Status claim made prior to the Closing Date;

(q)     any payments from, and all rights to payments that may become due from, Medicare or Medicaid programs based on adjustments to cost reports covering services prior to the Effective Time, including the Final Cost Reports;

(r)     any Privilege that relates to any Excluded Asset or any Excluded Liability; and

(s)     All funds with respect to the Debtors' self-funded (i) insurance, (ii) benefits, or (iii) similar programs.

## SCHEDULE  B

### Other Business

| *Property Name* | *Location* |
|---|---|
| Fairfax Rural Health Clinic | 40 Hospital Road<br>Fairfax, OK  74637 |
| The Pawnee Clinic | 533 6th Street<br>Pawnee, OK  74058 |

## SCHEDULE C

### Permitted Encumbrances

1.     "Permitted Encumbrances" means (a) any restrictions or regulations affecting the Property by virtue of any zoning, or other law or regulation of any governmental authority having jurisdiction over the same, whether now or hereafter in effect; (b) real estate taxes and assessments (both general and special) and utilities which are a lien as of the Closing Date but which are not yet due and payable; (c) Assumed Contracts; (d) matters that would be revealed by a current and accurate survey of the subject property; and (e) matters of title either approved or deemed approved by Buyer; provided, however, that Purchaser shall receive a credit towards the Purchase Price to the extent Purchaser satisfies amounts that are otherwise payable by Seller under Section 2.9.

## SCHEDULE D

## Real Property

| Address | Parcel No. |
|---|---|
| 40 Hospital Road<br>Fairfax, OK  74637 | 18-24-06-82549 |

# SCHEDULE E

## Taxes and Assessments

[To Be Determined]

**SCHEDULE 2.7**

**Assumed Contracts**

1. Medicare Provider Agreement.

**SCHEDULE 3.7**

**Debtor's Health Care Permits**

[To Be Determined]

**SCHEDULE 3.9(A)**

**Legal Description of Real Property**

A tract of land in the Northwest Quarter (NW/4) of Section Eighteen (18), Township Twenty-four (24) North, Range Six (6) East of the Indian Meridian, Osage County, State of Oklahoma, more particularly described as follows: Commencing at the Northwest comer of said NW/4, thence North 90°00'00" East along the North line of said NW/4 for a distance of 649.10 feet; thence South 00°00'00" East for a distance of 325.67 feet to the true point of beginning; thence North 90°00'00" East for a distance of 181.57 feet; thence North 32'10'40" East for a distance of 50.00 feet; thence South 71°37'45" East for a distance of 182.00 feet; thence South 56°39'27" East for a distance of 177.00 feet; thence North 90°00'00" East for a distance of 530.00 feet; thence South 00°09'33" West for a distance of 45.00 feet; thence North 90'00'00" West for a distance of 356.00 feet; thence South 17'03'00" West for a distance of 313.80 feet; thence North 90'00'00" West for a distance of 610.65 feet; thence North 00°00'00" East for a distance of 457.33 feet to the true point of beginning.

**SCHEDULE 3.9(D)**

**Real Estate Leases/Licenses**

## SCHEDULE 3.14(B)(I)

### Permits

## SCHEDULE 3.14(B)(II)

## Deficiencies

**EXHIBIT A**

**Form of Deed**

# EXHIBIT B

## Form of Bill of Sale, Assignment and Assumption